

FILED

OCT 24 2014

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

1  Thomas Benson
2  Marcella Benson
   736 North Golden Avenue
3  Lodi, California 95240
   (209) 263-5845
4  tluvesmj214@hotmail.com
   *Plaintiffs in proper person*
5

6          **UNITED STATES DISTRICT COURT**
           **EASTERN DISTRICT OF CALIFORNIA**
7                **SACRAMENTO DIVISION**

8  Thomas Benson; Marcella Benson,          Case No. **2:14 - CV   2 4 9 5 TLN KJN PS**

9
              Plaintiffs,
10
11      vs.

12  Ocwen Loan Servicing, LLC; Western       **COMPLAINT.**
    Progressive, LLC; Mortgage Electronic
13  Registration Systems, Inc.; and HSBC Bank USA,
    N.A., as Trustee on behalf of ACE Securities
14  Corp. Home Equity Loan Trust Series 2006-HE3,
15
16            Defendants.

17      Plaintiffs Thomas Benson and Marcella Benson ("Plaintiffs"), appearing *in proper person*,

18  hereby allege and complain as follows:

19                              **PARTIES**

20      1.      Plaintiffs are **Thomas Benson** and **Marcella Benson**, 736 North Golden Avenue, Lodi,

21  California 95240.  Defendants are **Ocwen Loan Servicing, LLC** ("Ocwen"), 1661 Worthington Road,

22  Suite 100, West Palm Beach, Florida 33409; **Western Progressive, LLC** ("Western"), 2002 Summit

23  Blvd., Suite 600, Atlanta, Georgia 30319; **Mortgage Electronic Registration Systems, Inc.**

24  ("MERS"), 1818 Library Street, Suite 300, Reston, Virginia 20190; and **HSBC Bank USA N.A. as**

25  **Trustee on behalf of ACE Securities Corp. Home Equity Loan Trust Series 2006-HE3** ("HSBC"),

26  8 East 40th Street, New York, New York 10016.

27                        **JURISDICTION and VENUE**

28      2.      Jurisdiction arises under Title 15 USC 1640 (Civil Liability); Title 12 CFR Part 226

                                        1

(also known as "Regulation Z" or "Truth in Lending Act"); Title 12 USC § 2601 et seq. (also known as "Regulation X" or "Real Estate Settlement Procedures Act"). This court also has authority to hear Federal Law.  This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (Federal Question) and § 1332 (Diversity of Citizenship) placing the District Court in the position of Jurisdiction over:

        (a)     Claims of Federal Questions concerning the Truth in Lending Act, hereinafter referred to as "TILA," and the Real Estate Settlement Procedures Act, hereinafter referred to as "RESPA;"

        (b)     Questions and claims of violation of Constitutionally-Protected Fundamental Rights;

        (c)     Violations of Plaintiffs' Common Law Rights in matters involving Federal Corporations and Interstate Commerce in the form of lending and banking;

        (d)     Violations of Plaintiffs' Rights codified pursuant to Interstate Law/Compact entitled the Uniform Commercial Code ("UCC" hereafter);

        (e)     A controversy which exceeds $75,000; and

        (f)     An action where the parties are citizens of different states.

3.    This court also has supplemental jurisdiction over all other claims that are so related to claims in this action that they form part of the same case or controversy under Article III of the United States Constitution, pursuant to 28 U.S.C. § 1367.

4.    Venue is properly laid in the Federal Court of the United States in the Judicial District of California, pursuant to 28 U.S.C. § 1391(c).

5.    Plaintiff avers that the court has *in personam* jurisdiction over the named Defendant(s) as Defendant(s) are subject to the Jurisdiction of this Federal Court by the following facts:

        (a)     Defendant(s) have entered into interstate commerce (Title 18 § 1241) by causing to be transmitted through the United States Mail mortgage statements containing false and misleading information concerning the alleged debt;

        (b)     Defendant(s) are subject to RESPA (Title 12 USC § 2601 et seq.) by acting as a mortgage loan servicer where no Defendant is the originator of the alleged debt, neither is any

Defendant a bona fide agent of the originator or subsequent true holder of the alleged debt;

(c)      Defendant(s) are subject to TILA (Title 12 CFR Part 226) by claiming a successive ownership interest in the alleged debt instruments.

## NATURE OF THE ACTION

6.      This case arises out of Defendants' fraudulent schemes involving intentional misrepresentation of various facts related to a "mortgage loan" and subsequent associated foreclosure proceedings.  Said "mortgage loan" was, in fact, a disguised securities transaction where the true parties and terms were never disclosed to the Plaintiffs.

7.      Plaintiffs have retained the services of forensic expert researchers Holmes & Galt LLC, who have discovered numerous improper elements inherent in the loan and in the acts of the Defendants, including false and/or flawed documents fabricated solely for the purpose of creating the appearance of authority where there is none, which documents were recorded in violation of state laws.  The Securitization Analysis & County Records Report ("Audit Report") is attached hereto as Exhibit "1," and the Affidavit of Selena Nieman ("Affidavit") of Holmes & Galt is attached as Exhibit "2."

8.      The participants in the scheme of selling mortgage loans as securities as described herein (a process hereinafter referred to as "securitization") have devised business plans to reap millions of dollars, as well as thousands of homes, in profits, illegally acquired at the expense of Plaintiff and other borrowers similarly situated.

9.      In addition to seeking compensatory, consequential and other damages stemming from a Wrongful Foreclosure, Misrepresentation, and the Unjust Enrichment of the Defendants, Plaintiffs seek an order cancelling all mortgage and foreclosure-related instruments; declaratory relief as to what (if any) party, entity or individual or group thereof is/was the owner of the Promissory Note executed at the time of the loan closing and whether the Mortgage secures any obligation of the Plaintiffs; and a Permanent Injunction prohibiting further foreclosure and/or eviction actions by the Defendants; or, in the alternative, a Final Judgment granting Plaintiffs Quiet Title in and to the subject property.

## FACTUAL BACKGROUND

10.      On or about February 1, 2006, Plaintiffs executed a Promissory Note and Deed of Trust

in relation to a loan, which documents named Encore Credit Corporation ("Encore") as the "lender," Mortgage Electronic Registration Systems, Inc. ("MERS") as the "nominee" beneficiary in place of the "lender," Fidelity National Title Insurance Company as "trustee," and Plaintiffs Thomas Benson and Marcella Benson as the "borrowers."   The subject Deed of Trust was recorded on or about February 9, 2006 in the official records of San Joaquin County, California; consequently, MERS designated itself as both "beneficiary" and "lienholder" in said records.  A copy of the said Deed of Trust is included in the Audit Report as Exhibit "B."

11.   On or about August 8, 2008, a "Notice of Default" was recorded in San Joaquin County, which instrument falsely states that Plaintiffs were "in default" with regard to the subject loan, and additionally falsely states that Defendant MERS is the "beneficiary" of the subject Deed of Trust. Said document is signed by Taryn Dewar, as Agent, Default Resolution Network a division of Fidelity National Title Company, Agent for the Beneficiary, By: Fidelity National Default Solutions, with a typewritten affixed date of August 7, 2008, and is not notarized.  A copy of the said Notice of Default is included in the Audit Report as Exhibit "E."

12.   On or about January 30, 2009, an "Assignment of Deed of Trust" was recorded in San Joaquin County, in which instrument MERS purported to "assign" all its rights, title and interest regarding the subject loan to HSBC Bank USA, N.A., as Trustee on behalf of Ace Securities Corp. Home Loan Trust and for the Registered Holders of Ace Securities Corp, Home Equity Loan Trust Series 2006-H3, Asset Backed Pass-through Certificates whose address in in care of Ocwen Loan Servicing, LLC. The said Assignment is signed by Scott Anderson, Vice President, Mortgage Electronic Registration Systems, Inc. Acting Solely as Nominee for Encore Credit Corp., with a typewritten date affixed of on September 05, 2008, and is notarized by Noemi Morales, commissioned Notary Public, State of Florida, County of Palm Beach with a typewritten date affixed of on September 05, 2008.  A copy of the said Assignment is included in the Audit Report as Exhibit "F."

13.   On or about January 30, 2009, a "Notice of Trustee's Sale" was recorded in San Joaquin County, which document states that the purported "beneficiary," Mortgage Electronic Registration Systems, Inc., under said Deed of Trust, recorded February 9, 2006 as Instrument No. 2006-032215, "will proceed to auction on a specified date, the property commonly known as, 736

North Golden Avenue, Lodi, California 95240, if the defaulted amount is not brought current." Said document is signed by Rozalyn Tudor, Authorized Signature, Fidelity National Title Insurance Company as Trustee, with a typewritten affixed date of January 22, 2009. Said document is not notarized. A copy of the said Notice of Trustee's Sale is included in the Audit Report as Exhibit "G."

14.    On or about April 22, 2014, a "Notice of Substitution of Trustee" was recorded in San Joaquin County, which states that "the undersigned, HSBC Bank USA, N.A., as Trustee on behalf of Ace Securities Corp. Home Equity Loan Trust and for the registered holders of Ace Securities Corp. Home Equity Loan Trust, Series 2006-HE3, Asset Backed Pass-Through Certificates, By Its Servicer Ocwen Loan servicing, LLC, is the present Beneficiary under that certain Deed of Trust dated 02/01/2006 and recorded on 02/09/2006 as Instrument No. 2006-032215 of official records of San Joaquin County, California, and does so substitute Western Progressive, LLC as Trustee." Said document is signed by Krystle D. Hernandez, Contract Management Coordinator, HSBC Bank USA, N.A., as Trustee on behalf of Ace Securities Corp. Home Equity Loan Trust and for the registered holders of Ace Securities Corp. Home Equity Loan Trust, Series 2006-HE3, Asset Backed Pass-Through Certificates, By Its Servicer Ocwen Loan servicing, LLC, with a handwritten date affixed of 4/16/2014. Said document is notarized by Kristin Frontera, commissioned Notary Public, State of Florida, County of Palm Beach, with a typewritten and handwritten date affixed of this 16th day of April, 2014. A copy of the Notice of Substitution of Trustee is included in the Audit Report as Exhibit "H."

15.    On or about May 1, 2014, a second "Notice of Default and Election to Sell under Deed of Trust" was recorded in San Joaquin County, which states "by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such Deed of Trust and all documents evidencing obligations secured thereby, and has declared and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby." Said document is signed by Tamika Y. Smith, Trustee Sale Assistant, Western Progressive, LLC, as agent for beneficiary, with a typewritten affixed date of April 29, 2014. Said document is not notarized. A copy of this second Notice of Default is included in the Audit Report as Exhibit "I."

16.     On or about May 12, 2014, Plaintiffs received a "Debt Validation Notice" from Defendant Western Progressive, LLC which contained the aforementioned "Notice of Default" recorded in May of 2014. A copy of the Debt Validation Notice is attached hereto as Exhibit "3."

17.     On or about September 13, 2014, in response to the above-referenced Debt Validation Notice, Plaintiffs submitted a Qualified Written Request ("QWR") to Western Progressive, LLC via Certified Mail. A copy of the QWR is attached hereto as Exhibit "4."

18.     During the period of September 30 to October 6, 2014, Plaintiffs received several responses to their QWR from directly from Ocwen, including (a) a general response letter dated September 30, 2014 (Exhibit "5"); (b) a Payment History dated September 30, 2014 (Exhibit "6"); and (c) a Payoff Quote dated October 3, 2014 (Exhibit "7").

19.     Plaintiffs seek to retain possession of their home and prove that there is fraud and/or illegality in the subject mortgage loan and associated foreclosure proceeding by the Defendants herein. Plaintiffs therefore file the instant Complaint and allege the following facts:

## GENERAL ALLEGATIONS

### A. Regarding MERS and the MERS "System"

20.     On February 9, 2006, the subject Deed of Trust was recorded in San Joaquin County, naming MERS as both "nominee" for the beneficiary, and as "beneficiary" of record. This recording resulted in MERS also designating itself as "lienholder" to the property secured by the loan.

21.     Plaintiffs allege that MERS is not a proper lienholder, as it did not loan any money to the Plaintiffs, was not owed any money by the Plaintiffs in the transaction, and had no right to foreclose in its own name if the loan was not paid.

22.     Plaintiffs additionally allege that MERS is not a proper "beneficiary" because the intent of the law is that the beneficiary named in a deed of trust be the same party who is owed the money and who has a legal right to foreclose upon the real property if the loan obligation is not paid.

23.     Plaintiffs assert that whenever MERS is listed as "beneficiary" or "lienholder" in the public property records, those records have become both inaccurate and unreliable, because (a) MERS is never the true beneficiary and is not a legal lienholder; and (b) it is impossible for a normal citizen to ascertain the identity of the true beneficiary/lienholder in the MERS database, as access is limited to

its "members" which are financial institutions that have participated in the securitization of mortgage loans.  This obfuscation of property records is clearly opposed to the intent of the Legislature when it created the Offices of the County Recorders and enacted the laws detailing their duties to keep property records <u>accurate</u> and <u>transparent</u> to the general public.

24.     Moreover, by naming itself as "beneficiary" in the property records, MERS concealed several transfers of the loan as it passed through the various entities in the securitization process (see the Audit Report for a detailed description of how this is done), as these changes of ownership would not be reflected in corresponding changes of ownership in the county records.  The result of these actions is that not only were millions of dollars in transfer taxes rightfully belonging to the counties illegally withheld by MERS, but also the purported "transfers" of ownership of the loan were defective in that the chain of transfers of the Deed of Trust did not follow the chain of transfers of the Note.

25.     MERS performed all of its improper and unlawful acts as a private company, with no special right or privilege to supersede state property laws, corrupt and/or conceal property ownership and transfer records, and evade taxes which any other citizen must pay each time an ownership interest in a mortgage is transferred.

26.     Because of the pattern of MERS and the method utilized in the MERS "system" of tracking mortgage loans, MERS has recorded false interests in property which constitute fraudulent liens.  Combined with the fact that MERS is not a legal beneficiary and cannot foreclose in its own name, MERS therefore has no right to transfer any interest in a mortgage loan which it does not legally possess, or those which it purports to possess through its fraudulent actions.

27.     As detailed in the attached Audit Report, MERS attempted to "assign" the beneficial interest in the subject Deed of Trust to Defendant HSBC Bank, N.A., purportedly acting as Trustee on behalf of ACE Securities Corp. Home Equity Loan Trust Series 2006-HE3 (hereinafter referred to as the "securitized trust") by way of an "Assignment of Deed of Trust" recorded on January 30, 2009.  However, this "Assignment of Deed of Trust" is void for several reasons:

(a)     MERS is not a legal beneficiary;

(b)     MERS is not a legal lienholder;

(c)     The role of "nominee" does not create an agency relationship with the lender;

(d)     MERS records false interests in property, in violation of state law;

(e)     MERS's false interests in property constitute fraudulent liens;

(f)     MERS's attempt to "assign" the beneficial interest of the subject Deed of Trust states that it is done "together with any and all notes" when, in fact, MERS has no interest at all in the subject Promissory Note, and any attempt to transfer only the Deed of Trust without a corresponding transfer of the associated Note is a legal nullity; and

(g)     MERS's "Assignment" directly to the securitized trust constitutes an attempt to perform an improper "A to D" transfer, bypassing several steps in the original chain of transfers which was required by both law and the securitized trust's own agreements.  In addition, the attempted transfer in 2009 was long past the June 27, 2006 "closing" date of the securitized trust under its tax-exempt REMIC status, and any act in contravention of the securitized trust agreements is void from its inception under the governing law (usually New York Trust Law).  Furthermore, the transfer of the subject loan was only attempted when the loan was claimed to be "in default" which also violated the securitized trust's prohibitions from receiving any non-performing loans.

28.     Plaintiffs therefore allege that the purported "Assignment" executed by MERS is void and assigned nothing, and that any reliance and/or representations of such "assignment" by MERS or the other Defendants are false.

**B. Securitization and Standing to Foreclose**

29.     Briefly, securitization is a process whereby multiple loans are "pooled" together and the payments from borrowers are paid out to investors who purchased "shares" of the pool.  The shares, called "certificates," are created at varying rates of risk and repayment, and are similar to bonds.  The pool of loans is held by a special-purpose vehicle, usually a trust (called the "securitized trust"), governed under the applicable state trust law, and typically claimed the tax-exempt status of a Real Estate Mortgage Investment Conduit or "REMIC."

30.     A securitized trust is formed under certain agreements that control the acts of the

1  parties and the payment streams of all funds into and through the trust.  Those agreements contain

2  strict rules and timelines within which the trust must operate, or be in jeopardy of (1) losing its tax-

3  exempt status; (2) being in violation of applicable law; and (3) breaching its agreements.

4      31.    One of the key foundations of the securitized trust which allows it to sell securities

5  created from a pool of loans is <u>the requirement that the trust possess both loan instruments, properly</u>

6  <u>endorsed, transferred and/or assigned, on or before the date that signals the start of business</u> (i.e., the

7  payment of the securities).  This date is commonly referred to as the "closing" date.

8      32.    Another key aspect of securitization is to protect the securitized trust from the possible

9  bankruptcy of the loan originator, in which case the asset, if transferred directly from the originator,

10  would be considered part of the estate of the bankruptcy and therefore could be deemed a "fraudulent

11  transfer."  To avoid this scenario, four entities are involved in three separate transactions which then

12  provide a "bankruptcy remote" protection of the assets transferred to the securitized trust so that it may

13  then offer its securities to investors.  The four entities in the securitization chain are: (1) the Originator,

14  referred to as the "lender" on the loan documents (but which "lender" rarely, if ever, provided the

15  funds to the borrower for the loan); (2) the "Sponsor" or "Seller" who purchases loans from the

16  originator and forms the pool of loans; (3) the "Depositor" who creates the securitized trust; and

17  finally (4) the Securitized Trust, also known as the "Issuing Entity" because it issues the certificates

18  purchased by the investors. (These parties are listed on page 17 of the Audit Report.)  Each transfer in

19  this chain must be a complete "true sale" of the loan.

20      33.    The Custodian of the securitized trust (in most instances, the trustee) is charged with

21  the duty of ensuring all loan instruments for all the loans in the pool have been received and are

22  properly endorsed and assigned to the trust.  The Custodian is required to execute a declaration to that

23  effect.

24      34.    Therefore, if a mortgage loan has been securitized, the Note and Deed of Trust (or

25  Mortgage) must show a complete, unbroken chain of transfers through the above securitization chain

26  of transfers FIRST, before any other party can claim "ownership" of either instrument, and certainly

27  before such party attempts to enforce the instruments.

28      35.    In the instant matter, the MERS "assignment" creates a "break" in the securitization

chain of transfers as it attempts an improper "A to D" type transfer. MERS never "assigned" the subject Deed of Trust to the sponsor as was required in the securitization agreements; therefore, the parties who are pursuing foreclosure against the Plaintiffs have completely, and illegally, bypassed this required chain of transfers.

36.     According to the Uniform Commercial Code ("U.C.C.") 3-203(b), a party may have possession of an instrument but not have the right to enforce as a "holder in due course" if fraud or illegality is involved.

37.     As mentioned earlier, MERS is not a legal "beneficiary" or "lienholder" as it records false interests in property which constitute fraudulent liens. MERS acts only as a "straw man beneficiary" in the public property records so that the parties to the securitization process could evade the payment of lawful transfer taxes while at the same time concealing the truth about who actually owns the loan.

38.     In the exhibits attached to this Complaint, Plaintiffs have submitted documented proof that the Defendants have bypassed the true chain of transfers in the securitization of the subject loan; consequently, Defendants' representations to the Plaintiffs regarding "ownership," "authority" or being "entitled to enforce" the loan instruments, all the while being knowledgeable about the broken chain of transfers, constitute fraud or illegality with respect to said instruments.

**C. Challenge to Standing of Alleged Principal**

39.     The enforcement/foreclosure proceeding against Plaintiffs is based on a claim that Plaintiffs Thomas Benson and Marcella Benson owe the debt obligation to the loan servicer, no matter what has transpired "behind the scenes." However, no Defendant herein has ever properly validated the debt, provided a proper accounting, or proven a true, unbroken chain of title free of clouds or defects.

40.     The document which purportedly gives rise to Defendant HSBC Bank's claim of interest in Plaintiffs' loan and property is the "Assignment of Deed of Trust" executed by MERS. However, as demonstrated herein, this attempt to "assign" a non-performing loan interest to the securitized trust over two years after the closing date, and bypassing several steps required in the chain of transfers, violates the trust's agreements and controlling law.

41.     Inasmuch as Defendants have demanded that Plaintiffs tender United States money to Defendants in payment of an alleged debt, Plaintiffs duly demand validation of said debt under applicable state and federal law.

42.     Further, where any Defendant has claimed agency for a principal, Plaintiffs demand that such Defendant prove that Defendant's alleged principal has standing as a proper holder in due course with rights of enforcement (as per U.C.C. 3-203(b)) of the alleged obligation.  Plaintiffs further demand express proof of Defendant's purported agency relationship with said principal.

43.     Therefore, where agency has been challenged, as it is here, the burden of proof has been properly shifted to the challenged party.

### D. Legal Arguments

44.     Plaintiff argues that no Defendant to this action is a legal owner of the subject mortgage loan because whatever interest it claims it "owns" was obtained in contravention of the terms and conditions of the securitized trust's Pooling and Servicing Agreement ("PSA") and other controlling documents, and occurred after the trust's closing date, again in violation of the trust's agreements.  In foreclosure, the foreclosing party must plead and prove as part of its prima facie case that it possesses an *ownership* interest in both the note and deed of trust, and therefore has the right to foreclose. A mere recital of assignment, holding or receipt of an asset is insufficient to transfer an asset.   The transferor must actually transfer the asset.

45.     In order to foreclose by sale, the entity demanding that the foreclosure sale be conducted must either own the indebtedness, or have an ownership interest in the indebtedness. Moreover, if the foreclosing entity is not the original beneficiary, a record of the chain of title must exist showing a proper and complete chain of assignments of the deed of trust.  In this instance, it is clear that Defendant HSBC was not the original beneficiary, and has only been "assigned" its interest in said Deed of Trust by way of a void "Assignment of Deed of Trust" executed and recorded by MERS, an entity which has no right to transfer any interest in any mortgage loan.

46.     Furthermore, even if the "Assignment" were valid on its face, the attempt to transfer the loan interest is void because it took place long after the closing date of the securitized trust, violating the terms of the trust under controlling law and its own agreements.   The attempted acquisition or

transfer of a mortgage past the closing date is not a mere technicality but a material violation of the trust's terms, which jeopardizes the trust's REMIC status and violates the applicable trust law, which clearly states that any act in contravention of the trust agreements is void *ab initio*, as if it never happened.

47.    Additionally, neither the Trustee, nor the Servicer, nor any Holders of the Certificates are permitted to endanger the status of the REMIC or cause any imposition of tax upon the REMIC. To do so would not only violate the REMIC rules, it would cause far-reaching financial liabilities upon all parties involved.  For example, since the securitized trust was organized as a REMIC, the investors received certain tax benefits on the income that passed through the trust to them.  Those benefits would be reversible and penalties would be imposed if the IRS discovered the impropriety of the acts of the securitized trust or its associated parties.

48.    Therefore, Plaintiffs assert that the entire enforcement and foreclosure of the subject mortgage loan by the Defendants herein is improper, wrongful, illegal and/or fraudulent and should be set aside, cancelled, reversed and/or expunged.

49.    Plaintiffs also argue that MERS' involvement in the matter raises additional questions as to the legitimacy of Defendants' claims of ownership interest in the subject real property. The security instrument (Deed of Trust) lists MERS as "nominee" for Encore Credit Corporation, its successors and assigns. "Nominee" means a "person designated to act in place of another, usually in a very limited way" or a "party who holds bare legal title for the benefit of others or who receives and distributes funds for the benefit of others."  Black's Law Dictionary, 1149 (Bryan Gamer ed. 2009). "Nominee" does not automatically create an "agency" relationship between MERS and Encore, and even if it did, Plaintiffs allege that such agency relationship is moot because Encore loaned no money to the Plaintiffs in the subject transaction.

50.    Moreover, the law does not permit MERS to assume the beneficial interest in the subject Deed of Trust.  The verbiage in the subject Deed of Trust states that MERS may, "as nominee for Lender and Lender's successors and assigns," exercise the interests **granted by the borrower**.  The clause **does not** state that MERS may assume **the note holder's right** to the security provided by the Deed of Trust.  In fact, the clause repeats, and thus emphasizes, that MERS is "solely" a nominee for

the party listed as "lender."

51.     Plaintiff alleges that MERS's authority as "nominee" is limited to only those powers that were specifically conferred to it and authorized by the party named as the "lender;" hence, since MERS is not even mentioned on the Promissory Note, MERS has no right to assign the underlying Note, and any claim that MERS "assigns" the Note (such as in the language of the "Assignment of Deed of Trust") was thus beyond MERS's authority as nominee or agent of the "lender."

52.     As shown herein, MERS has usurped state law by recording false interests in property, which false interests constitute fraudulent liens.  MERS can neither acquire nor transfer an interest in a mortgage loan through fraud or illegality.

53.     Plaintiffs allege that the subject Promissory Note was split from its associated Deed of Trust through the securitization of the subject loan.  The Note traveled a divergent path from the Deed of Trust by the use of the MERS "system" which results in MERS being listed as the unchanging "beneficiary" and "lienholder" of record in the County while concealing numerous transfers of the loan.  In fact, MERS seems to have been created specifically for this purpose.  As such, any attempted transfer of the Deed of Trust without an accompanying transfer of the Note is a nullity, void, and without any legal effect.  One legal ramification of this fact is that the holder of the Note has no security upon which it may foreclose if it has not also become the beneficiary of the Deed of Trust by way of a proper assignment.

54.     The Defendants to this action have fabricated false instruments for the sole purpose of creating the *appearance* of authority, which instruments they have filed in county records in violation of state laws.  Such fraudulent instruments should be expunged and title quieted of such "noise."

**CLAIMS FOR RELIEF**

**COUNT I: VIOLATIONS OF REAL ESTATE SETTLEMENT PROCEDURES ACT**

**Defendants Ocwen Loan Servicing, LLC and Western Progressive, LLC**

55.     Plaintiffs reaffirm and re-allege paragraphs 1-54 above as if specifically set forth more fully below.

56.     As mortgage servicer, Defendant Ocwen is subject to the provisions of the Real Estate Settlement Procedures Act ("RESPA"), 12 USC sec. 2601 et seq.  Defendant Western, who claims to

1  be "agent" of the "beneficiary" is similarly subject to RESPA.

2      57.    In violation of 12 USC sec. 2607 and in connection with the mortgage loan to Plaintiffs,

3  Defendants demanded and/or accepted charges for the rendering of real estate services which were, in

4  fact, charges other than for services actually performed.

5      58.    As a result of the Defendants' violations of RESPA, Defendants Ocwen and Western

6  are liable to Plaintiffs in an amount equal to three (3) times the amount of charges paid by Plaintiffs

7  for "settlement services" pursuant to 12 USC sec. 2607 (d)(2).

8              **COUNT II: VIOLATIONS OF FEDERAL TRUTH-IN-LENDING ACT**

9                                **Defendant Ocwen**

10     59.    Plaintiffs reaffirm and re-allege paragraphs 1-58 above as if specifically set forth more

11 fully below.

12     60.    Defendant Ocwen, as loan servicer, is liable for any failures to include and disclose

13 certain charges contrary to the disclosed finance charge(s) shown on the TIL statement, which charges

14 were imposed on Plaintiffs incident to the extension of credit to the Plaintiffs, and which were required

15 to be disclosed pursuant to 15 USC sec. 1605 and Regulation Z sec. 226.4, thus resulting in an

16 improper disclosure of finance charges in violation of 15 USC sec. 1601 et seq., and Regulation Z sec.

17 226.18(d).

18     61.    By calculating the annual percentage rate ("APR") based upon improperly calculated

19 and disclosed amounts, Defendant Ocwen is in violation of 15 USC sec. 1601 et seq., Regulation Z

20 sec. 226.18(c), 18(d), and 22.

21     62.    In addition, Defendant Ocwen has never disclosed the true nature of the actual

22 transaction which occurred once the loan originator acquired the signatures and personal financial

23 information from the Plaintiffs.  Plaintiffs have been kept in the dark about the fact that their payments

24 funded a disguised securities transaction, which never could have resulted in a "satisfaction of

25 mortgage" or clear conveyance of title had they paid the loan in full under the existing circumstances.

26 The loan documents were false in that they described a transaction which never occurred, and

27 concealed a transaction which did occur.  Even though none of the Defendants to this action is the

28 named "lender" on the loan documents, their attempts at enforcement and foreclosure of same creates

a liability upon them for the inaccuracy of the disclosures contained therein.

63.     Defendant's failure to provide the required disclosures provides Plaintiffs with the right to rescind the loan transaction.  Therefore, Plaintiffs, through this public Complaint which is intended to be construed for purposes of this claim as a formal Notice of Rescission, hereby elect to rescind the transaction.

## COUNT III: VIOLATION OF FAIR CREDIT REPORTING ACT

### Defendant Ocwen

64.     Plaintiffs reaffirm and re-allege paragraphs 1-63 above as if specifically set forth more fully below.

65.     At all times material, Defendant Ocwen qualified as a provider of information to the national Credit Reporting Agencies, including but not limited to Experian, Equifax, and TransUnion, as under the Federal Fair Credit Reporting Act.

66.     Defendant wrongfully, improperly, and illegally reported negative information as to the Plaintiffs to one or more Credit Reporting Agencies, resulting in Plaintiffs having negative information on their credit reports and the lowering of their FICO scores.

67.     The negative information included, but was not limited to, an excessive amount of debt through an unconscionable contract into which Plaintiffs were tricked and deceived into signing.

68.     Notwithstanding the above, Plaintiffs made full and timely payments from the time of the loan closing through the time of the discovery that the loan, the servicing thereof, and the resultant foreclosure proceeding, were all improper and unlawful.

69.     Pursuant to 15 USC sec. 1681(s)(2)(b), Plaintiffs are entitled to maintain a private cause of action against Defendant Ocwen for an award of damages in an amount to be proven at the time of trial for all violations of the Fair Credit Reporting Act which caused actual damages to Plaintiffs, including emotional distress and humiliation.

70.     Plaintiffs are further entitled to recover damages from Defendant Ocwen for negligent non-compliance with the Fair Credit Reporting Act pursuant to 15 USC sec. 1681(o).

71.     Plaintiffs are also entitled to an award of punitive damages against Defendant Ocwen for its willful non-compliance with the Fair Credit Reporting Act pursuant to 15 USC sec.

1681(n)(a)(2) in an amount to be proven at time of trial.

## COUNT IV: INTENTIONAL MISREPRESENTATION

### All Defendants

72.    Plaintiffs reaffirm and re-allege paragraphs 1-71 above as if specifically set forth more fully below.

73.    Each Defendant to this action has knowingly and intentionally concealed material information from Plaintiffs which was required by Federal Statutes and Regulations to be disclosed to the Plaintiffs at all stages of the process – before and at the "closing" of the loan; during the collection of the loan payments; prior to and during the foreclosure process; and in documents recorded in San Joaquin County concerning the subject loan and property.

74.    Defendants also intentionally misrepresented material information to the Plaintiffs with full knowledge by Defendants that their affirmative representations were false, fraudulent, and misrepresented the truth at the time said representations were made.

75.    Under the circumstances, the material omissions and material misrepresentations of the Defendants were malicious.

76.    Plaintiffs, not having the financial savvy of investment bankers, securities dealers, or mortgage lenders, reasonably relied upon the representations of the Defendants in every phase of the loan and subsequent collection and/or foreclosure process.

77.    Had Plaintiffs known of the falsity of Defendants' representations, Plaintiffs would not have (1) entered into the transaction the subject of this action; (2) continued to make payments under the mistaken belief that such payments would be properly applied toward "principal" and "interest" as represented; and (3) given their sensitive personal and financial information to any party for any reason other than what they were informed was a "plain vanilla" mortgage loan, when, in fact, nothing was further from the truth.

78.    As a direct and proximate cause of the Defendants' material omissions and material misrepresentations, Plaintiffs have suffered damages in an amount to be proven at trial.

/ / /

/ / /

## COUNT V: UNJUST ENRICHMENT

### All Defendants

79.  Plaintiffs reaffirm and re-allege paragraphs 1-78 above as if specifically set forth more fully below.

80.  Defendants had an implied agreement with the Plaintiffs to ensure that Plaintiffs understood all fees which would be paid to the Defendants to obtain credit on Plaintiffs' behalf and to not charge any fees which were not related to the settlement of the loan and without full disclosure to Plaintiffs.

81.  In addition, Defendants had an implied agreement and duty to ensure that any monies which were paid by Plaintiffs were not used or applied improperly, illegally, fraudulently, or in any way contrary to the representations made in the loan documents.

82.  Defendants cannot, in good conscience and equity, retain the benefits from their actions of charging a higher interest rate, fees, rebates, kickbacks, profits and gains stemming from acts including, but not limited to, resale of mortgages and notes using Plaintiffs' identity, credit score and reputation without consent, right, justification or excuse as part of an illegal enterprise scheme unrelated to the settlement services provided at closing.

83.  Defendants have all been unjustly enriched at the expense of the Plaintiffs, and maintenance of the enrichment would be contrary to the rules and principles of equity.

84.  Defendants have also been additionally enriched through the receipt of payments from third parties including but not limited to investors, insurers, other borrowers, the United States Department of the Treasury, and the United States Federal Reserve, stemming from false claims made which are based, at least in part, upon their false claims of "ownership" of the subject loan and the expectations of payments from the Plaintiffs made under false pretenses.

85.  Plaintiffs thus demand restitution from the Defendants in the form of actual damages, exemplary damages, costs and attorney's fees where applicable.

## COUNT VI: CIVIL CONSPIRACY

### All Defendants

86.  Plaintiffs reaffirm and re-allege paragraphs 1-85 above as if specifically set forth more

fully below.

87.     In connection with the application for and consummation of the mortgage loan which is the subject of this action, and the associated subsequent enforcement/foreclosure proceeding, Defendants agreed between and among themselves to engage in actions and a course of conduct designed to further an illegal act or accomplish a legal act by unlawful means, and to commit one or more overt acts in furtherance of the conspiracy to defraud the Plaintiffs.

88.     Defendants agreed between and among themselves to engage in the conspiracy to defraud, for the common purpose of accruing economic gains for themselves at the expense of, and detriment to, the Plaintiffs.

89.     The actions of the Defendants were committed intentionally, willfully, wantonly, and with reckless disregard for the rights and financial well-being of the Plaintiffs.

90.     As a direct and proximate result of the actions of the Defendants in combination resulting in violations and breaches of fiduciary duties, Plaintiffs have suffered damages.

91.     Plaintiffs thus demand an award of actual, compensatory, and punitive damages.

### COUNT VII: WRONGFUL FORECLOSURE

#### All Defendants

92.     Plaintiffs reaffirm and re-allege paragraphs 1-91 above as if specifically set forth more fully below.

93.     Defendants have conspired to foreclose and sell the Plaintiff's property by way of (1) false and legally void instruments recorded in San Joaquin County, including a "Notice of Default," a "Substitution of Trustee" and an "Assignment of Deed of Trust;" (2) false claims of "ownership" of the subject loan when, in fact, no Defendant herein legally owns the subject loan; and (3) an intentional attempt to bypass the chain of transfers required by law and the securitized trust's own agreements as part of a civil conspiracy to fabricate the *appearance* of authority to enforce the subject loan documents.

94.     None of the Defendants herein are or ever were properly authorized to initiate such foreclosure and sale, and in fact, Defendants have committed numerous violations by falsely representing, in recorded documents submitted to county officials, that they have such authority.

95.     Further, no true and correct accounting has ever been provided which takes into consideration all the monies received by the original creditors – the certificateholders issued by the securitized trust.  Such creditors received payments on their accounts through cross-collateralization, overcollateralization, credit default swaps, insurance guarantees, and government bailout monies, any or all of which have offset the Plaintiffs' indebtedness, but none of which has ever been reported by any Defendant, in violation of applicable state and federal laws.

96.     The actions of the Defendants were committed intentionally, willfully, wantonly, and with reckless disregard for the rights of the Plaintiffs.

97.     As a direct and proximate result of the actions of the Defendants in combination, resulting in a Wrongful Foreclosure proceeding, Plaintiffs have suffered damages, the amount of which will be proven at trial.

98.     Plaintiffs thus demand awards of actual, compensatory, and punitive damages.

99.     In addition, Plaintiffs request a Declaration by the instant Court that the foreclosure proceeding be cancelled and all related instruments be expunged from county records.

**COUNT VIII: CANCELLATION OF INSTRUMENTS:**

***PROMISSORY NOTE; DEED OF TRUST; NOTICE OF DEFAULT (2);***

***SUSBTITUTION OF TRUSTEE; ASSIGNMENT OF DEED OF TRUST***

**All Defendants**

100.    Plaintiffs reaffirm and re-allege paragraphs 1-99 above as if specifically set forth more fully below.

101.    As described herein, the subject Promissory Note, Deed of Trust, and the recorded Notice(s) of Default, Substitution of Trustee, and Assignment of Deed of Trust constitute false and/or fraudulent documents and/or recordings which contain fatal defects and material misrepresentations. In addition, for the reasons given herein, the Deed of Trust and Assignment of Deed of Trust, both of which name MERS as "beneficiary," are false interests recorded in real property which constitute fraudulent liens.

102.    If the false, legally void and wrongfully recorded instruments listed above are left outstanding, Plaintiffs will continue to suffer material, financial and emotional losses and damages.

Plaintiffs therefore seek cancellations of the following instruments:

(a)   **Promissory Note** executed February 1, 2006;

(b)   **Deed of Trust** executed February 1, 2006 and recorded February 9, 2006;

(c)   **Notice of Default** recorded August 8, 2008;

(d)   **Assignment of Deed of Trust** recorded January 30, 2009;

(e)   **Notice of Trustee's Sale** recorded January 30, 2009;

(f)   **Substitution of Trustee** recorded April 22, 2014; and

(g)   **Notice of Default** recorded May 1, 2014.

103.   Plaintiffs are informed and believe, and therefore allege, that Defendants acted wilfully and with a conscious disregard for Plaintiffs' rights and with a specific intent to defraud and injure Plaintiffs, by causing said instruments to be prepared and recorded without a factual or legal basis for doing so.

104.   By virtue of Defendants' wilful and wrongful conduct as herein alleged, Plaintiffs are entitled to general and special damages in an amount to be proven at trial, as well as punitive and exemplary damages as determined by this court.

## COUNT IX: COMPLAINT TO QUIET TITLE TO REAL PROPERTY

### All Defendants

105.   Plaintiffs reaffirm and re-allege paragraphs 1-104 above as if specifically set forth more fully below.

106.   No party Defendant to this action is now or ever was the "real party in interest" with respect to the subject mortgage loan as it pertains to the subject real property purportedly "secured" by the said loan, as no party ever legally acquired its purported interest by way of a lawful "true sale" from the investors who advanced funds to purchase asset-backed securities issued by the securitized trust. Yet, Defendants have unlawfully fabricated and recorded numerous instruments related to title of the subject property or transfers thereof solely for the purpose of making it appear as though they do possess such authority. Thus, Plaintiffs are entitled to quiet title against Defendants, clearing title of any and all such purported "encumbrances" to the subject property.

107.   Plaintiffs are ignorant of the true names and capacities of other interested parties, but

will amend this Complaint to allege their true names and capacities when ascertained or if otherwise necessary.

108.    Plaintiffs are informed and believe and thereon allege that, during all times herein mentioned, each of the Defendants sued herein acted as the agent and/or employee of each of the remaining Defendants, and was, at such times, acting within the purpose and scope of such agency and employment.

109.    Plaintiffs are informed and believe and thereupon allege that each of the Defendants currently claim, or might claim, an interest in the property adverse to Plaintiffs herein. However, as shown herein, the claim of said Defendants is without any right whatsoever, and said Defendants have no legal or equitable right, claim, or interest in said property.

110.    Plaintiffs allege that the existence of the true creditor, and that this creditor would be "repaid" in a manner far different than that which was stated in the loan documents, was never properly disclosed to them; nor has the true accounting for the manner in which Plaintiffs' payments were disbursed to the creditor-securitized trust ever been provided; nor has proof been given as to whether the monies advanced by the creditor-investors is now or ever was secured by the subject Deed of Trust (as the Note was originally separated from the Deed of Trust when MERS, having no interest in the Note, was designated as the "beneficiary" in a "nominee" capacity, ensuring that the chain of transfers of the Deed of Trust would be divergent from the chain of transfers of the associated Note – *exactly as intended by the Defendants*).  As such, it is impossible to do "equity" with any of the Defendants herein.

111.    Plaintiffs therefore seek a declaration that the title to the subject property is vested in Plaintiffs alone and that the Defendants herein, and each of them, be declared to have no estate, right, title or interest in the subject property and that said Defendants, and each of them, be forever enjoined from asserting any estate, right, title or interest in the subject property adverse to Plaintiffs herein.

112.    WHEREFORE, in this Count, Plaintiffs pray this Court will enter judgment against Defendants and each of them, as follows:

(a)     For an order compelling said Defendants, and each of them, to transfer or release legal title and all alleged encumbrances thereon and, if applicable, possession of the

subject property to Plaintiffs herein;

(b)     For a declaration and determination that Plaintiffs are the rightful holder of title to the property and that Defendants herein, and each of them, be declared to have no estate, right, title or interest in said property;

(c)     For a judgment forever enjoining said Defendants, and each of them, from claiming any estate, right, title or interest in the subject property;

(d)     For costs of suit herein incurred; and

(e)     For such other and further relief as the court may deem proper.

<u>**RELIEF SOUGHT**</u>

WHEREFORE, having set forth numerous legally sufficient causes of actions against the Defendants, Plaintiffs pray for the entry of Final Judgment against all Defendants jointly and severally in an amount not yet quantified but to be proven at trial, and such other amounts to be proven at trial, and for costs and attorney's fees where applicable; that the Court find that the transactions the subject of this action are illegal and are deemed void and that the Court order the cancellation of all applicable instruments; that the foreclosure proceeding which has been commenced be deemed and declared illegal and void, that all further proceedings in connection with the foreclosure be enjoined; and for any other and further relief which is just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs demand trial by jury of all matters so triable as a matter of right.


Respectfully submitted this 2-4 day of October, 2014.


Thomas Benson
736 North Golden Avenue
Lodi, California 95240
(209) 263-5845
tluvesmj214@hotmail.com
*Plaintiff in proper person*

Marcella Benson
736 North Golden Avenue
Lodi, California 95240
(209) 263-5845
tluvesmj214@hotmail.com
*Plaintiff in proper person*

**<u>VERIFICATION</u>**

I, Thomas Benson, am the Plaintiff in the above-entitled action. I have read the foregoing **Complaint** and know the contents thereof.  The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe them to be true.

*Thomas Benson*
Thomas Benson

STATE OF CALFORNIA            )
                             ) s.s.
COUNTY OF SAN JOAQUIN         )


This instrument was acknowledged before me on the _____ day of October, 2014, by Thomas Benson.

_____
(Signature of Notary)



(Notary Seal)

23

# CALIFORNIA ALL-PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

State of California

County of San Joaquin

On October 24, 2014 before me, Divyesh Patel, Notary Public ,

(Here insert name and title of the officer)

personally appeared Thomas Benson ,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature of Notary Public

(Notary Seal)

DIVYESH PATEL
COMM. #2070626
NOTARY PUBLIC - CALIFORNIA
SAN JOAQUIN COUNTY
My Comm. Expires July 4, 2018

---

## ADDITIONAL OPTIONAL INFORMATION

### DESCRIPTION OF THE ATTACHED DOCUMENT

Verification
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages _____ Document Date_____

_____
(Additional information)

### CAPACITY CLAIMED BY THE SIGNER

☐ Individual (s)
☐ Corporate Officer

_____
(Title)

☐ Partner(s)
☐ Attorney-in-Fact
☐ Trustee(s)
☐ Other _____

### INSTRUCTIONS FOR COMPLETING THIS FORM

*Any acknowledgment completed in California must contain verbiage exactly as appears above in the notary section or a separate acknowledgment form must be properly completed and attached to that document. The only exception is if a document is to be recorded outside of California. In such instances, any alternative acknowledgment verbiage as may be printed on such a document so long as the verbiage does not require the notary to do something that is illegal for a notary in California (i.e. certifying the authorized capacity of the signer). Please check the document carefully for proper notarial wording and attach this form if required.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document

1

2

## **VERIFICATION**

3      I, Marcella Benson, am the Plaintiff in the above-entitled action. I have read the foregoing

4  **Complaint** and know the contents thereof.  The same is true of my own knowledge, except as to those

5  matters which are therein alleged on information and belief, and as to those matters, I believe them to

6  be true.

7

8                                              Marcella Benson

9  STATE OF CALFORNIA            )

10                                ) s.s.
   COUNTY OF SAN JOAQUIN         )

11

12

13      This instrument was acknowledged before me on the _____ day of October, 2014, by

14  Marcella Benson.

15  _____

16  (Signature of Notary)

17

18                                          (Notary Seal)

19

20

21

22

23

24

25

26

27

28

# CALIFORNIA ALL-PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

State of California

County of San Joaquin

On October 24, 2014 before me, Divyesh Patel, Notary Public,

*(Here insert name and title of the officer)*

personally appeared Marcella Benson ,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature of Notary Public

DIVYESH PATEL
COMM. #2070626
NOTARY PUBLIC - CALIFORNIA
SAN JOAQUIN COUNTY
My Comm. Expires July 4, 2018

(Notary Seal)

---

## ADDITIONAL OPTIONAL INFORMATION

### DESCRIPTION OF THE ATTACHED DOCUMENT

Verification
*(Title or description of attached document)*

_____
*(Title or description of attached document continued)*

Number of Pages _____ Document Date_____

_____
*(Additional information)*

### CAPACITY CLAIMED BY THE SIGNER
☐ Individual (s)
☐ Corporate Officer

_____
*(Title)*
☐ Partner(s)
☐ Attorney-in-Fact
☐ Trustee(s)
☐ Other _____

### INSTRUCTIONS FOR COMPLETING THIS FORM
*Any acknowledgment completed in California must contain verbiage exactly as appears above in the notary section or a separate acknowledgment form must be properly completed and attached to that document. The only exception is if a document is to be recorded outside of California. In such instances, any alternative acknowledgment verbiage as may be printed on such a document so long as the verbiage does not require the notary to do something that is illegal for a notary in California (i.e. certifying the authorized capacity of the signer). Please check the document carefully for proper notarial wording and attach this form if required.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they,- is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document

# EXHIBIT "1"

# Securitization Analysis & County Records Report

## Thomas Benson

Disclosure: You have engaged Holmes & Galt, LLC to examine your real estate documents and report the findings in preparation for you, the homeowner, and your legal counsel. This information is not to be construed as legal advice or the practice of law or legal advice. Pursuant to Business and Professions Code 6125 et seq, it is the intent of Holmes & Galt, LLC, its members, analysts, and independent contractors, not to engage in activities that could be considered the practice of law by conduct exhibiting any of the following practices: "the performing of services in a court of justice in any matter depending therein throughout the various stages and in conformity with the adopted rules of procedure. It includes legal advice and counsel and the preparation of legal instruments and contracts by which the legal rights are secured although such matter may or may not be depending in a court."

Analyst: Selena Nieman
Date of Completion: 07/31/2014

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

# TABLE OF CONTENTS

Table of Contents ............................................................................................................... 2

Securitization..................................................................................................................... 4

Portfolio Lending and Whole Loans..................................................................................... 5

Securitized Lending............................................................................................................. 6

The Loan ............................................................................................................................ 8

The Note............................................................................................................................. 9

The Current Servicer .......................................................................................................... 9

The Original Lender ...........................................................................................................10

Agency Trusts ...................................................................................................................11

Section Conclusion:...........................................................................................................13

SEC Filings ........................................................................................................................14

The Trust...........................................................................................................................15

Governing Documents & Dates of the Trust ......................................................................16

A Comparison of the Prospectus & ABSNet........................................................................16

Transaction Participants » Prospectus...............................................................................17

Related Parties » ABSNet...................................................................................................19

Third Party » ABSNet .........................................................................................................19

The Certificates » Prospectus Cover ..................................................................................20

Capital Structure, The Groups » ABSNet ............................................................................21

The Mortgage Loans » Prospectus, Page S-2 & S-3.............................................................22

The Pools » ABSNet ...........................................................................................................23

The Pool Performance » ABSNet ........................................................................................23

The Tranches » ABSNet......................................................................................................24

Assignment of the Loans & True Sale » Prospectus S-159 ..................................................27

A True Sale .......................................................................................................................29

SECURITIZATION FLOW CHART ..........................................................................................31

    The Correct Process of Securitization.............................................................................31

*Copyright © 2012–Holmes & Galt LLC*     <u>www.holmesgalt.com</u>

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

The Common Shortcut Taken by the Lenders..................................................................31

Assignment ....................................................................................................................31

Standing .........................................................................................................................33

Beneficial Interest..........................................................................................................34

Beneficiary .....................................................................................................................34

The Servicers: .................................................................................................................35

The Deed of Trust..............................................................................................................37

Mortgage Electronic Registration System (MERS)..........................................................39

About MERS (from the MERS Website) ..........................................................................44

MOM Loans .....................................................................................................................47

FORECLOSURE & BANKRUPTCY .......................................................................................48

Chain of Endorsements & Chain of Title..........................................................................49

Section Conclusion:.........................................................................................................50

County Records...............................................................................................................51

Companies & Status.........................................................................................................51

Robosigning and Fraudulent or Misleading Documents ...................................................58

California Foreclosure Law & Case Law............................................................................70

Report Conclusion:..........................................................................................................71

Note ...............................................................................................................................71

Deed of Trust ..................................................................................................................72

MERS...............................................................................................................................72

County Records ...............................................................................................................73

These conclusions are supported by various legal rulings. ...............................................76

Documents & Exhibits: ....................................................................................................77

        Copyright © 2012–Holmes & Galt LLC        www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

SECURITIZATION

Securitization got its "start" when The Gramm-Leach-Bliley Act was introduced in 1999.  This act allowed banks to package and securitize loans on Wall Street.  The theory was that by involving Wall Street and its millions, more people could become homeowners and opportunities that hadn't existed for many would now help to build a thriving economy.

For many banking institutions and Wall Street Investors, the heyday of Securitization was both exciting times and caution-free times. There was money to be made in the trillions.  The banks prospered, Wall Street prospered, and the borrower, who had never been able to achieve the American Dream, was able to call himself a "homeowner".  It seemed that everybody was a winner.

For a number of years the process seemed to be working. American and Foreign markets were once again intertwined -similar to the market that existed prior to the Great Depression in fact.

There was, however, one problem that seemed to be ignored.  The process of Securitization eliminated caution for the Banker who had invested in that borrower at his local bank. He no longer needed to be certain that the borrower could repay the loan.  Risk, Responsibility, and Accountability were no longer of serious concern to the lender.  Why?

Because he was going to sell the loan that he gave to the borrower into a securitized Trust. Normally right after the borrower closed.  Further, he wasn't even lending his own money: That had been borrowed from Wall Street as well.  Mostly that banker only needed approximately a two-year accountability point with the borrower.  After that he was off the hook.

As can be expected, euphoric greed soon replaced logic, reason, morals and a precise application of the laws – specifically those pertaining to the Real Property, Contract, UCC, and the Securities and Exchange Commission they were all being – to a greater or lesser degree - "manipulated for the moment". In essence, many of those laws and regulations were ignored or read to mean a different thing – usually that "money making thing" that the bankers and investors so loved.

Ultimately, the process would collapse and it did.  By the early part of 2007, many borrowers had gone into foreclosure or were missing payments, loans could not be refinanced, property values were plummeting and the banks and investors were trying to determine who best to sue

   Copyright © 2012–Holmes & Galt LLC   www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

or blame.  The economy collapsed once again – probably a greater collapse than in the years of the depression, but statistics to confirm that have been skewed, thus it can be difficult to say.

Today, the banks, the investors, the US Government, and the borrowers are all still struggling to recover from the "process of securitization."


## PORTFOLIO LENDING AND WHOLE LOANS

It is important to understand what banking used to be to gain a better understanding of what it became.  In fact, during this era of banking, the banks and the FDIC were regulated under the Glass-Steagall Act, which was enacted in 1933.  Banks were prohibited from trading money in their safekeeping on Wall Street. Interestingly, a lot of this safer structure was developed as a part of the solutions to prevent another Great Depression, which was triggered by the fall of Wall Street in 1929. Besides ruining many thousands of individual investors, this crash in the value of assets greatly strained the banks and other financial institutions, particularly those holding stocks in their portfolios. Many banks were forced into insolvency; by 1933, 11,000 of the United States' 25,000 banks had failed.

Over the next four or five decades, Mortgage lending was very carefully done.  If you wanted a loan to buy a house, you would approach your bank.   The bank manager or loan officer would review your credit worthiness and stability.  They would assess the risk in lending to you.  If you were approved, that bank would loan you the money for your home.  You would then pay back that bank.  Your loan was not sold, it did not change hands, and your Deed or Mortgage was the collateral that the bank had in case you did not repay the loan.

This was known as whole loan lending or portfolio lending.  It was simple, but it was not always easy to get a loan.  The bank was putting its money at risk.  They wanted to know that there was a very good probability they would receive all payments due.   Foreclosures were not that common, and when a borrower was foreclosed upon the process was clear and concise.  The documents were factual.  The banker who had loaned the money was now claiming their collateral due to a default.  In short, there was a clear and concise chain of title, which had not been broken. This was "stuffy old banking at its best."

It often meant that a borrower was turned down.  But it also prevented the collapse of banking, the Mortgage industry, and the US and Foreign Economy.

Copyright © 2012 –Holmes & Galt LLC        www.holmesgalt.com

Many lenders today still carry a portion of their loans as whole loans and trade their own portfolios on the stock market.  However, this is not securitization and the borrower's loan has not been sold.

## Securitized Lending

The Glass-Steagall Act was repealed when the Gramm-Leach-Bliley Act was enacted.  That effectively was the end of "Main Street Mortgage Lending" as it had existed.

It was the new and exciting way to loan somebody else's money.

Trust Funds were created on Wall Street.  These were to be filled with Mortgage loans that would then provide a steady stream of income to Wall Street Investors who purchased certificates representing some share of the Trust Fund Mortgages, but not a particular Mortgage.  These certificates were not Mortgages, but they were bits and pieces of several Mortgages.

Mortgage Brokers would fund loans to erstwhile homeowners (often giving the unsuspecting borrower quite the story about how in a year or two the Mortgage broker could get him into a better loan, but for now, this (30-year, interest-only, 7%, $475,000 loan) would get him started.

The loans all had to be funded by a certain date (known as the cut-off date) in order to be placed into the Trust.  This process (coupled with the greed factor) allowed for rapid approval lines, and a rapidly declining underwriting process.  This Trust also had a closing date, which meant that if all the securitization steps were not completed within the closing date of the Trust, then that loan could not be securitized into that Trust.

The securitization steps required the following chain:

**Borrower >>> Original Lender >>> Sponsor/Seller >>> Depositor >>> Trust Fund**

The Sponsor/Seller Group was really more like the Purchaser for the Trust Fund and a Seller to the Trust Fund all in one.  Mortgage brokers and small lending institutions (often called warehouse lenders) were getting their loans closed as rapidly as they could and selling them off to the Sponsor/Seller.  The Sponsor/Seller was then reviewing all the paperwork to make sure

Copyright © 2012 –Holmes & Galt LLC     www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

he had everything the Trust required and was then selling them to the Depositor --best likened to a middle man.

The Depositor would review, confirm paperwork was in order and then sell to the Trustee, who could now issue certificates. Meanwhile on Wall Street, Investors were reviewing a prospectus that detailed all these loans, and they were lining up to buy certificates.  However the certificates could not be issued until the closing date of the Trust.

Things moved rapidly. Literally in the blink of an eye, thousands of loans were sold twice and placed into a Trust Fund, where they were no longer loans but grouped characteristics, which "fed" monthly payments in the form of Mortgage payments, to expenses of the Trust, insurance premiums the Trust Fund required and the certificate holders.

The Trusts were set up to be bankruptcy remote, in simplest terms – the goal was to make sure that he who had sold last had no legal liability that could come back to him.  They were also set up to provide tax exemption.  This complex area was part of the reason why three sales were required.  Moreover, these actions are the most critical points that have opened the doors to borrowers today.

As you read this report you will see where the process broke down.  The complete securitization process was subjected to a series of shortcuts and a lack of responsibility, accountability and true ownership that today clashes with property laws, various state civil codes, the UCC codes and an ever growing base of case law is supporting the clash.

In many ways, the banker has left himself "holding the bag."

*Copyright © 2012–Holmes & Galt LLC*      www.holmesgalt.com

## THE LOAN

**Borrower:** Thomas Benson and Marcella Benson, husband and wife as Joint Tenants

**Subject Property:** 736 North Golden Avenue, Lodi, CA  95240

**Current Servicer:** Unknown

**Current Loan Number:** Unknown

> "WHERE THE MORTGAGEE HAS 'TRANSFERRED' ONLY THE MORTGAGE, THE TRANSACTION IS A NULLITY AND HIS "ASSIGNEE" HAVING RECEIVED NO INTEREST IN THE UNDERLYING DEBT OR OBLIGATION, HAS A WORTHLESS PIECE OF PAPER."
>
> (4 RICHARD R. POWELL), POWELL ON REAL PROPERTY, § 37.27 [2] (2000)

**NOTE: A COPY OF THE NOTE WAS NOT AVAILABLE FOR REVIEW.**

### DEED OF TRUST

Original Deed of Trust Lender: Encore Credit Corporation

Original Loan Number: 319955

Loan Amount: $361,000.00

Maturity: March 1, 2036

Deed of Trust Nominee or Beneficiary: Mortgage Electronic Registration Systems, Inc.

Trustee: Fidelity National Title Insurance Company

MIN: 1001801-0000319955-9

Title Company:  Fidelity National Title

Date Recorded: February 9, 2006

Copyright © 2012–Holmes & Galt LLC        www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

## THE NOTE

A copy of the Note was not made available for review.  Below is what could be derived from the Deed of Trust.

On February 1, 2006, Thomas Benson and Marcella Benson, executed a negotiable promissory Note in the amount of $361,000.00 for 736 North Golden Avenue, Lodi, CA  95240.

- The Lender is Encore Credit Corp, A California Corporation.

**Signatures**

- A copy of the Note e was not available to review for signatures.

**Endorsements & Allonges**

- The Note was not available to review for Endorsements and/or Allonges.

## THE CURRENT SERVICER

- A Mortgage Statement was not available for review.

Copyright © 2012–Holmes & Galt LLC       www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

## THE ORIGINAL LENDER

*Encore Credit Corporation, funded this loan in 2006.*

### About the Bank

As of October 2007, Encore Credit Corporation has been acquired by Bear Stearns Residential Mortgage Corporation. Encore Credit Corporation operates as wholesale nonconforming lender. It funds loans. The company was founded in 2002 and is based in Irvine, California.

**Address:**  1833 Alton Parkway, Irvine, CA  92606

Encore Credit Corporation, was a correspondent lender originating loans that would (in the main) be sold and securitized.

**Current Status:**  Suspended



*Copyright © 2012-Holmes & Galt LLC*     www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

AGENCY TRUSTS

Fannie Mae & Freddie Mac are Agency Trusts

Agency Trusts are researched to determine if any are involved.

### A Search of the Fannie Mae Website – via the Loan Look Up

Fannie Mae Loan Lookup Results: No Match Found



It appears that Fannie Mae does not own your loan, based on the information you entered.

Thomas Benson
736 North Golden Avenue
Lodi, CA 95240
Last 4 Digits of Social Security Number
****

**The loan is not owned by Fannie Mae.**

### A Search of the Freddie Mac Website – via the Loan Look Up



Considering a Home
Rent or Buy

No. Our records show that Freddie Mac is not the owner of your mortgage.

**The loan is not owned by Freddie Mac.**

*Copyright © 2012–Holmes & Galt LLC*      www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

SECURITIZATION OF THE NOTE

*Using the ABSNet Financial Research Platform, research was conducted to locate the Note as of June 2014.  The Note was found in a non-agency Trust.*

| Loan ID | Original Loan Am... △ | Original Interest Rate | Loan Origination Date | Maturity Date | ZIP C... | St... | Deal Name | Bloomberg Name |
|---|---|---|---|---|---|---|---|---|
| 0111932411 | 361,000.00 | 12.790000 | 2/1/2006 | 3/1/2036 | 95240 | CA | ACE Securities Corp. Home Equity Loa... | ACE 2006-HE3 |

| PoolGroupId | MbaPmtsMissed12m | LoanOriginationDate | LoanPurpose | HistDelinqDaysMba |
|---|---|---|---|---|
| ACE06HE3-2 | 9 | 2/1/2006 | Cash-Out Refinance | 000000100001200010000011234555555555555555000000000000000000000000001101101112123455550001 23455555 |

| OriginalInterestRate | OriginalLoanBalance | MaturityDate | OriginalTerm | LoanId | PropertyState | PropertyZip | PropertyCity | CurrentLoanId | DaysInForeclosure | PeriodicRateCap |
|---|---|---|---|---|---|---|---|---|---|---|
| 12.7900 | 361,000.00 | 3/1/2036 | 360 | 0111932411 | CA | 95240 | LODI | 0111932411 | 334 | 1.0000 |

This screenshot shows the loan is in the Trust as loan #0111932411 with the original loan amount of $361,000.00, with a loan origination date of 02/01/2006 and a loan maturity date of 03/01/2036, in the zip code 95240, State of California.  The Deal Name is identified as ACE Securities Corp. Home Equity Loan Trust 2006-HE3.

Financial Exhibit A

*Copyright © 2012–Holmes & Galt LLC*     www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

SECTION CONCLUSION:

- The loan was originally funded by Encore Credit Corp, A California Corporation and then sold into a securitized Trust.  This loan is securitized.

- As of June 2014, the loan was found to be active in the ACE Securities Corp. Home Equity Loan Trust 2006-HE3.

- The Note is still active in the Trust and has not been modified by the lender.

- Due to a copy of the Note being available for review, the alleged chain of endorsements of the Note could not be verified as to if the Note was sold and transferred to the Sponsor/Seller, Depositor and the Trustee in the time frame allowed for by this Trust.

- Agency Trusts (Fannie Mae and Freddie Mac) are not involved with this loan.

   Copyright © 2012–Holmes & Galt LLC        www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

## SEC FILINGS

Publicly Traded Trust Funds and Companies are required by the Securities and Exchange Commission (SEC) to disclose.  There are various types of filings required such as annual reports and quarterly reports, known as 10k and 8k respectively.  In regards to the Trust, these filings disclose financial information, reporting status, profits and losses and so on.

There are also the filings that created and established the management and agreements between the parties involved in the Trust:  they include the 424B5, the PSA and/or the FWP. These are some of the critical documents that were used to establish the Trusts and the relationships and responsibilities of those involved in the Trust.

The complete history of filings and the full PSA are available here:

http://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001365337&owner=exclude&count=40&hidefilings=0

> Real Estate Mortgage Investment Conduit: From: http://financial-dictionary.thefreedictionary.com/REMIC
>
> REMIC: The most common type of Mortgage-backed security. A REMIC entitles the owner to a claim on the principal and interest payments on the particular Mortgages underpinning the security. REMICs pay an interest rate that is usually related to the interest rates the homeowners are paying on their Mortgages. The equivalent of the coupon on a Mortgage-backed security is a percentage of the interest and principal paid on the Mortgages backing the security. REMICs can take different legal forms: Trusts, partnerships, and assets without a legal status. They qualify for special tax treatment. REMICs were established by the Tax Reform Act of 1986.

One of the most significant documents of the Trust is the Pooling & Servicing Agreement (PSA), which is filed with the Securities & Exchange Commission (SEC). Sometimes the PSA will be incorporated into the 424B5 or the Free Writing Prospectus (FWP). The Prospectus Supplement and Prospectus are also commonly referred to and relied upon documents – they are best described as summary information about the Trust and refer to many of the documents and agreements used for the establishment and management of the Trust.  The Prospectus Supplement and Prospectus were provided to potential investors who were considering purchasing certificates from the Trust.

 Copyright © 2012–Holmes & Galt LLC     www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

*Mortgage Backed Security:*

*A type of asset-backed security that is secured by a Mortgage or collection of Mortgages. These securities must also be grouped in one of the top two ratings as determined by an accredited credit rating agency, and usually pay periodic payments that are similar to coupon payments.*

*http://www.investopedia.com/terms/m/mbs.asp#axzz1vu6evZN9*

## THE TRUST

Exhibit C – Prospectus

The Depositor will establish a trust with respect to the certificates  under the pooling and servicing agreement dated as of the Cut-off Date among the Depositor,  the Servicer, the Master Servicer, the Securities  Administrator and the Trustee. There are nineteen classes of certificates  representing the trust. SEE "DESCRIPTION OF THE CERTIFICATES" IN THIS PROSPECTUS SUPPLEMENT.

The certificates  represent in the  aggregate the entire  beneficial  ownership interest in the trust. In general,  distributions of interest and principal,  if applicable, on the Offered Certificates will be made only from payments received in connection with the mortgage loans,  payments made by the Swap Provider under the interest rate swap agreement and payments made by the Cap Provider under the cap agreements.

Copyright © 2012–Holmes & Galt LLC      www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

## GOVERNING DOCUMENTS & DATES OF THE TRUST

*These were the two dates that the Trust identified for all business to be conducted and completed by:*

- Loans that were to be sold to the Trust had to have been originated before the **Cut-Off Date: June 1, 2006**

- All documentation, interim sales, filings and recordings had to be completed and to the Trustee or custodian by the **Closing Date: On or about June 27, 2006**

## A COMPARISON OF THE PROSPECTUS & ABSNET

*In the following pages, information about the Trust and its regulations has been excerpted from the Prospectus Supplement and Prospectus that was obtained via ABSNet or the secinfo.com website.*

*This Prospectus Supplement and Prospectus does not include the **Pooling and Servicing Agreement**, however the full Pooling and Servicing Agreement can be obtained from the link to the SEC website provided above.*

*Below many of the Prospectus excerpts will be screen shots from the Securities & Exchange Commission - EDGAR, helping to illustrate the information from the Prospectus as well as provide the "Current Day" information.*

> *According to U.C.C. section 3-309, a missing Note—without more—does not prohibit enforcement of the Note in question.[42] However, "[e]nforcement of [the] Note always requires that the [financial institution] seeking to collect show that it is the holder. A holder is an entity that has acquired the Note either as the original payor or transfer[43] by endorsement of order paper or physical possession of bearer paper."[44] So, while a financial entity does not need to produce the Note, in order to enforce a Note through a Mortgage foreclosure, a financial institution which was not the original lender must establish that it (1) acquired the Note through Assignment or (2) show physical possession of the Note.[45]*
>
> *Temple Law Review – page 259 (volume 83)*
> http://www.temple.edu/law/tlawrev/content/issues/83.1/83.1_Greenberg.pdf*

   Copyright © 2012–Holmes & Galt LLC    www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

## TRANSACTION PARTICIPANTS » PROSPECTUS
From the Prospectus Page S-1 & S-2

| | |
|---|---|
| Depositor............................. | ACE Securities Corp., a Delaware corporation. SEE "THE DEPOSITOR" IN THIS PROSPECTUS SUPPLEMENT. |
| Originators........................... | Encore Credit Corp., a California corporation, with respect to approximately 30.51% of the mortgage loans, Aegis Mortgage Corporation, a Delaware corporation, with respect to approximately 19.10% of the mortgage loans and First NLC Financial Services, LLC, a Florida limited liability company, with respect to approximately 11.25% of the mortgage loans, in each case, by aggregate principal balance as of the Cut-off Date. The remainder of the mortgage loans were originated by various originators, none of which have originated 10% or more of the mortgage loans. SEE "THE ORIGINATORS" IN THIS PROSPECTUS SUPPLEMENT. |
| Sponsor............................... | DB Structured Products, Inc., a Delaware corporation. SEE "THE SPONSOR" IN THIS PROSPECTUS SUPPLEMENT. |
| Master Servicer...................... | Wells Fargo Bank, National Association, a national banking association. SEE "THE SECURITIES ADMINISTRATOR, THE MASTER SERVICER AND THE CUSTODIANS" IN THIS PROSPECTUS SUPPLEMENT. |
| Servicer.............................. | Ocwen Loan Servicing, LLC, a Delaware limited liability company. SEE "SERVICING OF THE MORTGAGE LOANS" IN THIS PROSPECTUS SUPPLEMENT. |
| Trustee............................... | HSBC Bank USA, National Association, a national banking association, will be the trustee of the trust and the supplemental interest trust. SEE "THE TRUSTEE" IN THIS PROSPECTUS SUPPLEMENT. |

Copyright © 2012–Holmes & Galt LLC          www.holmesgalt.com

Securities Administrator............       Wells   Fargo   Bank,   National
Association. SEE "THE  SECURITIES
ADMINISTRATOR,  THE MASTER SERVICER
AND   THE   CUSTODIANS"   IN   THIS
PROSPECTUS SUPPLEMENT.

S-1

<PAGE>

Custodians.........................       Wells   Fargo   Bank,   National
Association  and  Deutsche  Bank
National  Trust  Company. SEE "THE
SECURITIES     ADMINISTRATOR,     THE
MASTER SERVICER AND THE CUSTODIANS"
IN THIS PROSPECTUS SUPPLEMENT.

Distribution Dates.................       Distributions   on   the   Offered
Certificates  will  be  made on the
25th day of each month, or, if that
day is not a business day,  on the
next   succeeding   business   day,
beginning in July 2006. The assumed
final Distribution  Date  for  the
Offered   Certificates   is   the
Distribution Date in June 2036.

Credit Risk Manager................       Clayton Fixed Income  Services Inc.
(formerly  known as The  Murrayhill
Company).   SEE  "THE  CREDIT  RISK
MANAGER"    IN    THIS    PROSPECTUS
SUPPLEMENT.

Swap Provider......................       Deutsche  Bank AG New York  Branch.
See    "THE    INTEREST    RATE    SWAP
AGREEMENT AND THE SWAP PROVIDER" IN
THIS PROSPECTUS SUPPLEMENT.

Cap Provider.......................       Deutsche  Bank AG New York  Branch.
See "THE CAP AGREEMENTS AND THE CAP
PROVIDER"   IN   THIS   PROSPECTUS
SUPPLEMENT.

*Copyright © 2012 –Holmes & Galt LLC*        <u>www.holmesgalt.com</u>

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

## RELATED PARTIES » ABSNET

Financial Exhibit B

This screenshot reveals the participants in the Trust that match to that which is listed in the Prospectus and reported to the SEC.

ACE Securities Corp. Home Equity Loan Trust 2006-HE3  ▬  Hide Deal Details

| ABSNet Deal ID: | 37810 | Region: | United States |
|---|---|---|---|
| Asset Class/Collateral Type: | RMBS/Subprime | Issuer: | Ace Securities Corporation |
| Deal Size: | 1,094,776,100 | Underwriter: | Deutsche Bank |
| Remittance Frequency: | Monthly | Trustee: | HSBC |
| Bloomberg Name: | ACE 2006-HE3 | Servicer: | Ocwen |

## THIRD PARTY » ABSNET

Financial Exhibit B-1

Third Party Summary for ACE Securities Corp. Home Equity Loan Trust 2006-HE3     Go to Snapshot

| Name | Role | S&P | | | Moody's | | | Fitch | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Long Term | Short Term | Watch | Long Term | Short Term | Watch | Long Term | Short Term | Watch |
| Ace Securities Corporation | Issuer | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Deutsche Bank | Underwriter | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| HSBC | Trustee | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Wells Fargo | Master Servicer | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Ocwen | Servicer | -- | -- | -- | -- | -- | -- | -- | -- | -- |

*Copyright © 2012–Holmes & Galt LLC*          www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

## THE CERTIFICATES » PROSPECTUS COVER

OFFERED CERTIFICATES The trust created for the Series 2006-HE3 certificates will
hold a pool of first and second lien, fixed-rate and adjustable-rate, one- to
four-family, residential mortgage loans. The trust will issue sixteen classes of
Offered Certificates.  You can find a list of these classes, together with their
initial certificate principal balances and pass-through rates, in the table
below.  Credit enhancement for all of the Offered Certificates will be provided
in the form of excess interest, overcollateralization, subordination and an
interest rate swap agreement.  In addition, the Offered Certificates may benefit
from a series of interest rate cap payments pursuant to two separate cap
agreements which are intended partially to mitigate interest rate risk.

<TABLE>
<CAPTION>

| CLASS | INITIAL CERTIFICATE PRINCIPAL BALANCE(1) | PASS-THROUGH RATE | ASSUMED FINAL MATURITY DATE |
|-------|------------------------------------------|-------------------|------------------------------|
| <S> | <C> | <C> | <C> |
| A-1.......... | $  585,651,000 | One-Month LIBOR + 0.14% (2)(3) | June 25, 2036 |
| A-2A......... | $  141,956,000 | One-Month LIBOR + 0.05% (2)(3) | June 25, 2036 |
| A-2B......... | $   54,743,000 | One-Month LIBOR + 0.09% (2)(3) | June 25, 2036 |
| A-2C......... | $   49,482,000 | One-Month LIBOR + 0.15% (2)(3) | June 25, 2036 |
| A-2D......... | $   24,704,000 | One-Month LIBOR + 0.24% (2)(3) | June 25, 2036 |
| M-1.......... | $   44,845,000 | One-Month LIBOR + 0.29% (2)(3) | June 25, 2036 |
| M-2.......... | $   37,983,000 | One-Month LIBOR + 0.30% (2)(3) | June 25, 2036 |
| M-3.......... | $   28,725,000 | One-Month LIBOR + 0.35% (2)(3) | June 25, 2036 |
| M-4.......... | $   20,740,000 | One-Month LIBOR + 0.39% (2)(3) | June 25, 2036 |
| M-5.......... | $   20,740,000 | One-Month LIBOR + 0.61% (2)(3) | June 25, 2036 |
| M-6.......... | $   18,499,000 | One-Month LIBOR + 0.46% (2)(3) | June 25, 2036 |
| M-7.......... | $   17,958,000 | One-Month LIBOR + 0.95% (2)(3) | June 25, 2036 |
| M-8.......... | $   15,696,000 | One-Month LIBOR + 1.15% (2)(3) | June 25, 2036 |
| M-9.......... | $   12,893,000 | One-Month LIBOR + 2.00% (2)(3) | June 25, 2036 |
| M-10......... | $    9,530,000 | One-Month LIBOR + 2.50% (2)(3) | June 25, 2036 |
| M-11......... | $   10,651,000 | One-Month LIBOR + 2.50% (2)(3) | June 25, 2036 |

*Copyright © 2012–Holmes & Galt LLC*     www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

CAPITAL STRUCTURE, THE GROUPS » ABSNET
Financial Exhibit C

This screenshot provides information regarding the Capital Structure of the Trust for each Group.

| Capital Structure | | | | | | | | Ratings and Prices are the most recent values received and independent of reporting period. | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Name | Currency | ID | Pools | Class Bal - Original | Class Bal - End | Class Factor | Coupon % - Current | Subordination % - Original | Subordination % - Current | S&P | Moody's | Fitch | DBRS | Price |
| A-1 | USD | 00441TAA1 | Group 1,Group 2 | 585,651,000 | 151,447,979 | .258596 | 0.290% | 21.250% | 0.000% | CCC | Caa3 | NR | -- | |
| A-2A | USD | 00441TAB9 | Group 3,Group 4 | 141,956,000 | -- | -- | -- | 21.250% | -- | NR | Aaa | NR | -- | |
| A-2B | USD | 00441TAC7 | Group 3,Group 4 | 54,743,000 | 2,021,076 | .036919 | 0.240% | 21.250% | 0.000% | CCC | Ca | NR | -- | |
| A-2C | USD | 00441TAD5 | Group 3,Group 4 | 49,482,000 | 41,888,798 | .846546 | 0.300% | 21.250% | 0.000% | CCC | Ca | NR | -- | |
| A-2D | USD | 00441TAE3 | Group 3,Group 4 | 24,704,000 | 20,913,077 | .846546 | 0.390% | 21.250% | 0.000% | CCC | Ca | NR | -- | |
| M-1 | USD | 00441TAF0 | Total Group | 44,845,000 | -- | -- | -- | 17.250% | -- | D | C | NR | -- | |
| M-2 | USD | 00441TAG8 | Total Group | 37,983,000 | -- | -- | -- | 13.862% | -- | D | C | NR | -- | |
| M-3 | USD | 00441TAH6 | Total Group | 28,725,000 | -- | -- | -- | 11.300% | -- | D | C | NR | -- | |
| M-4 | USD | 00441TAJ2 | Total Group | 20,740,000 | -- | -- | -- | 9.450% | -- | D | WR | NR | -- | |
| M-5 | USD | 00441TAK9 | Total Group | 20,740,000 | -- | -- | -- | 7.600% | -- | D | WR | NR | -- | |
| M-6 | USD | 00441TAL7 | Total Group | 18,499,000 | -- | -- | -- | 5.950% | -- | D | WR | NR | -- | |
| M-7 | USD | 00441TAM5 | Total Group | 17,938,000 | -- | -- | -- | 4.350% | -- | D | C | NR | -- | |
| M-8 | USD | 00441TAN3 | Total Group | 15,896,000 | -- | -- | -- | 2.950% | -- | D | C | NR | -- | |
| M-9 | USD | 00441TAP8 | Total Group | 12,893,000 | -- | -- | -- | 1.800% | -- | D | C | NR | -- | |
| M-10 | USD | 00441TAQ6 | Total Group | 9,530,000 | -- | -- | -- | 0.950% | -- | NR | C | NR | -- | |
| M-11 | USD | 00441TAR4 | Total Group | 10,851,000 | -- | -- | -- | 0.000% | -- | NR | C | NR | -- | |
| CE | USD | -- | Total Group | 26,345,233 | 0 | -- | 0.000% | -- | -- | NR | NR | NR | -- | |
| P | USD | -- | Total Group | 100 | 100 | -- | 0.000% | 0.000% | 0.000% | NR | NR | NR | -- | |
| R | USD | -- | Total Group | 0 | -- | -- | 0.000% | -- | -- | NR | NR | NR | -- | |

        Copyright © 2012–Holmes & Galt LLC        www.holmesgalt.com

## THE MORTGAGE LOANS » PROSPECTUS, PAGE S-2 & S-3

This shows the types of loans that were to be placed into the Trust, and how they were to be grouped.  Each group of loans that was created would pay classes of certificates that were assigned to it.

References to percentages of the mortgage loans under this section are calculated based on the aggregate  principal balance of the mortgage loans as of the Cut-off Date.

The trust will contain 6,294 conventional, one- to four-family, first and second lien, fixed-rate and adjustable-rate  mortgage loans on residential real properties (the "Mortgage Loans").

For purposes of calculating  interest and principal  distributions  on the Class A-1  Certificates  and the Class  A-2A,  Class  A-2B,  Class A-2C and Class A-2D Certificates (collectively,  the "Class A-2 Certificates"; and together with the Class A-1  Certificates,  the "Class A  Certificates"),  the Mortgage Loans have been divided into two loan groups,  designated  as the "Group I Mortgage  Loans" and the "Group II Mortgage  Loans." The Group I Mortgage  Loans consist of first and

S-2

<PAGE>

second lien,  fixed-rate  and  adjustable-rate  mortgage  loans with  principal balances at origination that conformed to Freddie Mac loan limits.  The Group II Mortgage Loans consist of first and second lien,  fixed-rate and adjustable-rate mortgage loans with principal  balances at origination  that may or may not have conformed to Freddie Mac loan limits.

     Copyright © 2012 –Holmes & Galt LLC     www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

## The Pools » ABSNet
Financial Exhibit C-1

The Pools are what make up the Groups of the Trust.  Each Pool can have many loans listed and the loans can be listed in more than one Pool.  This loan is located in Pool Group 2.

**Pools**

| Group 1 | Pool Bal - End | WAC - Net | WARM | WALA | CPR - Current | CDR - Current | 30 Day Delq Bal % | 60 Day Delq Bal % | 90 Day Delq Bal % | BK Bal % | FCL Bal % | | REO Bal % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25-Jun-14 | 34,251,846 | 4.621% | 262 | -- | 9.738% | 13.641% | 5.598% | 0.564% | 1.612% | 1.545% | 4.623% | | 2.571% |
| 25-May-14 | 34,604,164 | 4.680% | 263 | -- | 20.382% | 2.419% | 6.674% | 1.446% | 0.511% | 1.531% | 5.093% | | 3.078% |
| 25-Apr-14 | 35,324,838 | 4.681% | 264 | -- | 8.365% | 7.984% | 7.600% | 0.501% | 0.927% | 1.176% | 6.302% | | 2.977% |

| Group 2 | Pool Bal - End | WAC - Net | WARM | WALA | CPR - Current | CDR - Current | 30 Day Delq Bal % | 60 Day Delq Bal % | 90 Day Delq Bal % | BK Bal % | FCL Bal % | | REO Bal % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25-Jun-14 | 104,413,868 | 3.689% | 281 | -- | 6.281% | 3.772% | 7.494% | 1.444% | 0.252% | 4.255% | 9.702% | | 3.066% |
| 25-May-14 | 105,131,406 | 3.706% | 282 | -- | 11.757% | 4.267% | 6.803% | 0.893% | 0.917% | 4.360% | 10.698% | | 3.220% |
| 25-Apr-14 | 106,384,527 | 3.745% | 283 | -- | 7.178% | 4.916% | 7.076% | 1.476% | 1.566% | 4.600% | 11.779% | | 3.365% |

| Group 3 | Pool Bal - End | WAC - Net | WARM | WALA | CPR - Current | CDR - Current | 30 Day Delq Bal % | 60 Day Delq Bal % | 90 Day Delq Bal % | BK Bal % | FCL Bal % | | REO Bal % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25-Jun-14 | 14,310,390 | 5.362% | 258 | -- | 0.258% | 0.000% | 14.139% | 1.020% | 7.107% | 4.415% | 1.377% | | 4.490% |
| 25-May-14 | 14,339,099 | 5.372% | 260 | -- | -1.059% | 1.082% | 7.310% | 7.092% | 1.654% | 4.414% | 1.375% | | 4.481% |
| 25-Apr-14 | 14,352,098 | 5.327% | 261 | -- | 6.305% | 4.994% | 15.645% | 1.652% | 0.327% | 4.414% | 1.373% | | 4.477% |

| Group 4 | Pool Bal - End | WAC - Net | WARM | WALA | CPR - Current | CDR - Current | 30 Day Delq Bal % | 60 Day Delq Bal % | 90 Day Delq Bal % | BK Bal % | FCL Bal % | | REO Bal % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25-Jun-14 | 44,247,109 | 3.270% | 277 | -- | 24.155% | 11.018% | 5.086% | 2.531% | 1.152% | 4.417% | 8.861% | | 0.915% |
| 25-May-14 | 45,349,097 | 3.262% | 278 | -- | -0.631% | 0.000% | 6.359% | 1.367% | 0.470% | 4.314% | 8.247% | | 1.774% |
| 25-Apr-14 | 45,397,262 | 3.305% | 279 | -- | 0.218% | 0.000% | 8.035% | 0.796% | 1.462% | 3.992% | 8.728% | | 1.204% |

| Total Group | Pool Bal - End | WAC - Net | WARM | WALA | CPR - Current | CDR - Current | 30 Day Delq Bal % | 60 Day Delq Bal % | 90 Day Delq Bal % | BK Bal % | FCL Bal % | | REO Bal % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25-Jun-14 | 197,223,213 | 3.876% | 275 | -- | 10.836% | 8.962% | 7.106% | 1.504% | 1.187% | 3.833% | 8.027% | | 2.601% |
| 25-May-14 | 199,423,767 | 3.892% | 276 | -- | 9.839% | 2.769% | 6.716% | 1.543% | 0.796% | 3.862% | 8.482% | | 2.957% |
| 25-Apr-14 | 201,468,520 | 3.923% | 277 | -- | 5.807% | 4.387% | 7.995% | 1.158% | 1.342% | 3.864% | 9.390% | | 2.889% |

## The Pool Performance » ABSNet
Financial Exhibit C-2

This screenshot shows the overall calculated performance of the Pool Groups of the Trust.  This loan is in Pool Group 2.

**Pool Performance Data**

| Name | Currency | Pool Bal - Original | Pool Bal - End | WAC - Net | WARM | WALA | CPR - Current | CDR - Current | 30 Day Delq Bal % | 60 Day Delq Bal % | 90 Day Delq Bal % | BK Bal % | FCL Bal % | REO Bal % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Group 1 | USD | 129,597,401 | 34,251,846 | 4.621% | 262 | -- | 9.738% | 13.641% | 5.598% | 0.564% | 1.612% | 1.545% | 4.623% | 2.571% |
| Group 2 | USD | 636,961,761 | 104,413,868 | 3.689% | 281 | -- | 6.281% | 3.772% | 7.494% | 1.444% | 0.252% | 4.255% | 9.702% | 3.066% |
| Group 3 | USD | 64,460,182 | 14,310,390 | 5.362% | 259 | -- | 0.258% | 0.000% | 14.139% | 1.020% | 7.107% | 4.415% | 1.377% | 4.490% |
| Group 4 | USD | 290,101,988 | 44,247,109 | 3.270% | 277 | -- | 24.155% | 11.018% | 5.086% | 2.531% | 1.152% | 4.417% | 8.861% | 0.915% |
| Total Group | USD | 1,121,121,333 | 197,223,213 | 3.876% | 275 | -- | 10.836% | 8.962% | 7.106% | 1.504% | 1.187% | 3.833% | 8.027% | 2.601% |

*Copyright © 2012 Holmes & Galt LLC*   <u>www.holmesgalt.com</u>

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

## THE TRANCHES » ABSNet
Financial Exhibit C-3

A Tranche, according to Investopedia, is a "term often used to describe a specific class of bonds within an offering wherein each tranche offers varying degrees of risk to the investor."  The Tranche that a specific loan is in can no longer be identified.  This can be pursued and identified during legal discovery.

**Tranches**

| A-1 | Class Bal - End | Class Factor | Coupon % - Current | Subordination % - Current | S&P | Moody's | Fitch | DBRS |
|---|---|---|---|---|---|---|---|---|
| 25-Jun-14 | 151,447,979 | .268598 | 0.290% | 0.000% | CCC | Caa3 | NR | -- |
| 25-May-14 | 152,304,988 | .260061 | 0.292% | 0.000% | CCC | Caa3 | NR | -- |
| 25-Apr-14 | 153,744,253 | .262519 | 0.294% | 0.000% | CCC | Caa3 | NR | -- |
| **A-2A** | Class Bal - End | Class Factor | Coupon % - Current | Subordination % - Current | S&P | Moody's | Fitch | DBRS |
| 25-Jun-14 | -- | -- | -- | -- | NR | Aaa | NR | -- |
| 25-May-14 | -- | -- | -- | -- | NR | Aaa | NR | -- |
| 25-Apr-14 | -- | -- | -- | -- | NR | Aaa | NR | -- |
| **A-2B** | Class Bal - End | Class Factor | Coupon % - Current | Subordination % - Current | S&P | Moody's | Fitch | DBRS |
| 25-Jun-14 | 2,021,076 | .036919 | 0.240% | 0.000% | CCC | Ca | NR | -- |
| 25-May-14 | 2,066,965 | .037794 | 0.242% | 0.000% | CCC | Ca | NR | -- |
| 25-Apr-14 | 2,069,579 | .037805 | 0.244% | 0.000% | CCC | Ca | NR | -- |
| **A-2C** | Class Bal - End | Class Factor | Coupon % - Current | Subordination % - Current | S&P | Moody's | Fitch | DBRS |
| 25-Jun-14 | 41,888,798 | .846546 | 0.300% | 0.000% | CCC | Ca | NR | -- |
| 25-May-14 | 42,881,353 | .866805 | 0.302% | 0.000% | CCC | Ca | NR | -- |
| 25-Apr-14 | 42,894,075 | .866882 | 0.304% | 0.000% | CCC | Ca | NR | -- |
| **A-2D** | Class Bal - End | Class Factor | Coupon % - Current | Subordination % - Current | S&P | Moody's | Fitch | DBRS |
| 25-Jun-14 | 20,913,077 | .846546 | 0.390% | 0.000% | CCC | Ca | NR | -- |
| 25-May-14 | 21,408,012 | .866605 | 0.392% | 0.000% | CCC | Ca | NR | -- |
| 25-Apr-14 | 21,414,964 | .866882 | 0.394% | 0.000% | CCC | Ca | NR | -- |
| **M-1** | Class Bal - End | Class Factor | Coupon % - Current | Subordination % - Current | S&P | Moody's | Fitch | DBRS |
| 25-Jun-14 | -- | -- | -- | -- | D | C | NR | -- |
| 25-May-14 | -- | -- | -- | -- | D | C | NR | -- |
| 25-Apr-14 | -- | -- | -- | -- | D | C | NR | -- |
| **M-2** | Class Bal - End | Class Factor | Coupon % - Current | Subordination % - Current | S&P | Moody's | Fitch | DBRS |
| 25-Jun-14 | -- | -- | -- | -- | D | C | NR | -- |
| 25-May-14 | -- | -- | -- | -- | D | C | NR | -- |
| 25-Apr-14 | -- | -- | -- | -- | D | C | NR | -- |
| **M-3** | Class Bal - End | Class Factor | Coupon % - Current | Subordination % - Current | S&P | Moody's | Fitch | DBRS |
| 25-Jun-14 | -- | -- | -- | -- | D | C | NR | -- |
| 25-May-14 | -- | -- | -- | -- | D | C | NR | -- |
| 25-Apr-14 | -- | -- | -- | -- | D | C | NR | -- |

Copyright © 2012–Holmes & Galt LLC       www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

| M-4 | Class Bal - End | Class Factor | Coupon % - Current | Subordination % - Current | S&P | Moody's | Fitch | DBRS |
|---|---|---|---|---|---|---|---|---|
| 25-Jun-14 | -- | -- | -- | -- | D | WR | NR | -- |
| 25-May-14 | | | | | D | WR | NR | |
| 25-Apr-14 | | | | | D | WR | NR | -- |
| **M-5** | Class Bal - End | Class Factor | Coupon % - Current | Subordination % - Current | S&P | Moody's | Fitch | DBRS |
| 25-Jun-14 | -- | -- | -- | -- | D | WR | NR | -- |
| 25-May-14 | | | | | D | WR | NR | |
| 25-Apr-14 | -- | -- | -- | -- | D | WR | NR | |
| **M-6** | Class Bal - End | Class Factor | Coupon % - Current | Subordination % - Current | S&P | Moody's | Fitch | DBRS |
| 25-Jun-14 | -- | -- | -- | -- | D | WR | NR | -- |
| 25-May-14 | -- | -- | -- | -- | D | WR | NR | |
| 25-Apr-14 | -- | -- | -- | -- | D | WR | NR | -- |
| **M-7** | Class Bal - End | Class Factor | Coupon % - Current | Subordination % - Current | S&P | Moody's | Fitch | DBRS |
| 25-Jun-14 | -- | -- | -- | -- | D | C | NR | -- |
| 25-May-14 | -- | -- | -- | -- | D | C | NR | |
| 25-Apr-14 | -- | -- | -- | -- | D | C | NR | -- |
| **M-8** | Class Bal - End | Class Factor | Coupon % - Current | Subordination % - Current | S&P | Moody's | Fitch | DBRS |
| 25-Jun-14 | -- | -- | -- | -- | D | C | NR | -- |
| 25-May-14 | -- | -- | -- | -- | D | C | NR | -- |
| 25-Apr-14 | -- | -- | -- | -- | D | C | NR | -- |
| **M-9** | Class Bal - End | Class Factor | Coupon % - Current | Subordination % - Current | S&P | Moody's | Fitch | DBRS |
| 25-Jun-14 | -- | -- | -- | -- | D | C | NR | -- |
| 25-May-14 | -- | -- | -- | -- | D | C | NR | -- |
| 25-Apr-14 | -- | -- | -- | -- | D | C | NR | -- |
| **M-10** | Class Bal - End | Class Factor | Coupon % - Current | Subordination % - Current | S&P | Moody's | Fitch | DBRS |
| 25-Jun-14 | -- | -- | -- | -- | NR | C | NR | -- |
| 25-May-14 | -- | -- | -- | -- | NR | C | NR | -- |
| 25-Apr-14 | -- | -- | -- | -- | NR | C | NR | -- |
| **M-11** | Class Bal - End | Class Factor | Coupon % - Current | Subordination % - Current | S&P | Moody's | Fitch | DBRS |
| 25-Jun-14 | -- | -- | -- | -- | NR | C | NR | -- |
| 25-May-14 | -- | -- | -- | -- | NR | C | NR | -- |
| 25-Apr-14 | -- | -- | -- | -- | NR | C | NR | -- |

     Copyright © 2012-Holmes & Galt LLC      www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

| CE | Class Bal - End | Class Factor | Coupon % - Current | Subordination % - Current | S&P | Moody's | Fitch | DBRS |
|---|---|---|---|---|---|---|---|---|
| 25-Jun-14 | 0 | -- | 0.000% | -- | NR | NR | NR | -- |
| 25-May-14 | 0 | -- | 0.000% | -- | NR | NR | NR | -- |
| 25-Apr-14 | 0 | -- | 0.000% | -- | NR | NR | NR | -- |
| **P** | **Class Bal - End** | **Class Factor** | **Coupon % - Current** | **Subordination % - Current** | **S&P** | **Moody's** | **Fitch** | **DBRS** |
| 25-Jun-14 | 100 | -- | 0.000% | 0.000% | NR | NR | NR | -- |
| 25-May-14 | 100 | -- | 0.000% | 0.000% | NR | NR | NR | -- |
| 25-Apr-14 | 100 | -- | 0.000% | 0.000% | NR | NR | NR | -- |
| **R** | **Class Bal - End** | **Class Factor** | **Coupon % - Current** | **Subordination % - Current** | **S&P** | **Moody's** | **Fitch** | **DBRS** |
| 25-Jun-14 | 0 | -- | 0.000% | -- | NR | NR | NR | -- |
| 25-May-14 | 0 | -- | 0.000% | -- | NR | NR | NR | -- |
| 25-Apr-14 | 0 | -- | 0.000% | -- | NR | NR | NR | -- |

    Copyright © 2012–Holmes & Galt LLC    www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

---

*The U.C.C. and the Assignment Process*

*In one of the first articles dealing with how the securitization process created significant standing issues in foreclosure cases, the authors focused primarily on the Uniform Commercial Code (U.C.C.) and how it applies in this situation.[41] As the U.C.C. has been adopted in some fashion by every state,[41] the U.C.C. analysis is important to a multi-state analysis of the standing debate. According to U.C.C. section 3-309, a missing Note—without more—does not prohibit enforcement of the Note in question.[42] However, "[e]nforcement of [the] Note always requires that the [financial institution] seeking to collect show that it is the holder. A holder is an entity that has acquired the Note either as the original payor or transferee[43] by endorsement of order paper or physical possession of bearer paper."[44] So, while a financial entity does not need to produce the Note, in order to enforce a Note through a Mortgage foreclosure, a financial institution which was not the original lender must establish that it (1) acquired the Note through Assignment or (2) show physical possession of the Note.[45]*

---

## ASSIGNMENT OF THE LOANS & TRUE SALE » PROSPECTUS S-159

On the Closing Date, the Depositor will transfer to the trust all of its right, title and interest in and to each Mortgage Loan, the related mortgage note, mortgage, assignment of mortgage in recordable form in blank and other related documents (collectively, the "Related Documents"), including all scheduled payments with respect to each such Mortgage Loan due after the Cut-off Date. The Trustee, concurrently with such transfer, will deliver the certificates to the Depositor. Each Mortgage Loan transferred to the trust will be identified on a schedule (the "Mortgage Loan Schedule") delivered to the Trustee and the Servicer pursuant to the Pooling and Servicing Agreement. The Mortgage Loan Schedule will include information such as the principal balance of each Mortgage Loan as of the Cut-off Date, its Mortgage Rate as well as other information with respect to each Mortgage Loan.

The Pooling and Servicing Agreement will require that, prior to the Closing Date, the Depositor will deliver or cause to be delivered to the Trustee (or the applicable Custodian, as the Trustee's agent for such purpose) the mortgage notes endorsed in blank and the Related Documents. In lieu of delivery of original mortgages or mortgage notes, if such original is not available or lost, the Depositor may deliver or cause to be delivered true and correct copies thereof, or, with respect to a lost mortgage note, a lost note affidavit. The assignments of mortgage are generally required to be recorded by or on behalf of the Depositor in the appropriate offices for real property records, except (i) in states as to which an opinion of counsel is delivered to the effect that such recording is not required to protect the Trustee's interest in the Mortgage Loan against the claim of any subsequent transferee or any successor to or creditor of the Depositor or the Sponsor, or (ii) with respect to any Mortgage Loan electronically registered through the Mortgage Electronic Registration Systems, Inc.

   Copyright © 2012-Holmes & Galt LLC     www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

On or prior to the Closing Date, the Trustee or the applicable Custodian on its behalf will review the Mortgage Loans and the Related Documents pursuant to the related Custodial Agreement and, if any Mortgage Loan or Related Document is found to be defective in any material respect and such defect is not cured within 90 days following notification thereof to the Sponsor by the Trustee or the Servicer, the Sponsor will be obligated either to (i) substitute for such Mortgage Loan a Qualified Substitute Mortgage Loan; however, such substitution is permitted only within two years of the Closing Date and may not be made unless an opinion of counsel is provided to the effect that such substitution will not disqualify any of the REMICs (as defined in the Pooling and Servicing Agreement) as a REMIC or result in a prohibited transaction tax under the Code; or (ii) purchase such Mortgage Loan at a price (the "Purchase Price") equal to the outstanding principal balance of such Mortgage Loan as of the date of purchase, plus all accrued and unpaid interest thereon, computed at the Mortgage Rate through the end of the calendar month in which the purchase is effected, plus the amount of any unpaid Servicing Fees or unreimbursed P&I Advances and servicing advances made by the Servicer plus all unreimbursed costs and damages incurred by the trust and the Trustee in connection with any violation by any such Mortgage Loan of any predatory or abusive lending law. The Purchase Price will be required to be remitted to the Servicer for deposit in the Collection Account (as defined herein) for remittance to the Securities Administrator prior to the next succeeding Distribution Date after such obligation arises. The obligation of the Sponsor to repurchase or substitute for a Deleted Mortgage Loan (as defined herein) is the sole remedy regarding any defects in the Mortgage Loans and Related Documents available to the certificateholders.

In connection with the substitution of a Qualified Substitute Mortgage Loan, the Sponsor will be required to remit to the Servicer for deposit in the Collection Account for remittance to the Securities Administrator prior to the next succeeding Distribution Date after such obligation arises an amount (the "Substitution Shortfall Amount") equal to the excess of the principal balance of the related Deleted Mortgage Loan over the principal balance of such Qualified Substitute Mortgage Loan.

To achieve a true sale and an unbroken chain of title the following three Assignments should have been recorded in the Public Land Records:

- Step One:  Original Lender sells to the Sponsor  - Assignment required

- Step Two: Sponsor sells to the Depositor  - Assignment required

- Step Three: Depositor delivers to the Trustee  - Assignment required

There were no Assignments found in the time frame allowed by this Trust.

*Copyright © 2012–Holmes & Galt LLC* www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

*This Section – A True Sale and the Securitization Chart that*
*follows help to explain why there can be no shortcuts.*

Definitions:

HIDC: Holder in Due Course

SPV: Special Purpose Vehicle

## A TRUE SALE

(Excerpted from 15th Annual Rocky Mountain Bankruptcy Conference Understanding the Securitization Process and the Impact on Consumer Bankruptcy Cases, Tara E. Gaschler, Esq., The Gaschler Law Firm LLC)

### A. True Sale and HIDC Status (Holder in Due Course)

The securitization process is designed, in most cases, to make the pooled assets "bankruptcy remote." To accomplish this, the transfer of the pooled assets from the Originator to the SPV must be accomplished by way of a "true sale." If the asset transfer is not a true sale, investors are vulnerable to claims against the Originator, including the claims of a bankruptcy Trustee that might be appointed if the Originator were to file bankruptcy. Without "bankruptcy remoteness," Investors would bear the risk of default in the underlying pooled assets, as well as any claim by the Originator's bankruptcy Trustee that the pooled assets or cash flows from those assets are part of the bankruptcy estate which could be used to satisfy claims of the Originator's creditors. A true sale also protects the Originator from claims by investors. If the pooled assets are sold into an SPV, the Investor can only seek payment from that entity, not from the general revenues of the Originator.

In order to create the desired "bankruptcy remoteness," the pool assets must be transferred by "true sale." Such a sale also provides the SPV with Holder in Due Course (HIDC) status and protection. In order to gain HIDC status, the SPV must satisfy the requirements of UCC section 3-302. The SPV must: take the instrument for value, in good faith, without notice that the instrument is overdue, dishonored or has an uncured default, without notice that the instrument contains unauthorized signatures or has been altered, and without notice that any party has a claim or defense in recoupment. Additionally, the instrument, when issued or negotiated to the holder, cannot bear any evidence of forgery or alteration or have irregularities that would give rise to questions of authenticity. The main benefit of HIDC status is that the holder may enforce the payment rights under the negotiable instrument free from all by a limited number of defenses as outlined in UCC 3-305. The HIDC takes the Note or instrument free from competing claims of ownership by third parties.

### A. Does the Trust Actually Own a Securitized Obligation?  Challenges Based on Standing

Securitization impacts consumer bankruptcy practice in a number of ways, most frequently in the context of motions for relief from stay and proofs of claim. Specifically, debtors' counsel must consider who actually owns the Mortgage Note,

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

auto loan or credit card receivable that has been securitized.  Is the Trust that is asserting ownership the true owner?

**Many times the answer is "NO" because the Trust has failed to properly acquire ownership of the Note or receivable.**  As discussed above, the goal of securitization is to achieve a true sale so that the SPV (Trust), not the Originator, will be the owner of each obligation in the pool.  In order to achieve this goal, each party in the chain of transfer, from Originator to Aggregator, to Depositor, to Issuer must actually pay value for the assets in order to acquire them by true sale and be able to transfer them to the next party in the chain.

Copyright © 2012–Holmes & Galt LLC           www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

## SECURITIZATION FLOW CHART

*THE CORRECT PROCESS OF SECURITIZATION*

Borrower:  Thomas & Marcella Benson



**TRUE SALE**

1) LEGAL OPINIONS
2) ASSET PURCHASE / SALE AGREEMENTS
3) DELIVERY & ACCEPTANCE RECEIPTS
4) COMPENSATION / MONEY
5) CAPACITY OF PARTIES TO BUY AND SELL

Assignment → Assignment → Assignment →

Original Lender:
Encore Credit Corp, A California Corporation

Sponsor/Seller:
DB Structured Products, Inc., a Delaware Corporation

Depositor:
ACE Securities Corp., a Delaware Corporation

**Trust Issuing Entity**

**ACE Securities Corp. Home Equity Loan Trust 2006-HE3**

*THE COMMON SHORTCUT TAKEN BY THE LENDERS*



Borrower → Original Lender → Trust/Issuing Entity

*Copyright © 2012–Holmes & Galt LLC*      www.holmesgalt.com

## ASSIGNMENT

*The following information on Assignments was obtained from* http://definitions.uslegal.com/a/Assignments/. *It may help to explain why MERS cannot assign the Deed of Trust; it also helps to show why the Assignments to each of the interim buyers/sellers are so critical.*

*While Assignment of a promissory Note also effectuates Assignment of the Mortgage (see Bank of N.Y. Silverberg, 86 AD3d at 280; U.S. Bank, N.A. v Collymore, 68 AD3d at 753-754; Mortgage Elec. Registration Sys., Inc. v Coakley, 41 AD3d 674), the converse is not true: since a Mortgage is merely security for a debt, it cannot exist independently of the debt, and thus, a transfer or Assignment of only the Mortgage without the debt is a nullity and no interest is acquired by it (see Deutsche Bank Natl. Trust Co. v Barnett, 88 AD3d 636; Bank of N.Y. v Silverberg, 86 AD3d at 280).*

"Assignment in legal terms means the transfer of a property right or title to some particular person under an agreement, usually in writing. Unless an Assignment is qualified in some way, it is generally considered to be a transfer of the transferor's entire interest in the estate, chattel, or other thing assigned. An Assignment is distinguished from a grant in that an Assignment is usually limited to the transfer of intangible rights, including contractual rights, choses in action, and rights in or connected with property, rather than, as in the case of a grant, the property itself. **For example, the payee may assign his or her rights to collect the Note payments to a bank.** Some contracts restrict the right of Assignment, so the terms of the contract must be read to determine if Assignment is prohibited. In a further example, a landlord may permit a lease to be assigned, usually along with an assumption agreement, whereby the new tenant becomes responsible for payments and other duties of the original lessee.

"**An Assignment, to be effective, must contain the fundamental elements of a contract generally, such as parties with legal capacity, consideration, consent, and legality of object.** Words of an Assignment are, assign, transfer, and set over; but the words grant, bargain, and sell, or any other words which will show the intent of the parties to make a complete transfer, will amount to an Assignment. The Deed by which an Assignment is made is also called an Assignment. In the absence of special statutory provision, no words of art and no special form of words are necessary to effect an Assignment."

       Copyright © 2012-Holmes & Galt LLC       www.holmesgalt.com

STANDING

*One of the key areas that the courts address is the issue of Standing:  Does the party bringing the suit have the right to do so?  Although this audit will not make an opinion about whether or not a lender has legal standing, as that can only be done through the legal process, the purpose of this section is to provide information that could assist with that determination process.*

This definition of Standing is provided from the following website:
http://www.lectiaw.com/def2/s064.htm

The legal right to initiate a lawsuit. To do so, a person must be sufficiently affected by the matter at hand, and there must be a case or controversy that can be resolved by legal action. There are three requirements for Article III standing: (1) injury in fact, which means an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal relationship between the injury and the challenged conduct, which means that the injury fairly can be traced to the challenged action of the defendant, and has not resulted from the independent action of some third party not before the court; and (3) a likelihood that the injury will be redressed by a favorable decision, which means that the prospect of obtaining relief from the injury as a result of a favorable ruling is not too speculative. *Lujan v. Defenders of Wildlife, 112 S. Ct. 2130, 2136 (1992) (Lujan).* The party invoking federal jurisdiction bears the burden of establishing each of these elements. Id.

     Copyright © 2012 –Holmes & Galt LLC     www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

*Many of the Legal Rulings that have come down have made their rulings regarding Standing based upon whether or not the Plaintiff (lender or bank or Trustee or MERS) had a beneficial interest or was a beneficiary.  Thus, these definitions are provided for the next section.*

http://definitions.uslegal.com/b/beneficiary/

### BENEFICIAL INTEREST

Beneficial interest is a right, interest, benefit or advantage that a person enjoys from a property or Trust, resulting from a contract, without actual ownership or control of the property. A beneficial interest can be distinguished from the rights of a Trustee who holds legal title. A beneficiary enjoys a beneficial interest in Trust property and the Trustee holds a legal title. In a contract, for example, if P enters into a contract with Q that P will pay S certain amount of money, then S is entitled to a beneficial interest. In certain cases, although minors are not permitted to join partnership contracts, they are eligible to a beneficial interest in the partnership by sharing the profits, but not the losses.

### BENEFICIARY

Generally, a beneficiary is a person or entity who receives a profit, advantage, or benefit. For example, a person named to receive something in a will is a beneficiary under such will. Similarly, a person named to receive the proceeds under an insurance proceeds is referred to as a beneficiary. A beneficiary is the person or entity named to receive assets or profits from an estate, a Trust, an insurance policy or any instrument in which there is distribution. Related concepts include an "incidental beneficiary" or a "third party beneficiary" who, although not specifically named, gain a benefit, such as someone who will make a profit if a piece of property is distributed to another.

   Copyright © 2012–Holmes & Galt LLC      www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

## THE SERVICERS:

The Trustee is paid for its services while the servicers are paid for theirs.  The Security Holders (Certificate holders) own the Certificates that they purchased. The Trust Fund holds only the Assets of the Trust "for the benefit of the Security Holders".  The Notes are "secured by a pledge of the assets from the Trust Fund."

From the Prospectus S-8 & S-9

SERVICING FEE

With respect to each Mortgage Loan, the amount of the annual  servicing fee that shall be paid to the  Servicer  is,  for a period  of one full  month,  equal to one-twelfth  of the  product  of (a)  0.50%  and  (b) the  outstanding  principal balance of such Mortgage Loan.  Such fee shall be payable  monthly,  computed on the basis of the same principal  amount and period  respecting which any related interest  payment on such Mortgage Loan is computed.  The  obligation to pay the servicing  fee is limited to, and the servicing fee is payable from the interest portion of such monthly payments collected;  provided, however, that accrued and unpaid servicing fees applicable to liquidated Mortgage Loans may be payable out of  amounts on deposit in the  collection  account as further  described  in the pooling and servicing agreement.

MASTER SERVICING FEE

With respect to each Mortgage  Loan,  the amount of the annual master  servicing fee that  shall be paid to the  Master  Servicer  is,  for a period of one full month, equal to one-twelfth of the product of (a) 0.004% and (b) the outstanding principal balance of such

S-8

<PAGE>

Mortgage Loan. Such fee shall be payable  monthly,  computed on the basis of the same principal  amount and period  respecting which any related interest payment on such Mortgage Loan is computed.  The  obligation to pay the master  servicing fee is limited to, and the master  servicing fee is payable from,  the interest portion of such monthly  payments  collected. The Master  Servicer will pay the trustee fee from its fee.

Copyright © 2012-Holmes & Galt LLC        www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

No Entity can be a creditor if they do not hold and own the asset. The asset would be the Note and/or the collateral (property). A Mortgage Pass Through Trust (i.e. R.E.M.I.C., as defined in Title 26, Subtitle A, Chapter I, Subchapter M, Part II §§ 850-862) cannot hold assets, for if they do, their tax exempt status is violated and the Trust itself is void ab initio.

Therefore, either the Trust has voided its intended Tax Free Status, or the asset is not in fact owned by it.

*This review suggests that the current parties who claim a beneficial ownership, in fact, do not have such.  Each party is either paid for the services it provides to the Trust, or it has a certificate which is a representation of partial beneficial ownership in a group of loans or the assets of the Trust, or they are working on behalf of somebody who is working on behalf of someone who has a beneficial interest in certificates. Finally, the Trust "owns", yet there is no entity that "owns" the Trust.*

From the Prospectus, Page 45 & 46

Except as described below, no Beneficial Owner will be entitled to receive a physical certificate representing a Certificate, or note representing a Note. Unless and until Definitive Notes or Definitive Certificates, as applicable, are issued, it is anticipated that the only "securityholder" of the Offered Notes or Offered Certificates, as applicable, will be Cede & Co., as nominee of DTC.

45

<PAGE>

Beneficial Owners will not be "Certificateholders" as that term is used in any Agreement, nor "Noteholders" as that term is used in any indenture. Beneficial Owners are only permitted to exercise their rights indirectly through Participants, DTC, Clearstream Luxembourg or Euroclear, as applicable.

The Beneficial Owner's ownership of a Book-Entry Security will be recorded on the records of the brokerage firm, bank, thrift institution or other financial intermediary (each, a "Financial Intermediary") that maintains the Beneficial Owner's account for that purpose. In turn, the Financial Intermediary's ownership of a Book-Entry Security will be recorded on the records of DTC (or of a Participant that acts as agent for the Financial Intermediary, whose interest will in turn be recorded on the records of DTC, if the Beneficial Owner's Financial Intermediary is not a Participant of DTC and on the records of Clearstream Luxembourg or Euroclear, as appropriate).

Copyright © 2012-Holmes & Galt LLC          www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

# THE DEED OF TRUST

Exhibit B

**Date Signed:** 02/01/2006

**Date Recorded:**  02/09/2006

On February 1, 2006, Thomas Benson and Marcella Benson, husband and wife as Joint Tenants, executed a security interest in the form of a Deed of Trust in the amount of $361,000.00 for 736 North Golden Avenue, Lodi, CA  95240.

The security instrument was filed as Document Number 2006-032215 in the Official Records of the Office of the Recorder of San Joaquin County, State of California on February 9, 2006.

- The Mortgage carries the MIN of 1001801-0000319955-9.

- There is an Adjustable Rate Rider to the Deed of Trust.

- There is a Prepayment Rider to the Deed of Trust.

The original lender of the promissory Note is Encore Credit Corporation, A California Corporation.

**Mortgage Electronic Registration Systems, Inc. (hereafter "MERS")** is not named as the payee of the Note, but is named as acting solely as a "nominee" for lender. MERS is the Beneficiary of the security instrument.  This is a MOM loan.

> *The Difference between a Mortgage and a Deed of Trust*
>
> *From:* http://www.escrowhelp.com/articles/2000121.html
>
> *The basic difference between the mortgage as a security instrument and a Deed of Trust is that in a Deed of Trust there are three parties involved, the borrower, the lender, and a Trustee, whereas in a mortgage document there are only two parties involved, the borrower and the lender. In a Deed of Trust, the borrower conveys title to a Trustee who will hold title to the property for the benefit of the lender. The title remains in Trust until the loan is paid.*
>
> *Another difference between a mortgage and a Deed of Trust is the manner in which foreclosure proceedings take place. State law will determine the method of foreclosure which must be used. Generally, the rules when using a Deed of Trust allow for a faster foreclosure time than with a judicial foreclosure required with a mortgage. Under a Deed of Trust, when the borrower defaults on the loan, the lender delivers the Deed of Trust to the Trustee, who then is instructed to sell the property.*

Copyright © 2012–Holmes & Galt LLC          www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

**Below Paragraph R of the Deed of Trust provides in part** "This Security Instrument secures to Lender: (i) the repayment of the Loan…"

**Paragraph 20 of the Deed of Trust provides** "The Note or a partial interest in the Note (together with this Security instrument) can be sold one or more times without prior notice to Borrower.

**MERS as Original Mortgagee (MOM Loan)**

A MIN (Mortgage Identification Number) was located on the loan, which indicates that this is a MOM loan – MERS as Original Mortgagee, and thus the Note and Deed of Trust were separated at the time of origination.  More in-depth information on MERS and MOM loans will appear later in this report.

         Copyright © 2012-Holmes & Galt LLC      www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

## Mortgage Electronic Registration System (MERS)

*The Mortgage Shows MIN:  1001801-0000319955-9*

*Min Status:  Inactive*

*Servicer:  Ocwen Loan Servicing, LLC*

*Investor:  HSBC Bank USA, National Association*

*There is no information to show when or why the loan status became inactive.*

*If MERS were to attempt to file any documents with the county, the borrower would not have any reference date to show if they were still active at the time of recording.*

### MERS Record



**Process Loans, Not Paperwork™**

www.mers-servicerid.org

**1 record matched your search:**

Need help? ❓

MIN: **1001801-0000319955-9**      Note Date: **02/01/2006**      MIN Status: **Inactive**

Servicer:  Ocwen Loan Servicing, LLC      Phone: **(800) 746-2936**
              **Waterloo, IA**

If you are a borrower on this loan, you can click here to enter additional information and display the Investor name.

Copyright © 2012–Holmes & Galt LLC      www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

⦿ **Investor for Individual Borrower**

*Your entries may be either upper or lower case.*

*Fields marked ★ are required.*

**Last Name:** Benson                                    ★

**SSN:** [    ] - [    ] - [    ]  ★

☐ By checking this box, the borrower or borrower's authorized representative is attesting to the fact that he or she is in fact the borrower or borrower's authorized representative for the loan in question. Additionally, borrowers wishing to learn the identity of their loan's investor must confirm their identity by entering their last name or corporation name as well as their SSN or TIN. If this information does not match the information contained in the MERS® System for the borrower of the loan, the investor information will not be displayed. Borrowers should verify the results with their loan servicer. ★

[ Submit ]

○ **Investor for Corporation/Non-Person Entity Borrower**

Servicer: Ocwen Loan Servicing, LLC                    Phone: **(800) 746-2936**
          **Waterloo, IA**

Investor: **HSBC Bank USA, National Association.**

This is a MOM Loan. A MIN number was assigned at the time of loan origination.  MERS became the "original Mortgagee."

          Copyright © 2012–Holmes & Galt LLC        www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

MERS Legal Rulings

U.S. Bankruptcy Judge Robert E. Grossman in Central Islip, New York, wrote that the membership rules of the company's Mortgage Electronic Registration Systems, or MERS, don't make it an agent of the banks that own the Mortgages. http://www.bloomberg.com/news/2011-02-14/MERScorp-has-no-right-to-transfer-Mortgages-u-s-judge-says.html

February 4, 2011:
http://www.businessweek.com/news/2012-02-04/jpmorgan-bofa-sued-by-new-york-over-use-of-Mortgage-database.html

"MERS's theory that it can act as a 'common agent' for undisclosed principals is not supported by the law," Grossman wrote in a Feb. 10 opinion. "MERS did not have authority, as 'nominee' or agent, to assign the Mortgage absent a showing that it was given specific written directions by its principal."

Because this loan was registered with MERS, the Assignments were not recorded in the public land records prior to the closing date of the Trust. This has caused a break in the Chain of Title.

Nothing was found that would show payment or benefit to MERS which is why its role as "beneficiary" has been brought into question in many courts of law.

*Numerous rulings have come down regarding the rights (or lack thereof) of the Mortgage Electronic Registration System's right to assign, foreclose and transfer Notes. (Cases in blue are positive rulings for MERS.)*

*MERSCORP, Inc. v. Romaine*, 8 N.Y.3d 90, 861 N.E.2d 81, 828 N.Y.S.2d 266 (N.Y. 2006): Precise question was whether Suffolk County Clerk must record Mortgages and Assignments of Mortgages which name MERS. The final paragraphs of opinion Note the confusion created for homeowners, potential that errors are hidden, even talks about the problem created by loss of revenue. Though creditors cite this case as some sort of approval of MERS, a footnote specifically says that the following questions are left for another day: the underlying validity of the MERS Mortgage instrument, whether its failure to transfer beneficial interest renders it a nullity under real property law, whether it violates the prohibition against separating the Note from the Mortgage, and whether MERS has standing to foreclose.

*Bank of New York v. Silverberg*, 86 A.D.3d 274, 926 N.Y.S.2d 532 (2nd Dept. June 7, 2011): MERS's authority as "nominee" was limited to only those powers that were specifically conferred to it and authorized by the lender; hence, although the consolidation agreement gave MERS the right to assign the Mortgages themselves, it did not specifically give MERS the right to assign

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

the underlying Notes, and the Assignment of the Notes was thus beyond MERS's authority as nominee or agent of the lender.

*Deutsche Bank Nat. Trust Co. v. Pietranico*, 33 Misc.3d 528, 928 N.Y.S.2d 818 (N.Y. Sup., July 27, 2011): MERS, as nominee, had authority to assign Mortgage.

*In re Agard*, 444 B.R. 231 (Bankr. E.D.N.Y. 2011): A written Assignment by MERS of the Mortgage to U.S. Bank was not sufficient to establish an effective Assignment of the Note to U.S. Bank, as the language in the Assignment was vague and insufficient to prove an intent to assign the Note, and, in any event, MERS was not a party to the Note, and the record was barren of any representation that MERS had any authority to take any action with respect to the Note.

*Bank of New York v. Alderazi*, 31 Misc.3d 1209(A), 929 N.Y.S.2d 198 (N.Y. Sup., April 11, 2011) (unreported table opinion; text found at 2011 WL 1364466): While the Mortgage granted some rights to MERS, it did not grant MERS the specific right to assign the Mortgage.

*In re Freeman*, 446 B.R. 625 (Bankr. S.D.Ga., Feb. 10, 2010): MERS, which was the grantee, as nominee for the lender, under the security Deed given by the debtor, had standing, as the security Deed gave MERS the right to foreclose on the debtor's property; that right was impaired by the automatic stay, and relief from the stay would redress that injury.

*In re Fontes*, Case No. 10-1345 (9th Cir. B.A.P., April 22, 2011): While MERS was named as the beneficiary of the Deed of Trust on the Chapter 13 debtors' property, as the nominee of the lender, MERS did not have the authority to transfer the debtors' promissory Note, where there was no evidence that MERS had any interest in the Note, and the Deed of Trust, although giving MERS the authority to assign the Deed of Trust, did not mention the Note.

*In re Martinez*, 2011 WL 996705 (Bankr. D. Wyo., March 16, 2011): MERS, which assigned the Mortgage from the original lender to Ocwen, had the authority to do so, as in the Mortgage MERS is designated as the nominee of the lender with authority to "take any action required of Lender".

*In re Thomas*, 2011 WL 576830 (Bankr. D.Mass., Feb. 9, 2011): The creditor could not rely on the recorded Assignment of the debtor's Mortgage from MERS to the creditor as evidence that the Note was transferred to the creditor; while the Assignment purported to assign both the Mortgage and the Note, MERS, which is a registry system that tracks the beneficial ownership and servicing of Mortgages, was never the holder of the Note, and therefore lacked the right to assign it.

    Copyright © 2012–Holmes & Galt LLC     www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

*In re Koontz*, 2010 WL 5625883 (Bankr. N.D.Ind., Sept. 30, 2010): The purported Mortgage creditor failed to establish the chain of title for its proof of claim; while the debtors' Mortgage had been assigned to the creditor by MERS, as the nominee of the original lender, MERS admitted that the individual who executed the Assignment on behalf of MERS was not a MERS employee.

*In re Tucker*, 441 B.R. 638 (Bankr. W.D. Mo., Sept. 20, 2010): The holder of the Chapter 7 debtors' Mortgage Note was entitled to seek relief from stay, although the Note holder was not also, on the petition date, the owner of the Deed of Trust on the debtors' property, as (1) the Note holder was a member of the MERS system, (2) MERS was the beneficiary under the Deed of Trust as nominee for the Note holder, and (3) all parties to whom the Note had been transferred in the chain from the original lender to the current Note holder had been members of the MERS system.

*In re Box*, 2010 WL 2228289 (Bankr. W.D. Mo., June 3, 2010): A purported transfer of a Note to a creditor by MERS was ineffective in the absence of evidence that MERS possessed the authority to transfer the Note.

*Mortgage Electronic Registration Systems, Inc. v. Medina*, 2009 WL 4823387 (D. Nev., Dec. 4, 2009): MERS, which provided no evidence that it was the agent or nominee for the current owner of the beneficial interest in the Note, did not establish that it was a real party in interest, as required under Bankruptcy Rule 7017.

*In re Sheridan*, 2009 WL 631355 (Bankr. D. Idaho, March 12, 2009): Mortgage Electronic Registration Systems, Inc., which filed a motion for relief from stay "as nominee HSBC Bank USA, National Association, as Indenture Trustee of the Fieldstone Mortgage Investment Trust Series 2006-3," did not establish its standing to prosecute such a motion, even assuming that MERS as a "nominee" had sufficient rights and ability as an agent to advance its principal's stay relief request.

    Copyright © 2012-Holmes & Galt LLC      www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240



**MERS Basics**

- Registration vs. Recording: The MERS® System is not a system of legal record nor a replacement for the public land records.  Mortgages must be recorded in the public land records.
- Tracking vs. Transfer: The MERS® System is a tracking system.  No interests are transferred on the system; only tracked.

*After a number of suits against MERS which it did not win, it is believed that MERS attempted to clarify its role in 2011 when this image was found on the MERS website.  The first item states, "MERS is not a system of legal record nor a replacement for the public land records.  Mortgages must be recorded in the public land records."*

*The second item states, "Tracking vs. Transfer: The MERS System is a tracking system.  No interests are transferred on the system, only tracked."*

*However, the image is no longer carried.  MERS has made a series of changes over recent years and the information provided below comes from the information available on their website as of April 2012.*

*Simply put, MERS continues to promote the use of its system, instead of the Public Land Records.*

## About MERS (FROM THE MERS WEBSITE)
Today:

"MERS was created by the Mortgage banking industry to streamline the Deed of Trust/Mortgage process by using electronic commerce to eliminate paper. Beneficiaries of MERS include Deed of Trusts/Mortgage originators, servicers, warehouse lenders, wholesale lenders, retail lenders, document custodians, settlement agents, title companies, insurers, investors, county recorders and consumers.

"MERS acts as nominee in the county land records for the lender and servicer. **Any loan registered on the MERS® System is inoculated against future Assignments because MERS remains the Mortgagee no matter how many times servicing is traded.** MERS as original Mortgagee (MOM) is approved by Fannie Mae, Freddie Mac, Ginnie Mae, FHA and VA, California and Utah Housing Finance Agencies, as well as all of the major Wall Street rating agencies."

*None of the above stated entities have the power or authority to sanction the role of MERS as it attempts to circumvent the proper recording of land records in the Public Land Records.*

Copyright © 2012 –Holmes & Galt LLC      www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

### MERS as Original Mortgagee:

*These three definitions show a consistency:  A Mortgagee loaned the money to the Mortgager.  In the case of MERS, it did not loan any money.  This is one of the key reasons why there have been so many legal rulings against MERS.  Yet, even today, its website still promotes that it is the Mortgagee.*

*The legal definition of Mortgagee is provided from a sampling of legal and investment dictionaries available online.*

**Definition of 'Mortgagee'**

An entity that lends money to a borrower for the purpose of purchasing a piece of real property. By accepting a Mortgage on the real property, the lender creates security in the full repayment of the loan in the future.

**Investopedia explains 'Mortgagee'**

Most people take out a Mortgage to finance the purchase of a residence or piece of real estate. In order to limit its risk in the investment, the lender in the transaction creates a priority legal interest in the value of the property, substantially lowering the probability the lender will not be repaid in full if the borrower defaults on the loan. http://www.investopedia.com/terms/m/Mortgage e.asp#axzz1vRtM25J3

**Mortgagee**

The person or business making a loan that is secured by the real property of the person (mortgagor) who owes the individual or business money. (See also: Mortgage) http://www.nolo.com/dictionary/Mortgag ee-term.html

**Mortgagee Definition:**

The person who extends credit secured by a Mortgage; the Mortgage lender. A term peculiar to Mortgage law and contracts; refers to the person who lends money on the basis of a Mortgage on real property. A typical Mortgagee is a bank or a credit union. The Mortgagee lends money to the mortgagor and the latter allows a Mortgage to be charged against, or registered on title of his real property, as security.

http://www.duhaime.org/LegalDictionary/ M/Mortgagee.aspx

*Copyright © 2012–Holmes & Galt LLC*     www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

*This is the definition of a MOM loan from 2006:*

| Administrator | Identifying a Mom Loan | | October 10, 2006 12:12 PM |
|---|---|---|---|
| | Jen: | | |
| | MOM stands for "MERS as Original Mortgagee." This means that the granting clause of the uniform security instrument has been modified according to Fannie/Freddie requirements so that the borrower grants the mortgage to "Mortgage Electronic Registration Systems, Inc." (MERS) rather than to the original lender. The MOM concept also works for non conforming and commercial security instruments. Assigning a valid "Mortgage Identification Number" (MIN) to the MOM security instrument is a requirement of MERS. If you record an otherwise correctly prepared MOM security instrument without a MIN, the security instrument is still valid; however, we require that you subsequently record a "corrective affidavit" that correlates the MIN on the corrective affidavit to the previously recorded security instrument without the MIN. | | |

*This is what MERS advertises today:*

**Under FAQ**

Does MERS change the current Mortgage closing process?

Yes, it makes it better! Your organization follows its normal and customary procedures, except that you'll save $30 or more per loan when you specify MERS as the Original Mortgagee (MOM) of Record in the Mortgage or Deed of Trust. MERS becomes Nominee for you as the lender and the lender is also identified on the document, using Fannie Mae and Freddie Mac approved language. You need to generate a Mortgage Identification Number (MIN), and include it on the closing documents, and complete the registration of the loan on MERS. Your closing process is even easier if the old Mortgage on the property was registered on MERS, because the lien release process is not delayed because of missing or incorrect prior Assignments. **Chain of title starts and stops with MERS!**

 *Copyright © 2012–Holmes & Galt LLC*      www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

**(Under "About MERS")**

MOM LOANS

To eliminate the need for Assignments and to realize the greatest savings, lenders should close loans using standard security instruments containing language approved by Fannie Mae and Freddie Mac which name MERS as Original Mortgagee (MOM).

**Benefits of MOM Loans:**

- Faster execution
- Reduction of shipping time and expenses
- Elimination of documentation errors
- Simplification of loan closing process
- Money savings
  - Assignments eliminated forever ($30 saved per loan)
  - No correction costs (up to $30 saved per document)
  - No tracking costs
  - No correspondent or broker document penalties
  - One Deed of Trust or Mortgage form for all transactions

**"Chain of title starts and stops with MERS!"**

MERS hides lender activity on all levels, not just the servicer level. Notes and Mortgages/Deeds of Trust are tracked and recorded on a private internal system that only MERS members have access to:  MERS members are not borrowers.  Borrowers do not know who the rightful owner of their Note is; they do not know if the loan has been properly endorsed on each sale, they cannot look to the public land recording records to ensure that the people claiming to hold their Notes truly do.

And the situation is only getting worse for borrowers: The changes to the Assignment process that all the bankers have agreed to allow is for MERS to assign the Deed of Trust/Mortgage to a servicer when a foreclosure needs to be initiated.  This is a system that opens the door to total chaos because the MERS process has each servicer tracking and transferring their own records in the MERS system – they are not autonomous. Thus a servicer can log into MERS, create an Assignment back to "himself," file it in the public land records and then foreclose on the property.  With this new system, the true Note holder is never revealed.

Ultimately, this new practice sums up to an entity who never had a beneficial interest in the Note, establishing themselves as the Mortgagee, even though they weren't, setting up a system

*Copyright © 2012–Holmes & Galt LLC*      www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

for their members to log into and transfer to another entity that never had a beneficial interest in the Note. And the transferring party who manipulated the MERS system is the "new Mortgagee".

If this process is allowed then a foreclosure proceeding will be accomplished without the borrower ever having knowledge of the true owner of the Note or Note Holder: that entity will be completely shielded from any legal proceedings.  The borrower will not have the public land records to rely upon or refer back to in an attempt to obtain a clear chain of title.

*This excerpt comes from the Bankruptcy & Foreclosure Section (Rule 8) of the MERS Membership document.*

### RULE 8

## FORECLOSURE & BANKRUPTCY

Section 1. (a) With respect to each Mortgage loan, which shall mean a loan secured by a Mortgage, Deed of Trust or security Deed (any such instrument is referred to herein as a "Security Instrument"), for which the Note owner or the Note owner's servicer has decided to: (i) initiate foreclosure proceedings, whether judicial or non-judicial or (ii) file a Proof of Claim or file a Motion for Relief from Stay in a bankruptcy ("Legal Proceedings"); and for which "Mortgage Electronic Registration Systems, Inc." is the Mortgagee, beneficiary or grantee of record (as applicable), the Note owner or the Note owner's servicer shall cause a MERS Certifying Officer (also known as a "Signing Officer") to execute an Assignment of the Security Instrument from MERS SPE Inc. to the Note owner's servicer, or to such other party expressly and specifically designated by the Note owner. The Member agrees and acknowledges that MERS SPE Inc. has the authority to execute such Assignment of the Security Instrument in accordance with the immediately preceding sentence. The Assignment of the Security Instrument must be executed, notarized, witnessed (if applicable) and be in recordable form and comply with all applicable laws, regulations and rules.

(b) The Member agrees and acknowledges that when MERS SPE Inc. is identified as nominee (as a limited agent) of the Note owner in the Security Instrument, MERS SPE Inc., as nominee, is the Mortgagee, beneficiary, or grantee (as applicable), in the Security Instrument on behalf of and for the benefit of the Note owner.

(c) The Member servicing a Mortgage loan registered on the MERS shall be responsible for processing foreclosures in accordance with the applicable agreements between such Member and the Note owner and all applicable laws, regulations and rules.

    Copyright © 2012-Holmes & Galt LLC    www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

**Endorsement:** Endorsement has different meanings, but in the law of negotiable instruments such as checks and securities, it is the act of the owner or payee signing his/her name to the back of a check, bill of exchange or other negotiable instrument so as to make it payable to another or cashable by any person. It is also sometimes referred to as "endorsement".

**Allonge:** An Allonge is generally an attachment to a legal document that can be used to insert language or signatures when the original document does not have sufficient space for the inserted material. It may be, for example, a piece of paper attached to a negotiable instrument or promissory Note, on which endorsements can be written because there isn't enough room on the instrument itself. The Allonge must be firmly attached so as to become a part of the instrument.

## CHAIN OF ENDORSEMENTS & CHAIN OF TITLE

### Chain of Endorsements

- Since a copy of the Note was not available for review, the chain of endorsements cannot be verified.

- The Note was located in the **ACE Securities Corp. Home Equity Loan Trust 2006-HE3.**

### Chain of Title

#### Closing Date of the Trust:  On or about June 27, 2006

- No Assignment to the Sponsor/Seller was found within the closing date.

- No Assignment to the Depositor was found within the closing date.

- No Assignment to the Trustee on behalf of the Certificate Holders of the Trust was found within the Closing Date.

- The role of MERS has prevented the proper recording of the Deed of Trust in the public land records.

*Copyright © 2012–Holmes & Galt LLC*          www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

SECTION CONCLUSION:

**The Chain of Endorsements cannot be verified.**

**The Chain of Title has been broken.**

**There have been no Assignments to any parties involved in this loan within the allotted timeframe.**

The terms of the Trust established a closing date of on or about June 27, 2006.  The Trust and its acquisition of the Trust assets as defined by the PSA are governed under Law.  The absence of the Assignments would be a void act because it violated the explicit terms of the Trust instrument.  The absence of any Assignments is conclusive to a broken chain of title.

Violations of this nature also open the door to question if all other original required documents were provided to the Trust and more specifically, what is the current physical location of the original Note?

     Copyright © 2012–Holmes & Galt LLC       www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

## COUNTY RECORDS

The Official Records of the Office of the Recorder of San Joaquin County, State of California were reviewed spanning the period of 2006-2014. The report records show the sale and finance of the subject property dated 02/01/2006, a Notice of Default and Election to Sell under Deed of Trust, an Assignment of Deed of Trust, a Notice of Trustee's Sale, a Substitution of Trustee and a Notice of Default and Election to Sell under Deed of Trust, all related to that Deed of Trust.

## COMPANIES & STATUS

*A review of the County Records showed that the following companies were found to be involved in some capacity with this loan. (MERS is not included in this section).*

**Company Name:**   Orange Coast Title

**Address:**  640 N. Tustin Ave. STE. 106, Santa Ana, CA  92705

**Nature of Business:**  Orange Coast Title Company has served the US real estate industry since 1974. During that time, we have provided the best in people and technology to ensure that we close your transaction in a friendly and efficient manner!

**Currently in Business:** Active



*Copyright © 2012–Holmes & Galt LLC*        www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

**Company Name:**   Fidelity National Title

**Address:** 2510 N. Redhill Ave., Santa Ana, CA  92705

**Nature of Business:** With origins that can be traced back 150 years, Fidelity National Title Insurance Company, through its underwriting subsidiaries, is one of the nation's premier real estate service companies, providing title insurance and other real estate-related products and services. In 1848 Western Title Insurance Company (now Fidelity National Title Insurance Company of California) traced its origin to C.V. Gillespie (founder), a notary public and searcher of records in San Francisco.

**Currently in Business:** Active



*Copyright © 2012–Holmes & Galt LLC*     www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

**Company Name:**    Ocwen Loan Servicing

**Address:** 1661 Worthington Road, STE 100, West Palm Beach, FL  33409

**Nature of Business:**  Ocwen Loan Servicing, LLC engages in servicing residential mortgage loans. Its loan servicing includes customer service, collections, investor accounting, escrow, loss mitigation, foreclosure, and property disposition. It services mortgage backed securitized and unsecuritized loans and securities. The company was founded in 1989 and is based in West Palm Beach, Florida. Ocwen Loan Servicing, LLC operates as a subsidiary of Ocwen Financial Corp.

**Currently in Business:** Active



FLORIDA DEPARTMENT OF STATE
DIVISION OF CORPORATIONS

| Home | Contact Us | E-Filing Services | Document Searches | Forms | Help |

Events  **No Name History**
Return to Search Results

Entity Name Search
Search

**Detail by Entity Name**

**Foreign Limited Liability Company**
OCWEN LOAN SERVICING  LLC
**Filing Information**
Document Number          M02000001240
FEI/EIN Number           010681100
Date Filed               05/14/2002
State                    DE
Status                   ACTIVE
Last Event               CORPORATE MERGER
Event Date Filed         07/07/2005
Event Effective Date     NONE
**Principal Address**
1661 Worthington Road, Ste 100
West Palm Beach, FL 33409

Changed  04/27/2013
**Mailing Address**
1661 Worthington Road, Ste 100

*Copyright © 2012–Holmes & Galt LLC*    <u>www.holmesgalt.com</u>

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

**Company Name:**    HSBC Bank USA

**Address:** Unknown

**Nature of Business:**  New York-based corporate bank provides a wide range of financial services to consumers and businesses.

**Currently in Business:** Withdrawn



Commonwealth of Virginia
**State Corporation Commission**

SCC
lerk's
rmation
ystem

07/29/14
16:19:55

Help

Print

gnoff

C-eFile
SCCeFile!

```
                CISM0180           CORPORATE DATA INQUIRY

      CORP ID:  F167453 - 2   STATUS: 40  WITHDRAWN(VOL)   STATUS DATE: 06/21/10
      CORP NAME:  HSBC Bank USA, National Association
                  Representative Office (USED IN VA BY: HSBC Bank US
    DATE OF CERTIFICATE:  07/11/2006 PERIOD OF DURATION:         INDUSTRY CODE: 23
    STATE OF INCORPORATION: US UNITED STATES   STOCK INDICATOR:  S STOCK
    MERGER IND:                     CONVERSION/DOMESTICATION IND:
    GOOD STANDING IND: N WITHDRAWN(VO  MONITOR INDICATOR:
    CHARTER FEE:  100.00    MON NO:         MON STATUS:  MONITOR DTE:
      R/A NAME: CT CORPORATION SYSTEM

      STREET:  4701 COX RD STE 301                   AR RTN MAIL:

          CITY:  GLEN ALLEN          STATE : VA  ZIP: 23060 6802
    R/A STATUS: 5 B.E. AUTH IN VI EFF. DATE: 07/11/06  LOC : 143
    ACCEPTED AR#: 209 54 0754  DATE: 07/08/09             HENRICO COUNTY
    CURRENT AR#: 209 54 0754  DATE: 07/08/09  STATUS: A  ASSESSMENT INDICATOR:  0
    YEAR    FEES    PENALTY    INTEREST    TAXES    BALANCE       TOTAL SHARES
      10    370.00                                   370.00         50,000
```

*Copyright © 2012–Holmes & Galt LLC*     www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

**Company Name:**   Ace Securities

**Address:** 6525 Morrison Boulevard, Ste. 318, Charlotte, NC  28211

**Nature of Business:** Ace Securities Corp. provides security brokerage services. The firm is headquartered in Charlotte, North Carolina.  Founded in 1931

**Currently in Business:** Active





*Copyright © 2012 Holmes & Galt LLC*   www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

**Company Name:**    Premium Title Agency, Inc.

**Address:**  2002 Summit Boulevard, suite 600, Atlanta, GA  30319

**Nature of Business:**  Premium Title offers a national title and settlement services solution providing centralized coordination and a single point of contact for transaction management, title insurance and escrow services. Premium Title is underwritten by A-rated title insurers and distinguishes itself by providing superior service delivery and leveraging Innovative technology to expedite the title production and settlement process.

**Currently in Business:** Active



Note:  Premium Title of California is Premium Title Agency and is also licensed in Georgia.

Copyright © 2012–Holmes & Galt LLC       www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

**Company Name:**    Western Progressive, LLC

**Address:**  2002 Summit Blvd., Suite 600, Atlanta, GA  30319

**Nature of Business:** Processes residential non-judicial foreclosures in California, Nevada and Arizona.

**Currently in Business:** Active



Note:  Was unable to find a Business License in Georgia or Delaware.

Copyright © 2012 –Holmes & Galt LLC      www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

## ROBOSIGNING AND FRAUDULENT OR MISLEADING DOCUMENTS

*An analysis has been conducted on each document with findings shown in red at the end of the document.*

*Your documents have been reviewed against a list of items which was developed by Attorney Max Gardner, who is one of the foremost experts on securitization, defective documents and robosigning.*

*All signatures on the documents have been reviewed to determine if there were any instances of robosigning.*

Analysis includes

- ✓ Fatal Defects
- ✓ Misrepresentations
- ✓ Inconsistencies
- ✓ Backdating and Future Dating
- ✓ Incorrect Sequence
- ✓ Potential Fraud
- ✓ Notary Fraud

*Following is a detailed record of all the actions that have occurred for this loan in date order. The Deed of Trust is provided in brief as a point of reference.*

**Deed of Trust**

(Exhibit B)

On February 1, 2006, Thomas Benson and Marcella Benson, husband and wife as Joint Tenants, executed a security interest in the form of a Deed of Trust in the amount of $361,000.00 for 736 North Golden Avenue, Lodi, CA  95240.

The security instrument was filed as Document Number 2006-032215 in the Official Records of the Office of the San Joaquin County Recorders, State of California on February 9, 2006.

  *Copyright © 2012–Holmes & Galt LLC*    www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

*Notice of Default and Election to Sell under Deed of Trust – Recorded 08/08/2008*

EXHIBIT E

**After Recording return to:** Fidelity National Title Company

**All Doc #s**

> **Document #** 2008-130147

A Notice of Default and Election to Sell under Deed of Trust is recorded in the Official Records of the Office of the San Joaquin County Recorders, State of California on 08/08/2008 as Document 2008-130147.  Said document states that the mortgage loan, recorded on February 9, 2006 as Instrument No. 2006-032215, is in default and if not the arrears are not cured that the property, securing the loan could proceed to public auction.  Said document is signed by Taryn Dewar, as Agent, Default Resolution Network a division of Fidelity National Title Company Agent for the Beneficiary, By: Fidelity National Default Solutions, with a typewritten affixed date of August 7, 2008. Said document is not notarized.

**Fatal Defects found from the Max Gardner Guidelines:**

1. The document refers to an "Instrument No."

2. The name of the signing party is stamped on the document in block letters.

3. The party who signed the document executed it as "an agent" for the servicer or the creditor.

**Robosigning:**

1. Taryn Dewar, as Agent, Default Resolution Network a division of Fidelity National Title Company Agent for the Beneficiary, By: Fidelity National Default Solutions

a. Taryn Dewar could not be identified as employed with any entity.

b. Taryn Dewar could not be identified as an alleged robosigner at this time.

Findings: A total of three fatal defects was identified with this document from the Max Gardner guidelines.  Said document is enacted by an entity that has no proven standing in which to request payment of the loan arrearage nor does it have the standing in which to pursue to foreclosure and auction said property.  This document is potentially fraudulent.

*Copyright © 2012–Holmes & Galt LLC*          www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA 95240

---

*Assignment of Deed of Trust California – Recorded 01/30/2009*

---

EXHIBIT F

**Recording requested by and after recording return to:** Unknown

**All Doc #s**

>**Document #** 2009-017779

>**Unidentified #** N/A

An Assignment of Deed of Trust California is recorded in the Official Records of the Office of the San Joaquin County Recorders, State of California on 01/30/2009 as Document 2009-017779. Said document states that Mortgage Electronic Registration Systems, Inc., Its Successors and Assigns as nominee for Encore Credit Corp., Its Successors and Assigns ("Assignor") does so assign all its rights, title and interest in a certain mortgage dated February 1, 2006, recorded February 9, 2006 as Instrument Number 2006-032215 to HSBC Bank USA, N.A., as Trustee on behalf of Ace Securities Corp. Home Loan Trust and for the Registered Holders of Ace Securities Corp, Home Equity Loan Trust Series 2006-H3, Asset Backed Pass-through Certificates whose address in in care of Ocwen Loan Servicing, LLC.  This Assignment is made without recourse, representation or warranty and begins with the statement that this is entered into as of the 19th day of June 2006.  Said document is signed by Scott Anderson, Vice President, Mortgage Electronic Registration Systems, Inc. Acting Solely as Nominee for Encore Credit Corp., with a typewritten date affixed of on September 05, 2008.  Said document is notarized by Noemi Morales, commissioned Notary Public, State of Florida, County of Palm Beach with a typewritten date affixed of on September 05, 2008.

**Fatal Defects found from the Max Gardner Guidelines:**

1. The document refers to an "Instrument No."

2. You cannot read the signature of the signor on the document.  Some people refer to these as "squiggle marks."  The bottom line is you cannot decipher any name or word from the same.

3. Any document signed by an officer of MERS.  MERS states at www.mersinc.org that: "Employees of the servicer will be certifying officers of MERS.  This means they are authorized to sign any necessary documents as an officer of MERS.  The certifying officer is granted this

power by a corporate resolution from MERS.  In other words, the same individual that signs the documents for the servicer will continue to sign the documents, but now as an officer of MERS.

4. The signor of the document states that he is acting "as nominee" for some other party.

5. The document purports to assign the Deed of Trust AFTER the cut-off date for the transfer of all such instrument to the Trust pursuant to the Pooling and Servicing Agreement

6. The document purports to assign the Deed of Trust AFTER the date for the acceptance of any final conveyance to the Trust as provided by the Pooling and Servicing Agreement.

7. Backdating of dates on assignments or the signatures of offices are dated years after the date stated on the document.

**Robosigning:**

1. Scott Anderson, Vice President, Mortgage Electronic Registration Systems, Inc. Acting Solely as Nominee for Encore Credit Corp.

a. Scott Anderson has not been identified as truly employed with any entity.

b. Scott Anderson is identified as a well-known robosigner and has been sought in many legal cases.


2. Noemi Morales, Notary Public, State of Florida, County of Palm Beach

a. Noemi Morales has not been identified as employed with any entity.

b. Noemi Morales was a commissioned Notary Public for the State of Florida, but her commission expired in 2013.

Copyright © 2012–Holmes & Galt LLC

**Commission Detail**

Notary ID: 950583
Last Name: Morales
First Name: Noemi
Middle Name:
Birth Date: 11/25/XX
Transaction Type: REN
Certificate: DD 937193
Status: EXP
Issue Date: 11/02/09
Expire Date: 11/01/13
Bonding Agency: Notary Public Underwriters
Mailing Address: Lake Worth, FL 33461-0000

ment of State][Notary Public Access System][Email ]

lorida Department of State Division of Corporations
P.O. Box 6327
Tallahassee, FL 32314
Phone (850) 245-6045

Findings: A total of seven fatal defects was identified from the Max Gardner guidelines.  Said document is enacted by an entity that is not the Holder in Due Course nor does it have the standing in which to enact anything.  The signor of this document is a well-known robosigner is involved and sought in many legal cases for their participation in alleged wrongdoings of many lenders, servicers, and creditors.  This document has no standing and is potentially fraudulent in nature.

Copyright © 2012–Holmes & Galt LLC          www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

---

*Notice of Trustee's Sale – Recorded 01/30/2009*

---

EXHIBIT G

**After Recording return to:** Fidelity National Title Ins. Co.

**All Doc #s**

> **Document #** 2009-017780

> **Unidentified #** N/A

A Notice of Trustee's Sale is recorded in the Official Records of the Office of the San Joaquin County Recorders, State of California on 01/30/2009.  Said document states that the beneficiary, Mortgage Electronic Registration Systems, Inc., under said Deed of Trust, recorded February 9, 2006 as Instrument No. 2006-032215, will proceed to auction on a specified date, the property commonly known as, 736 North Golden Avenue, Lodi, California  95240, if the defaulted amount is not brought current. Said document is signed by Rozalyn Tudor, Authorized Signature, Fidelity National Title Insurance Company as Trustee, with a typewritten affixed date of January 22, 2009. Said document is not notarized.

**Fatal Defects found from the Max Gardner Guidelines:**

1. The document refers to an "Instrument No."

2. The party who signed the document executed it as "an authorized agent" for the servicer or the creditor.

**Robosigning:**

1. Rozalyn Tudor, Authorized Signature, Fidelity National Title Insurance Company as Trustee

a. Rozalyn Tudor has not been identified as an alleged robosigner at this time.

   Copyright © 2012–Holmes & Galt LLC     www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

b. According to Roxalyn Tudor's own Linkedin account, she is the Trustee at Fidelity National Financial, Information & Services in the Sacramento California area.



Findings: A total of two fatal defects was identified from the Max Gardner guidelines.  If taken at face value, this document appears to be prepared, filed and recorded accordingly.

*Copyright © 2012–Holmes & Galt LLC*          www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

---

*Substitution of Trustee – Recorded 04/22/2014*

---

EXHIBIT H

**Recording Requested by:** Premium Title Agency

**After Recording return to:** Western Progressive, LLC

**All Doc #s**

    **Document #** 2014-039007

    **Unidentified #** N/A

A Substitution of Trustee is recorded in the Official Records of the Office of the Recorder of San Joaquin County, State of California on 04/22/2014 as Document 2014-039007.  Said document states that the undersigned, HSBC Bank USA, N.A., as Trustee on behalf of Ace Securities Corp. Home Equity Loan Trust and for the registered holders of Ace Securities Corp. Home Equity Loan Trust, Series 2006-HE3, Asset Backed Pass-Through Certificates, By Its Servicer Ocwen Loan servicing, LLC, is the present Beneficiary under that certain Deed of Trust dated 02/01/2006 and recorded on 02/09/2006 as Instrument No. 2006-032215 of official records of San Joaquin County, California, and does so substitute Western Progressive, LLC as Trustee.  Said document is signed by Krystle D. Hernandez, Contract Management Coordinator, HSBC Bank USA, N.A., as Trustee on behalf of Ace Securities Corp. Home Equity Loan Trust and for the registered holders of Ace Securities Corp. Home Equity Loan Trust, Series 2006-HE3, Asset Backed Pass-Through Certificates, By Its Servicer Ocwen Loan servicing, LLC, with a handwritten date affixed of 4/16/2014.  Said document is notarized by Kristin Frontera, commissioned Notary Public, State of Florida, County of Palm Beach, with a typewritten and handwritten date affixed of this 16th day of April, 2014.

**Fatal Defects found from the Max Gardner Guidelines:**

1. The document refers to an "Instrument No."

2. The name of the signing party is stamped on the document in block letters.

     *Copyright © 2012–Holmes & Galt LLC*      *www.holmesgalt.com*

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

**Robosigning:**

1. Krystle D. Hernandez, Contract Management Coordinator, HSBC Bank USA, N.A., as Trustee on behalf of Ace Securities Corp. Home Equity Loan Trust and for the registered holders of Ace Securities Corp. Home Equity Loan Trust, Series 2006-HE3, Asset Backed Pass-Through Certificates, By Its Servicer Ocwen Loan servicing, LLC

a. According to Krystle D. Hernandez's own Linkedin account she is the Contract Management Coordinator at Ocwen Financial Corporation, in the West Palm Beach, Florida area.



b. Krystle D. Hernandez has not been identified as an alleged robosigner at this time.

2. Kristin Frontera, Notary Public, State of Florida, County of Palm Beach

a. Kristin Frontera is a currently commissioned Notary Public for the State of Florida.



Findings: A total of two fatal defects was identified from the Max Gardner guidelines.  If this document is taken at face value, it is allegedly prepared, filed and recorded accordingly.  One note though is that the entity claiming to be the beneficiary is not truly and has no proven

     Copyright © 2012–Holmes & Galt LLC     www.holmesgalt.com

standing nor has it proven to be the Holder in Due Course.  This document would actually be allegedly fraudulent.

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

*Notice of Default and Election to Sell under Deed of Trust – Recorded 05/01/2014*

EXHIBIT I

**Recording requested by:**  Premium Title of California

**After Recording return to:** Western Progressive, LLC

**All Doc #s**

> **Document #** 2014-042513

> **Unidentified #** N/A

A Notice of Default and Election to sell under Deed of Trust is recorded in the Official Records of the Office of the San Joaquin County Recorders, State of California on 05/01/2014 as Document 2014-042513.  Said document states that by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such Deed of Trust and all documents evidencing obligations secured thereby, and has declared and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby. Said document is signed by Tamika Y. Smith, Trustee Sale Assistant, Western Progressive, LLC, as agent for beneficiary, with a typewritten affixed date of April 29, 2014. Said document is not notarized.

**Fatal Defects found from the Max Gardner Guidelines:**

1. The document refers to an "Instrument No."

2. You cannot read the signature of the signor on the document.  Some people refer to these as "squiggle marks."  The bottom line is you cannot decipher any name or word from the same.

3. The party who signed the document executed it as a representative of the servicer.

**Robosigning:**

1. Tamika Y. Smith, Trustee Sale Assistant, Western Progressive, LLC, as agent for beneficiary

a. Tamika  Y. Smith could not be identified as employed with any entity.

Page **68** of **77**      *Copyright © 2012 –Holmes & Galt LLC*      <u>www.holmesgalt.com</u>

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

b. Tamika  Y. Smith has not been identified as an alleged robosigner at this time.

Findings: A total of three fatal defects was identified from the Max Gardner guidelines.  Said document reveals that the entity signing is signing on behalf of the Trust Fund's Trustee to which has no proven standing in which to do anything with this Deed of Trust.  Said document is potentially fraudulent.

Copyright © 2012–Holmes & Galt LLC        www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

# CALIFORNIA FORECLOSURE LAW & CASE LAW

## Foreclosure Law

Most foreclosures in California are done outside of the Courts.  However, some foreclosures can be done judicially.  California Civil Code Section 2920 through 2944.7 governs California Foreclosures.

## Case Law

*In Re Vargas* - The Bankruptcy Court found many errors with regard to the proceedings instituted by MERS to get relief from stay so it could take the home away from Mr. Vargas, an 83 year old World War II veteran.  MERS was found to have submitted fraudulent documents.  Additionally, the Court held that MERS did not have legal standing to foreclose upon Mr. Vargas because it did not hold the note and deed.

          Copyright © 2012–Holmes & Galt LLC          www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

## REPORT CONCLUSION:

**The chain of title has been broken. There is no clear ownership of the Note.**

**The Note and Deed of Trust have been separated.**

### NOTE

A copy of the Note was not made available for review.  Below is what could be derived from the Deed of Trust.

On February 1, 2006, Thomas Benson and Marcella Benson, executed a negotiable promissory Note in the amount of $361,000.00 for 736 North Golden Avenue, Lodi, CA  95240. The Lender is Encore Credit Corporation, A California Corporation.

Through research conducted on the ABSNet Financial Research Platform, the loan was found to be in the ACE Securities Corp. Home Equity Loan Trust 2006-HE3.

Since a copy of the Note was not available for review, the chain of endorsements could not be reviewed and verified.

The Pooling and Servicing Agreement (PSA), is a public record available on the website of the Securities Exchange Commission.  It is the official agreement that created the ACE Securities Corp. Home Equity Loan Trust 2006-HE3.  The Trust and agreements of the Trust are also described in a Prospectus Supplement and Prospectus, available on the SEC website.

A cutoff date of June 1, 2006, with a closing date of on or about June 27, 2006, was set by the Trust. The promissory Note, in this case, allegedly became Trust property in compliance with the requirements set forth in the PSA. However there were no Assignments found that could verify this. This loan should not have been placed in this Trust.

As regards the closing date, the Trust agreement is filed under oath with the Securities and Exchange Commission.  The assets of the Trust, as well as their acquisition by the Trust are governed under the law.

If the chain of securitization had been done properly: The loan would have originally been sold to the Sponsor, DB Structured Products, Inc., a Delaware Corporation and then sold to the Depositor, ACE Securities Corp., a Delaware Corporation and finally transferred to ACE Securities Corp. Home Equity Loan Trust 2006-HE3.

*Copyright © 2012–Holmes & Galt LLC*       *www.holmesgalt.com*

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

There is no evidence to support that this occurred.

## DEED OF TRUST

On February 1, 2006, Thomas Benson and Marcella Benson, husband and wife as Joint Tenants, executed a security interest in the form of a Deed of Trust in the amount of $361,000.00 for 736 North Golden Avenue, Lodi, CA  95240.

The security instrument was filed as Document Number 2006-032215 in the Official Records of the Office of the San Joaquin County Recorders, State of California on February 9, 2006.

There is record of an Assignment to the Trust, but it was approximately three years after the closing date of the Trust acceptance, even though the signor of the Assignment document attempted to back date the document to be in line with the Trust Fund reconveyance allowance.

While the Note has allegedly traveled to the ACE Securities Corp. Home Equity Loan Trust 2006-HE3, the Deed of Trust has remained with the original lender Encore Credit Corp., A California Corporation.

Thus, any failure to deliver the Deed of Trust or delivery of the Deed of Trust without its Assignments as regulated by these Trusts in general could be a void act for the reason that it violated the express terms of the Trust instrument.

## MERS

The Deed of Trust was found to have MIN 100180100003199559.  A search of the MERS database produced the servicer of Ocwen Loan Servicing, LLC and the "Investor" is, HSBC Bank USA, National Association.  The MIN status is inactive.

Mortgage Electronic Registration Systems, Inc. (hereafter "MERS") is not named as the payee of the Note, but is named as acting solely as a "nominee" for lender as the beneficiary of the security interest Deed of Trust.

The role of MERS and the actions they took have been shown to be in violation of standard procedure and accepted practices, and have separated the Note and the Deed of Trust.

Regardless of whether or not MERS in involved in a nominal capacity, the Deed of Trust must follow the Note pursuant to the language of the contract between the lender and the borrower and well established law.

     Copyright © 2012-Holmes & Galt LLC     www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

Irrespective of the role that MERS has established and played, and regardless of their actions to avoid the recording of Assignments in public records, the lender or the lender's successor and assigns are bound to do so under the terms of the Deed of Trust and all applicable laws including statutes of fraud.

Finally, it should be noted that whatever interest the original lender could claim in the subject Note was released shortly after the origination date of the Trust when it allegedly signed the Note in an attempt to deliver the Note to ACE Securities Corp. Home Equity Loan Trust 2006-HE3, thus MERS, even if it was to somehow be considered as a "duly empowered agent to the original lender would not have had any beneficial interest at the time if an Assignment were executed by it.

## COUNTY RECORDS

The Official Records of the Office of the Recorder of San Joaquin County, State of California were reviewed spanning the period of 2006-2014. The report records show the sale and finance of the subject property dated 02/01/2006, a Notice of Default and Election to Sell under Deed of Trust, an Assignment of Deed of Trust, a Notice of Trustee's Sale, a Substitution of Trustee and a Notice of Default and Election to Sell under Deed of Trust, all related to that Deed of Trust.

A Notice of Default and Election to Sell under Deed of Trust is recorded in the Official Records of the Office of the San Joaquin County Recorders, State of California on 08/08/2008 as Document 2008-130147.  Said document states that the mortgage loan, recorded on February 9, 2006 as Instrument No. 2006-032215, is in default and if not the arrears are not cured that the property, securing the loan could proceed to public auction.  Said document is signed by Taryn Dewar, as Agent, Default Resolution Network a division of Fidelity National Title Company Agent for the Beneficiary, By: Fidelity National Default Solutions, with a typewritten affixed date of August 7, 2008. Said document is not notarized.

Findings: A total of three fatal defects was identified with this document from the Max Gardner guidelines.  Said document is enacted by an entity that has no proven standing in which to request payment of the loan arrearage nor does it have the standing in which to pursue to foreclosure and auction said property.  This document is potentially fraudulent.

An Assignment of Deed of Trust California is recorded in the Official Records of the Office of the San Joaquin County Recorders, State of California on 01/30/2009 as Document 2009-017779. Said document states that Mortgage Electronic Registration Systems, Inc., Its Successors and Assigns as nominee for Encore Credit Corp., Its Successors and Assigns ("Assignor") does so assign all its rights, title and interest in a certain mortgage dated February 1, 2006, recorded

Copyright © 2012–Holmes & Galt LLC        www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

February 9, 2006 as Instrument Number 2006-032215 to HSBC Bank USA, N.A., as Trustee on behalf of Ace Securities Corp. Home Loan Trust and for the Registered Holders of Ace Securities Corp, Home Equity Loan Trust Series 2006-H3, Asset Backed Pass-through Certificates whose address in in care of Ocwen Loan Servicing, LLC.  This Assignment is made without recourse, representation or warranty and begins with the statement that this is entered into as of the 19th day of June 2006.  Said document is signed by Scott Anderson, Vice President, Mortgage Electronic Registration Systems, Inc. Acting Solely as Nominee for Encore Credit Corp., with a typewritten date affixed of on September 05, 2008.  Said document is notarized by Noemi Morales, commissioned Notary Public, State of Florida, County of Palm Beach with a typewritten date affixed of on September 05, 2008.

Findings: A total of seven fatal defects was identified from the Max Gardner guidelines.  Said document is enacted by an entity that is not the Holder in Due Course nor does it have the standing in which to enact anything.  The signor of this document is a well-known robosigner is involved and sought in many legal cases for their participation in alleged wrongdoings of many lenders, servicers, and creditors.  This document has no standing and is potentially fraudulent in nature.

A Notice of Trustee's Sale is recorded in the Official Records of the Office of the San Joaquin County Recorders, State of California on 01/30/2009.  Said document states that the beneficiary, Mortgage Electronic Registration Systems, Inc., under said Deed of Trust, recorded February 9, 2006 as Instrument No. 2006-032215, will proceed to auction on a specified date, the property commonly known as, 736 North Golden Avenue, Lodi, California  95240, if the defaulted amount is not brought current. Said document is signed by Rozalyn Tudor, Authorized Signature, Fidelity National Title Insurance Company as Trustee, with a typewritten affixed date of January 22, 2009. Said document is not notarized.

Findings: A total of two fatal defects was identified from the Max Gardner guidelines.  If taken at face value, this document appears to be prepared, filed and recorded accordingly.

A Substitution of Trustee is recorded in the Official Records of the Office of the San Joaquin County Recorders, State of California on 04/22/2014 as Document 2014-039007.  Said document states that the undersigned, HSBC Bank USA, N.A., as Trustee on behalf of Ace Securities Corp. Home Equity Loan Trust and for the registered holders of Ace Securities Corp. Home Equity Loan Trust, Series 2006-HE3, Asset Backed Pass-Through Certificates, By Its Servicer Ocwen Loan servicing, LLC, is the present Beneficiary under that certain Deed of Trust dated 02/01/2006 and recorded on 02/09/2006 as Instrument No. 2006-032215 of official records of San Joaquin County, California, and does so substitute Western Progressive, LLC as Trustee.  Said document is signed by Krystle D. Hernandez, Contract Management Coordinator, HSBC Bank USA, N.A., as

 Copyright © 2012–Holmes & Galt LLC     www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

Trustee on behalf of Ace Securities Corp. Home Equity Loan Trust and for the registered holders of Ace Securities Corp. Home Equity Loan Trust, Series 2006-HE3, Asset Backed Pass-Through Certificates, By Its Servicer Ocwen Loan servicing, LLC, with a handwritten date affixed of 4/16/2014.  Said document is notarized by Kristin Frontera, commissioned Notary Public, State of Florida, County of Palm Beach, with a typewritten and handwritten date affixed of this 16th day of April, 2014.

Findings: A total of two fatal defects was identified from the Max Gardner guidelines.  If this document is taken at face value, it is allegedly prepared, filed and recorded accordingly.  One note though is that the entity claiming to be the beneficiary is not truly and has no proven standing nor has it proven to be the Holder in Due Course.  This document would actually be allegedly fraudulent.

A Notice of Default and Election to sell under Deed of Trust is recorded in the Official Records of the Office of the San Joaquin County Recorders, State of California on 05/01/2014 as Document 2014-042513.  Said document states that by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such Deed of Trust and all documents evidencing obligations secured thereby, and has declared and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.  Said document is signed by Tamika Y. Smith, Trustee Sale Assistant, Western Progressive, LLC, as agent for beneficiary, with a typewritten affixed date of April 29, 2014. Said document is not notarized.

Findings: A total of three fatal defects was identified from the Max Gardner guidelines.  Said document reveals that the entity signing is signing on behalf of the Trust Fund's Trustee to which has no proven standing in which to do anything with this Deed of Trust.  Said document is potentially fraudulent.

        Copyright © 2012–Holmes & Galt LLC       www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

THESE CONCLUSIONS ARE SUPPORTED BY VARIOUS LEGAL RULINGS.

*"Indeed, in the event that a Mortgage loan somehow separates interests of the Note and the Deed of Trust, with the Deed of Trust lying with some independent entity, the Mortgage may become unenforceable. The practical effect of splitting the Deed of Trust from the promissory Note is to make it impossible for the holder of the Note to foreclose, unless the holder of the Deed of Trust is the agent of the holder of the Note."* (LANDMARK NATIONAL BANK, PLAINTIFF/APPELLEE, V. BOYD A. KESLER NO. 98,489 SUPREME COURT, KS SEPTEMBER 29 2008)

*"We agree with the judge that the plaintiffs, who were not the original Mortgagees, failed to make the required showing that they were the holders of the Mortgages at the time of foreclosure. As a result, they did not demonstrate that the foreclosure sales were valid to convey title to the subject properties, and their requests for a declaration of clear title were properly denied."* (U.S. BANK NATIONAL ASSOCIATION, TRUSTEE [FN1] VS. ANTONIO IBANEZ NO. SJC-10694. SUPREME JUDICIAL COURT, MA JANUARY 7, 2011)

*An Assignment of a Mortgage in the absence of the Assignment and physical delivery of the Note in question is a nullity.* (Sobel v Mutual Development, Inc., 313 So 2d 77 (1st DCA Fla 1975).

*"A crucial element in any Mortgage foreclosure proceeding is that the party seeking foreclosure must demonstrate that it has standing to foreclose."* McLean v. JP Morgan Chase Bank Nat'l Ass'n, 79 So. 3d 170, 173 (Fla. 4th DCA 2012).

          Copyright © 2012 - Holmes & Galt LLC          www.holmesgalt.com

Thomas & Marcella Benson – 736 North Golden Avenue, Lodi, CA  95240

DOCUMENTS & EXHIBITS:

| Exhibit | Document Obtained From: | Document name | Date signed | Date recorded |
|---------|------------------------|---------------|-------------|---------------|
| Financial Exhibit A | ABSNet Financial Research Platform | Loan Finder | | June 2014 |
| Financial Exhibit B | ABSNet Financial Research Platform | Related Parties | | June 2014 |
| Financial Exhibit B-1 | ABSNet Financial Research Platform | Third Party | | June 2014 |
| Financial Exhibit C | ABSNet Financial Research Platform | Capital Structure | | June 2014 |
| Financial Exhibit C-1 | ABSNet Financial Research Platform | The Pools | | June 2014 |
| Financial Exhibit C-2 | ABSNet Financial Research Platform | Pool Performance | | June 2014 |
| Financial Exhibit C-3 | ABSNet Financial Research Platform | The Tranches | | June 2014 |
| Exhibit B | Borrower via County Records | Deed of Trust Doc #2006-032215 | 02/01/2006 | 02/09/2006 |
| Exhibit C | Securities & Exchange Commission – EDGAR | The Trust Prospectus | | |
| Exhibit E | Borrower via County Records | Notice of Default and Election to Sell Doc#2008-130147 | 08/07/2008 | 08/08/2008 |
| Exhibit F | Borrower via County Records | Assignment of Deed of Trust Doc#2009-017779 | 09/05/2008 | 01/30/2009 |
| Exhibit G | Borrower via County Records | Notice of Trustee's Sale Doc#2009-017780 | 01/22/2009 | 01/30/2009 |
| Exhibit H | Borrower via County Records | Substitution of Trustee Doc #2014-039007 | 04/16/2014 | 04/22/2014 |
| Exhibit I | Borrower Via County Records | Notice of Default and Election to Sell under DOT Doc#2014-042513 | 04/29/2014 | 05/01/2014 |

These exhibits accompany this report.

Copyright © 2012-Holmes & Galt LLC      www.holmesgalt.com

# SECURITIZATION AUDIT REPORT
## EXHIBIT "B"

**Recording Requested By:**
**ORANGE COAST TITLE**
Recording Requested By:
**Encore Credit Corp**

Return To:

**Encore Credit Corp**
**1833 Alton Parkway**
**Irvine, CA 92606**

**DOC # 2006-032215**
02/09/2006 11:18A Fee:89.00
Page 1 of 21
Recorded in Official Records
County of San Joaquin
GARY W. FREEMAN
Assessor-Recorder-County Clerk
Paid by TITLE COURT SERVICE

Prepared By:

**Encore Credit Corp.**
**1833 Alton Parkway**
**Irvine, CA 92606**

────────[Space Above This Line For Recording Data]────────

# DEED OF TRUST

MIN 100180100003199559

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **February 1, 2006**
together with all Riders to this document.
(B) "Borrower" is THOMAS BENSON AND MARCELLA BENSON, HUSBAND AND WIFE, AS JOINT TENANTS.

Borrower is the trustor under this Security Instrument.
(C) "Lender" is **Encore Credit Corp, A California Corporation**

Lender is a **Corporation**
organized and existing under the laws of **California**

319955

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

Form 3005 1/01

-6A(CA) (0005).01
Page 1 of 15
Initials:

VMP MORTGAGE FORMS - (800)521-7291

Lender's address is 1833 Alton Parkway
Irvine, CA 92606

(D) "Trustee" is Fidelity National Title Insurance Company, A California
Corporation    17911 Von Karman Avenue, Suite 300   Irvine, California

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated February 1, 2006
The Note states that Borrower owes Lender three hundred sixty-one thousand and 00/100
                                                                                              Dollars
(U.S. $ 361,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than March 1, 2036

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [x] Other(s) [specify] |
| | | Prepayment Rider |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

-6A(CA) (0005).01                       Page 2 of 15              Initials:              319955
                                                                                 Form 3005  1.01

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale. the following described property located in the

         County           of            SAN JOAQUIN                    ;
   [Type of Recording Jurisdiction]         [Name of Recording Jurisdiction]

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT
"A".


Parcel ID Number: 041-260-12                    which currently has the address of
736 NORTH GOLDEN AVENUE                                               [Street]
LODI                                         [City], California 95240   [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

                                                    Initials: [signature]        319955

-6A(CA) (0005).01                  Page 2 of 15                          Form 3005   1/01

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

-GA(CA) (0005).01    Page 4 of 15    Initials: ___    319955    Form 3005   1/01

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

-6A(GA) (0005).01                         Page 5 of 15                Initials: [signature]        119955
                                                                                        Form 3005  1/01

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

319955

Initials: _____

-6A(CA) (0005).01                    Page 6 of 15                    Form 3005   1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

319955

Initials: _BMB_

-6A(CA) (0005).01                    Page 7 of 15                    Form 3005  1/01

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

319955

Initials: _____

-6A(CA) (0005).01                    Page 8 of 15                    Form 3005 1/01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

-6A(CA) (0005).01                    Page 9 of 15                    Initials: ____                    319955

                                                                                                        Form 3005 1/01

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

-6A(CA) (0005).01                    Page 10 of 15           Initials: [signature]      319955
                                                                         Form 3005  1/01

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

Initials: _____   319955

-6A(CA) (0005).01                                   Page 11 of 15                                   Form 3005  1/01

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

-6A(CA) (0005).01    Page 12 of 15    Initials:    319955    Form 3005  1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Initials: _____                319955

-6A(CA) (0005).01                Page 13 of 15                Form 3005  1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                   THOMAS   BENSON          -Borrower

_____          _____ (Seal)
                                   MARCELLA   BENSON         -Borrower

_____ (Seal)   _____ (Seal)
                  -Borrower                          -Borrower

_____ (Seal)   _____ (Seal)
                  -Borrower                          -Borrower

_____ (Seal)   _____ (Seal)
                  -Borrower                          -Borrower

319955

-6A(CA) (0005).01              Page 14 of 15              Form 3005  1/01

State of California
County of San Joaquin                              } ss.

On Feb. 2, 2006,          before me, Betty Lou Beyer, Notary Public,
                                                                personally appeared

THOMAS BENSON, MARCELLA BENSON

                                                    , personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

BETTY LOU BEYER
Commission # 1436848
Notary Public - California
San Joaquin County
My Comm. Expires Aug 29, 2007

_____ (Seal)

                                                    319955
Initials: _____                                   Form 3005  1/01

-6A(CA) (0005).01              Page 15 of 15

## Exhibit "A"

Lot 2 of tract no. 604, Lawrence Ranch Subdivision Unit no. 2, according to the official map thereof filed for record in vol. 16 of maps, page 106, San Joaquin County Records.

## Interest Only ADJUSTABLE RATE RIDER
### (Six-Month LIBOR Index (As Published In *The Wall Street Journal*)-Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 1st day of **February, 2006**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed ( the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Interest Only Adjustable Rate Note ("the Note") to Encore Credit Corp. A California Corporation ("Lender") of the same date and covering the property described in the Security Instrument and located at **736 NORTH GOLDEN AVENUE, LODI, CA 95240**

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY. THE NOTE REQUIRES INTEREST ONLY PAYMENTS FOR A PERIOD OF TIME.

**ADDITIONAL COVENANTS**
In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

2.   **INTEREST RATE**     The Note provides for an initial rate of 7.790%.

3.   **MONTHLY PAYMENT CHANGES**
The Note provides that before the First Principal and Interest Payment Due Date as described in section 4 below, my payments will consist only of the interest due on the unpaid principal balance of the Note. Thereafter, I will pay principal and interest by making a payment every month until I have paid all of the principal and interest and any other charges that I may owe under the Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before principal.

4.   **ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for changes in the monthly payments, as follows:
**(A)  Change Dates**
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of **March, 2009** , and the adjustable interest rate I will pay may change on that day every six months thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B)  The Index**
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average on interbank offered rates for six-month U.S. dollar-denominated deposits in the London Market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index".
If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C)  Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding **five and one-quarter** percentage points **(5.250%)** to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

RevDt: 08/05
EIOARMR1.UFF                                   Page 1 of 3                                   Initials: _____

The Note Holder will then determine the amount of the monthly payment, which prior to the First Principal and Interest Payment Due Date will be an amount sufficient to pay interest at my new interest rate and thereafter will be an amount that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 9.790% or less than 7.790%. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than one percentage (1.00%) points from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 12.790% or less than 7.790%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount on my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me, and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the **twenty-fifth (25th)** monthly payment due after the first Change Date.

**11. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform covenant 18 of the Security Instrument is amended to read as follows.

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 of the Interest Only Adjustable Rate Note, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.**

As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

RevDt: 04/05
EIOARMR2.UFF

Page 2 of 3

Initials:

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 of the Interest Only Adjustable Rate Note, Uniform Covenant 18 of the Security Instrument described in Section 11(A) of the Interest Only Adjustable Rate Note shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.**
     As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

     If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

     To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

     If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

     BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Interest Only Adjustable Rate Rider.

_____ (Seal)     _____ (Seal)
Signature                      -Borrower    -Borrower Signature              -Borrower
**THOMAS BENSON**                            **MARCELLA BENSON**

_____ (Seal)     _____ (Seal)
Signature                      -Borrower    -Borrower Signature              -Borrower

_____ (Seal)     _____ (Seal)
Signature                      -Borrower    -Borrower Signature              -Borrower

_____ (Seal)     _____ (Seal)
Signature                      -Borrower    -Borrower Signature              -Borrower

RevDt: 04/05                                         Initials: _____ _____
EIOARMR3.UFF              Page 3 of 3

# PREPAYMENT RIDER
## (Multi-State)

Loan Number:  319955

Date:  February 1, 2006

Borrower(s): THOMAS BENSON, MARCELLA BENSON

This Prepayment Rider is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of trust or Security Deed of the same date (the"Security Instrument") made by the undersigned (the "Borrower") as trustor or mortgagor in favor of Encore Credit Corp. A California Corporation (the "Lender").

To the extent that the provisions of the Prepayment Rider are inconsistent with the provisions of the Security Instrument, the provisions of the Rider shall prevail over and shall supersede any such inconsistent provisions of the Security Instrument.

Prepayment Covenants. Notwithstanding anything to the contrary set forth in the Security Instrument, Borrower and Lender covenant, and agree, as follows:

Subject to the Prepayment penalty provided below, I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". A "Full Prepayment" is the prepayment of the entire unpaid Principal due under the Note. A payment of only part of the unpaid Principal is known as a "Partial Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

**If within Thirty-six (36) months from the date of execution of the Security Instrument I make a full or partial Prepayment, and the total of such  Prepayments in any 12-month period exceeds TWENTY PERCENT (20%) of the original Principal amount of the loan, I will pay a Prepayment charge in an amount equal to SIX (6) months' advance interest on the amount by which the total on my Prepayments within that 12-month period exceeds TWENTY PERCENT (20%) of the original Principal amount of the loan.**

The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under the Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.

If my Note provides for changes in the interest rate, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

The Note Holder's failure to collect a Prepayment charge at the time a Prepayment is received shall not be deemed a waiver of such charge. Any Prepayment charge not collected at the time the Prepayment is received shall be payable on demand.

Rev Dt: 05/05                        Page: 1 of 2                        MULTPPR1.UFF

## PREPAYMENT RIDER
### (Multi-State)

All other provisions of the Security Instrument are unchanged and remain in full force and effect.

**NOTICE TO BORROWER**
   Do not sign this Addendum before you read it. This Addendum provides for the payment of a Prepayment penalty if you wish to repay the loan prior to the date provided for repayment in the Note.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED:


_____   2/2/06        _____   2/2/06
**THOMAS BENSON**          Date          **MARCELLA BENSON**        Date


_____                 _____
                           Date                                    Date


_____                 _____
                           Date                                    Date


_____                 _____
                           Date                                    Date


Rev Dt: 05/05                    Page: 2 of 2                    MULTPPR2.UFF

# SECURITIZATION AUDIT REPORT
# EXHIBIT "C"

**The Prospectus Supplement (to Prospectus Dated June 7, 2006) for the ACE Securities Corp. Home Equity Loan Trust Series 2006-HE3 is comprised of hundreds of pages.  The full document is found on the SEC website at either address below:**

http://www.sec.gov/Archives/edgar/data/1365337/000088237706002048/d518661.htm

http://www.sec.gov/Archives/edgar/data/1365337/000088237706002065/d518624.htm

**SECURITIZATION AUDIT REPORT**
**EXHIBIT "E"**

Doc #: 2008-130147
Fri Aug 08 10:34:27 PDT 2008
Page: 1 of 2   Fee: $13.00
Gary W. Freeman
San Joaquin County Recorders
Paid By: TITLE COURT SERVICE

Recording Requested By
and When Recorded Mail to:

Fidelity National Title Company
391 Howe Avenue
Suite 101
Sacramento, CA 95825

---

Trustee Sale No: 08-02342-5
Loan No: 80112733

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

### IMPORTANT NOTICE

### IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION,

and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is $11,465.50 as of August 6, 2008, and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the end of the three-month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or

if your property is in foreclosure for any other reason, contact : HSBC BANK USA, N.A., AS TRUSTEE ON BEHALF OF ACE SECURITIES CORP. HOME EQUITY LOAN TRUST AND FOR THE REGISTERED HOLDERS OF ACE SECURITIES CORP. HOME EQUITY LOAN TRUST, SERIES 2006-HE3, ASSET BACKED PASS-THROUGH CERTIFICATES C/O OCWEN LOAN SERVICING, LLC., 1675 PALM BEACH LAKES BLVD., WEST PALM BEACH, FL 33401  TS# 08-02342-5

FOR REINSTATEMENT OR PAYOFF QUOTES, PLEASE CONTACT THE LOAN RESOLUTION DEPARTMENT AT: 877-596-8580

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.  Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.

REMEMBER, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION. NOTICE IS HEREBY GIVEN THAT: Default has been declared under a Deed of Trust dated as of February 1, 2006, executed by THOMAS BENSON AND MARCELLA BENSON, HUSBAND AND WIFE, AS JOINT TENANTS, as trustor, to secure obligations in favor of ENCORE CREDIT CORP, A CALIFORNIA CORPORATION AS LENDER, AND MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., as Beneficiary, recorded on February 9, 2006, as Instrument No. 2006-032215 of Official Records in the office of the Recorder of San Joaquin County, CA, and that

The Deed of Trust encumbers certain property more particularly described therein (the "Trust Property"), and that

The Deed of Trust secures the  payment of and the performance of certain obligations, including but not limited to, the obligations set forth in a promissory note(s) with a face amount of $361,000.00, and that

A breach of, and default in, the obligations for which said Deed of Trust is security has occurred in that the trustor has failed to perform obligations pursuant to or under the Note and/or the Deed of Trust, specifically: failed to pay payments which became due;   together with late charges due; failed to pay advances made by the Beneficiary; and that

By reason thereof, the present beneficiary under such Deed of Trust, has delivered to said Trustee a Declaration and Demand for Sale, and has deposited with said duly appointed Trustee such Deed of Trust and all documents evidencing the obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the Trust Property to be sold to satisfy the obligations secured thereby.

Default Resolution Network
a division of Fidelity National Title Company          Date: August 7, 2008
Agent for the Beneficiary
By:Fidelity National Default Solutions


By:

        Taryn Dewar, as agent

# SECURITIZATION AUDIT REPORT
# EXHIBIT "F"

(?)

08-023412-5

Doc #: 2009-017779
Fri Jan 30 10:52:57 PST 2009
Page: 1 of 2 Fee: $13.00

San Joaquin County Recorders
Paid By: TITLE COURT SERVICE

Prepared by: Maria Alvarez
Ocwen Loan Servicing,LLC
1661 Worthington Road, Suite 100
West Palm Beach, Florida, 33409
Phone Number: 561-682-8835
Loan Number: 80112733
Attorney Code:22799

E841047

**ASSIGNMENT OF DEED OF TRUST
CALIFORNIA**

This **ASSIGNMENT OF DEED OF TRUST** is made and entered into as of the 19TH day of JUNE 2006, from **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**, whose address 3300 SW 34 Avenue, Suite 101, Ocala, FL 34474, its successors and assigns, as nominee for ENCORE CREDIT CORP., its successors and assigns, ("Assignor) to **HSBC BANK USA, N.A., AS TRUSTEE ON BEHALF OF ACE SECURITIES CORP: HOME EQUITY LOAN TRUST AND FOR THE REGISTERED HOLDERS OF ACE SECURITIES CORP. HOME EQUITY LOAN TRUST, SERIES 2006-HE3, ASSET BACKED PASS-THROUGH CERTIFICATES**, whose address is c/o Ocwen Loan Servicing, LLC, 1661 Worthington Road, Suite 100, West Palm Beach, Florida, 33409, its successors and assigns, all its rights, title and interest in and to a certain mortgage duly recorded in the Office of the County Recorder of **SAN JOAQUIN** County, State of **CALIFORNIA**, as follows:

Trustor: THOMAS BENSON AND MARCELLA BENSON
Trustee: FIDELITY NATIONAL TITLE INSURANCE COMPANY
Beneficiary: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ACTING SOLELY AS NOMINEE FOR ENCORE CREDIT CORP.
Document Date: FEBRUARY 1, 2006
Date Recorded: February 9, 2006
Document/Instrument/Entry Number: 2006-032215
Property Address: 736 NORTH GOLDEN AVENUE , LODI , CA

Together with any and all notes and obligations therein described or referred to, the debt respectively secured thereby and all sums of money due and to become due thereon, with interest thereon, and attorney's fees and all other charges.
This Assignment is made without recourse, representation or warranty.

DATED: SEPTEMBER 05, 2008 .

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
ACTING SOLELY AS NOMINEE FOR ENCORE CREDIT CORP.

BY: _____
NAME: Scott Anderson
TITLE: Vice President

State of Florida _____ )
County of Palm Beach )

On SEPTEMBER 05, 2008, before me, _Noemi Morales_ , Notary Public personally appeared Scott Anderson, the Vice President for MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ACTING SOLELY AS NOMINEE FOR ENCORE CREDIT CORP., who proved to me on the basis of satisfactory evidence to the person whose name is subscribed to the within Instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the Instrument.

Witness my hand and official seal.

Notary: _____

MIN: 100180100003199559

**NOEMI MORALES**
Notary Public, State of Florida
My Commission # DD 478684
Expires: October 5, 2009

MERS Ph.#: (888) 679 ~ 6377

# SECURITIZATION AUDIT REPORT
# EXHIBIT "G"

When Recorded Mail To:

Doc #: 2009-017780
Fri Jan 30 10:02:07 PST 2009
Page: 1 of 2   Fee: $11.00

San Joaquin County Recorders
Paid By: TITLE COURT SERVICE

Fidelity National Title Insurance Company

3075 Prospect Park Dr., Ste 100

Rancho Cordova, CA 95670

---

Trustee Sale No.:08-02342-5 Loan No.: 80112733  TSG No.:  E841047

APN: 041-260-12

## NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED February 1, 2006. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

On **February 17, 2009** at 10:00 AM, **Fidelity National Title Insurance Company** as the duly appointed Trustee under and pursuant to Deed of Trust Recorded on **February 9, 2006**, as Instrument No. 2006-032215 of Official Records in the office of the Recorder of San Joaquin County, CA , executed by: **THOMAS BENSON AND MARCELLA BENSON, HUSBAND AND WIFE, AS JOINT TENANTS**, as Trustor, and **ENCORE CREDIT CORP, A CALIFORNIA CORPORATION AS LENDER, AND MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.** as Beneficiary, WILL SELL AT PUBLIC AUCTION TO THE HIGHEST BIDDER FOR CASH (payable at time of sale in lawful money of the United States, by cash, a cashier's check drawn by a state or national bank, a check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, savings association, or savings bank specified in section 5102 of the Financial Code and authorized to do business in this state): **at the East Weber Avenue entrance to the County Courthouse, 222 East Weber Avenue, Stockton, CA** , all right, title and interest conveyed to and now held by it under said Deed of Trust in the property situated in said County, California describing the land therein: AS MORE FULLY DESCRIBED IN SAID DEED OF TRUST

The property heretofore described is being sold "as is"  The street address and other common designation, if any, of the real property described above is purported to be: **736 Golden Avenue, Lodi, CA 95240**

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein. Said sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by said Deed of Trust, with interest thereon, as

Trustee Sale No.:08-02342-5 Loan No.: 80112733

TSG No.: E841047      APN: 041-260-12

provided in said note(s), advances, if any, under the terms of the Deed of Trust, estimated fees, charges and expenses of the Trustee and of the trusts created by said Deed of Trust, to-wit: $397,349.29 (Estimated)

Accrued interest and additional advances, if any, will increase this figure prior to sale.

FOR REINSTATEMENT OR PAYOFF QUOTES, PLEASE CONTACT THE LOAN RESOLUTION DEPARTMENT AT: 877-596-8580

Beneficiary: HSBC BANK USA, N.A., AS TRUSTEE ON BEHALF OF ACE SECURITIES CORP. HOME EQUITY LOAN TRUST AND FOR THE REGISTERED HOLDERS OF ACE SECURITIES CORP. HOME EQUITY LOAN TRUST, SERIES 2006-HE3, ASSET BACKED PASS-THROUGH CERTIFICATES
C/O Fidelity National Title Insurance Company
3075 Prospect Park Dr., Ste 100
Rancho Cordova, CA 95670
916-636-0114

SALE INFORMATION CAN BE OBTAINED ON LINE AT www.fidelityasap.com
AUTOMATED SALES INFORMATION PLEASE CALL 714-259-7850

The beneficiary under said Deed of Trust heretofore executed and delivered to the undersigned a written Declaration of Default and Demand for sale, and a written Notice of Default and Election to Sell. The undersigned caused said Notice of Default and Election to Sell to be recorded in the county where the real property is located and more than three months have elapsed since such recordation.

DATE January 22, 2009

FIDELITY NATIONAL TITLE INSURANCE COMPANY AS TRUSTEE

_Rozalyn Tudor_

Rozalyn Tudor Authorized Signature

The undersigned mortgagee, beneficiary or authorized agent for the mortgagee or beneficiary pursuant to California Civil Code § 2923.5(b) declares that the mortgagee, beneficiary or the mortgagee's or beneficiary's authorized agent contacted the borrower to assess the borrower's financial situation and to explore options for the borrower to avoid foreclosure.

Fidelity National Title Company, authorized agent for the mortgagee or beneficiary

By: _Rozalyn Tudor_ , Rozalyn Tudor , Authorized Signature

# SECURITIZATION AUDIT REPORT
# EXHIBIT "H"

Doc #: 2014-039007
04/22/2014 07:57:37 AM
Page 1 of 2    Fee: $25.00
Kenneth W. Blakemore
San Joaquin County Recorder
Paid By: PREMIUM TITLE TSG

RECORDING REQUESTED BY:
Premium Title Agency, Inc

AND WHEN RECORDED MAIL TO:
Western Progressive, LLC
2002 Summit Blvd, Suite 600
Atlanta, GA 30319

TS No.: 2014-00817-CA                     558011273344          SPACE ABOVE THIS LINE FOR RECORDER'S USE

## SUBSTITUTION OF TRUSTEE

WHEREAS, Thomas Benson And Marcella Benson, Husband And Wife, As Joint Tenants. was the original Trustor, FIDELITY NATIONAL TITLE INSURANCE COMPANY, A CALIFORNIA CORPORATION was the original Trustee, and ENCORE CREDIT CORP, A CALIFORNIA CORPORATION, A CORPORATION, AS LENDER, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., was the original Beneficiary under that certain Deed of Trust dated 02/01/2006 and recorded on 02/09/2006 as Instrument No. 2006-032215, in book ---, page --- of Official Records of San Joaquin County, California, and

WHEREAS, the undersigned is the present Beneficiary under said Deed of Trust, and

WHEREAS, the undersigned desires to substitute a new Trustee under said Deed of Trust in place and instead of said original Trustee, or Successor Trustee, there under, in the manner in said Deed of Trust provided,

NOW, THEREFORE, the undersigned hereby substitutes Western Progressive, LLC, 2002 Summit Blvd, Suite 600, Atlanta, GA 30319 as Trustee under said Deed of Trust.

2014-039007  Page 2 of 2
04/22/2014 07:57:37 AM

TS No.: 2014-00817-CA                    558011273344

     Whenever the context hereof so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

Dated: 4|16|2014

                      **HSBC Bank USA, N.A., as Trustee on behalf of ACE Securities Corp. Home Equity Loan Trust and for the registered holders of ACE Securities Corp. Home Equity Loan Trust, Series 2006-HE3, Asset Backed Pass-Through Certificates., By its Servicer Ocwen Loan servicing, LLC**

                      Krystle D. Hernandez
                      Contract Management Coordinator

STATE OF FLORIDA

COUNTY OF PALM BEACH

     The foregoing instrument was acknowledged and sworn before me _____ this __16__ day of April , 2014, by **Krystle D. Hernandez** as a _Contract Management Coordinator_ of Ocwen Loan Servicing, LLC, who is personally known to me or who has produced _____ as identification.

My Commission Expires: 3/31/18

                      Notary Public - State of Florida

                      Notary Public State of Florida
                      Kristin Frontera
                      My Commission FF 106101
                      Expires 03/31/2018

# SECURITIZATION AUDIT REPORT
# EXHIBIT "I"

RECORDING REQUESTED BY:

Premium Title of California

WHEN RECORDED MAIL TO:

Western Progressive, LLC

2002 Summit Blvd, Suite 600

Atlanta, GA 30319

Doc #: 2014-042513
05/01/2014 08:00:45 AM
Page 1 of 5    Fee: $34.00
Kenneth W. Blakemore
San Joaquin County Recorder
Paid By: PREMIUM TITLE TSG

---

Loan No.: 80112733                                      TS No. 2014-00817-CA
                                                        APN No.:041-260-12

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER
## DEED OF TRUST

### PURSUANT TO CIVIL CODE § 2923.3(a), THE SUMMARY OF INFORMATION REFERRED TO BELOW IS NOT ATTACHED TO THE RECORDED COPY OF THIS DOCUMENT BUT ONLY TO THE COPIES PROVIDED TO THE TRUSTOR.

NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED
注：本文件包含一个信息摘要
참고사항: 본 첨부 문서에 정보 요약서가 있습니다
NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACION DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY

### IMPORTANT NOTICE
**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until approximately 90 days from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is **10,848.75** as of 04/25/2014 ,and will increase until your account becomes current. While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Loan No.: 80112733                                    TS No. 2014-00817-CA

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than three months after this notice of default is recorded) to, among other things. (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

**To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:**

**Ocwen Loan Servicing, LLC HSBC Bank USA, N.A., as Trustee on behalf of ACE Securities Corp. Home Equity Loan Trust and for the registered holders of ACE Securities Corp. Home Equity Loan Trust, Series 2006-HE3, Asset Backed Pass-Through Certificates By Ocwen Loan Servicing, LLC, its attorney in-fact**

C/O Western Progressive, LLC

30 Corporate Park, Suite 450

Irvine, California 92606

Beneficiary Phone: 877-596-8580

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure. **Remember, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.**

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

NOTICE IS HEREBY GIVEN: That Western Progressive, LLC is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary under a Deed of Trust dated 02/01/2006, executed by, **Thomas Benson And Marcella Benson, Husband And Wife, As Joint Tenants.**, as Trustor, to secure certain obligations in favor of ENCORE CREDIT CORP, A CALIFORNIA CORPORATION, A CORPORATION, AS LENDER, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS BENEFICIARY., recorded 02/09/2006 , as Instrument No. 2006-032215 , in Book ---, Page --- , of Official Records in the Office of the Recorder of San Joaquin County, California describing land therein as: **As more particularly described on**

Loan No.: 80112733                                    TS No. 2014-00817-CA

said Deed of Trust.

Street Address or other common designation of real property:     **736 North Golden Avenue, Lodi, CA 95240**

The subject obligation includes **ONE NOTE(S) FOR THE ORIGINAL** sum of 361,000.00. A breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of the following:

**Installment of Principal and Interest plus impounds and/or advances which became due on 09/01/2013 plus late charges, and all subsequent installments of principal, interest, balloon payments, plus impounds and/or advances and late charges that become payable.**
**You are responsible to pay all payments and charges due under the terms and conditions of the loan documents which come due subsequent to the date of this notice, including, but not limited to, foreclosure trustee fees and costs, advances and late charges.**
**Furthermore, as a condition to bring your account in good standing, you must provide the undersigned with written proof that you are not in default on any senior encumbrance and provide proof of insurance.**
**Nothing in this notice of default should be construed as a waiver of any fees owing to the beneficiary under the deed of trust, pursuant to the terms and provisions of the loan documents.**

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

"See Attached Declaration"

WE ARE ASSISTING THE BENEFICIARY TO COLLECT A DEBT AND ANY INFORMATION WE OBTAIN WILL BE USED FOR THE PURPOSE BY EITHER OURSELVES OR THE BENEFICIARY, WHETHER RECEIVED ORALLY OR IN WRITING. YOU MAY DISPUTE THE DEBT OR A PORTION THEREOF WITHIN THIRTY (30) DAYS. THEREAFTER WE WILL OBTAIN AND FORWARD TO YOU WRITTEN VERIFICATION THEREOF. SHOULD YOU NOT DO
SO, THE DEBT WILL BE CONSIDERED VALID. IN ADDITION, YOU MAY REQUEST THE NAME AND ADDRESS OF THE ORIGINAL CREDITOR IF DIFFERENT FROM THE CURRENT ONE.

**2. The mortgage servicer has exercised due diligence to contact the borrower pursuant to California Civil Code § 2923.55(f) to "assess the borrower's financial situation and explore options for the borrower to avoid foreclosure." Thirty (30) days, or more, have passed since these due diligence requirements were satisfied.**

Loan No.: 80112733                                    TS No. 2014-00817-CA

Dated: April 29, 2014        Western Progressive, LLC, as agent for beneficiary
                             C/O 30 Corporate Park Suite 450
                             Irvine, CA 92606
                             Beneficiary Phone: 877-596-8580


                             _____
                             Tanzika Y. Smith, Trustee Sale Assistant

## California Declaration of Compliance
### (Civ. Code § 2923.55(c))

Borrower(s):   Thomas Benson
               Marcella Benson
Loan No.:      80112733

The undersigned declares as follows:

I am employed by the undersigned mortgage servicer, and I have reviewed its business records for the borrower's loan, including the borrower's loan status and loan information, to substantiate the borrower's present loan default and the right to foreclose. The information set forth herein is accurate, complete and supported by competent and reliable evidence that I have reviewed in the mortgage servicer's business records. Those records reflect *one* of the following.

☐   The mortgage servicer contacted the borrower to assess the borrower's financial situation and to explore options for the borrower to avoid foreclosure as required by California Civil Code § 2923.55. Thirty days, or more, have passed since the initial contact was made.

☑   The mortgage servicer has exercised due diligence to contact the borrower pursuant to California Civil Code § 2923.55(f) to "assess the borrower's financial situation and explore options for the borrower to avoid foreclosure." Thirty (30) days, or more, have passed since these due diligence requirements were satisfied.

☐   The mortgage servicer was not required to comply with California Civil Code § 2923.55 because the individual does not meet the definition of a "borrower" under Civil Code §2920.5(c).

☐   The mortgage servicer was not required to comply with California Civil Code § 2923.55 because the above-referenced loan is not secured by a first lien mortgage or deed of trust that secures a loan on "owner-occupied" residential real property as defined by California Civil Code § 2924.15(a)

Signed and Dated:

By: Ocwen Loan Servicing, LLC, as Servicer for HSBC Bank USA, N.A., as Trustee on behalf of ACE Securities Corp. Home Equity Loan Trust and for the registered holders of ACE Securities Corp. Home Equity Loan Trust, Series 2006-HE3, Asset Backed Pass-Through Certificates

**Matthew Owens**   Contract Management Coordinator

Print Name                                    Signature                              Date

# EXHIBIT "2"

# Affidavit

## Thomas and Marcella Benson

### Securitization Analysis and County Records Report

For a loan given on February 01, 2006, for the property commonly known as 736 Golden Avenue, Lodi, CA 95240.

I, Selena Nieman, a citizen of the United States, being of majority in age, declare as follows, under penalty of perjury of the laws of the United States of America and the State of California that the facts stated herein are true, correct and complete in all material fact, except as to those matters that are herein, made upon information and belief.  And as to those claims or facts, the undersigned believes them to be true and admissible as evidence in a court of law, and if called upon as a witness, I will testify to the veracity of my statements:

1. The contents of this report are factual, but it is provided for informational purposes only and is not to be construed as "legal advice."[1]

2. I am a Mortgage Securitization Analyst and my qualification, expertise and experience provide me with the background necessary to be qualified as an expert in this field.

3. I am a subscriber to the ABSNet Professional Service, licensed to use such service. I have completed the required training and engaged in continual education through ABSNet, to stay abreast of ABSNet Professional Service's latest progress and developments. I have the requisite knowledge and the trained ability to navigate and perform effective searches on the ABSNet Financial System.

4. At the request of the borrowers, I researched all of the following:

    a. ABSNet Financial Research Platforms, Fannie Mae loan finder, Freddie Mac loan finder, Mortgage Electronic Registration System, the Official Records of the Office of the Recorder of San Joaquin County, State of California, the Securities and Exchange Commission - EDGAR, and other various public information resources, which have been identified in the accompanying Securitization Analysis and County Records Report.

    b. I also conducted a complete review of all documentation provided to me for the borrower's property address stated above, which has been detailed in the accompanying Securitization Analysis and County Records Report.

---

[1] The client has been strongly advised to seek legal consultation from a competent legal professional in connection with the content of this report and how to properly use it.

Based upon the research and information review, I concluded the following:

**The chain of title has been broken. There is no clear ownership of the Note.**

**The Note and Deed of Trust have been separated.**

NOTE

A copy of the Note was not made available for review.  Below is what could be derived from the Deed of Trust.

On February 1, 2006, Thomas Benson and Marcella Benson, executed a negotiable promissory Note in the amount of $361,000.00 for 736 North Golden Avenue, Lodi, CA  95240. The Lender is Encore Credit Corp, A California Corporation.

Through research conducted on the ABSNet Financial Research Platform, the loan was found to be in the ACE Securities Corp. Home Equity Loan Trust 2006-HE3.

Since a copy of the Note was not available for review, the chain of endorsements could not be reviewed and verified.

The Pooling and Servicing Agreement (PSA), is a public record available on the website of the Securities Exchange Commission.  It is the official agreement that created the ACE Securities Corp. Home Equity Loan Trust 2006-HE3.  The Trust and agreements of the Trust are also described in a Prospectus Supplement and Prospectus, available on the SEC website.

A cutoff date of June 1, 2006, with a closing date of on or about June 27, 2006, was set by the Trust. The promissory Note, in this case, allegedly became Trust property in compliance with the requirements set forth in the PSA. However there were no Assignments found that could verify this. This loan should not have been placed in this Trust.

As regards the closing date, the Trust agreement is filed under oath with the Securities and Exchange Commission.  The assets of the Trust, as well as their acquisition by the Trust are governed under the law.

If the chain of securitization had been done properly: The loan would have originally been sold to the Sponsor, DB Structured Products, Inc., a Delaware Corporation and then sold to the Depositor, ACE Securities Corp., a Delaware Corporation and finally transferred to ACE Securities Corp. Home Equity Loan Trust 2006-HE3.

There is no evidence to support that this occurred.

## DEED OF TRUST

On February 1, 2006, Thomas Benson and Marcella Benson, husband and wife as Joint Tenants, executed a security interest in the form of a Deed of Trust in the amount of $361,000.00 for 736 North Golden Avenue, Lodi, CA  95240.

The security instrument was filed as Document Number 2006-032215 in the Official Records of the Office of the Recorder of San Joaquin County, State of California on February 9, 2006.

There is record of an Assignment to the Trust, but it was approximately three years after the closing date of the Trust acceptance, even though the signor of the Assignment document attempted to back date the document to be in line with the Trust Fund reconveyance allowance.

While the Note has allegedly traveled to the ACE Securities Corp. Home Equity Loan Trust 2006-HE3, the Deed of Trust has remained with the original lender Encore Credit Corp., A California Corporation.

Thus, any failure to deliver the Deed of Trust or delivery of the Deed of Trust without its Assignments as regulated by these Trusts in general could be a void act for the reason that it violated the express terms of the Trust instrument.

## MERS

Because this loan was registered with MERS, all Assignments would have required recording in the public land records to keep the chain of title intact. It further drives home how critical the Assignments were in keeping a clear chain of title.

Many Securitized Trust Funds attempted to circumvent the filing and recording of land documents in the Public Land Records by utilizing The Mortgage Electronic Registration System to "track and transfer" Notes and operate as their "nominee" or "agent".  MERS is a private membership club originally set up by the Banking Institutions who claimed that the electronic database would "streamline" the tracking and transfers of loans.

Lenders, Investors and Servicers may all become members; however borrowers are not allowed membership. Thus MERS can be likened to a private club, where only certain members have access to certain information.  Thus it cannot replace the public land records because borrowers lose track of who they are truly indebted to and cannot confirm for themselves that Mortgage or Deed of Trust recorded with the public land records has been kept with the Note throughout the tracking and transferring done by MERS.  This is because with the MERS membership, members do not have to record Assignments each time they transfer the Note.

MERS provides their services to their member companies by granting them access to the online systems and then letting those members, under the name of MERS, do their

own transfers and tracking. These MERS members can even initiate Assignments to be recorded when a foreclosure process needs to be executed. The member company need only designate an employee within their company to be the "Authorized Agent" or even "Vice President" of MERS and then they may do their own tracking, transferring, and sign official documents as if they were actually an employee of MERS, while still in the employ of the member company. Often these members are not the holders of the Note. They are merely the servicers, who hold no beneficial interest in the Note. These servicers literally log onto the MERS system and prepare an Assignment which they record at the county.  The servicer will represent themselves as the Assignor stating that they are a vice president or authorized agent of MERS and assign the Mortgage or Deed of Trust to themselves. Just as often, the foreclosure attorney firm, in the employ of the Servicer will pretend to be the "MERS Employee" tracking and transferring and assigning a Note that they have no beneficial interest in. There is no known regulation or oversight of this MERS Member System used by the banking industry.

The Deed of Trust was found to have MIN 100180100003199559.  A search of the MERS database produced the servicer of Ocwen Loan Servicing, LLC and the "Investor" is, HSBC Bank USA, National Association.  The MIN status is inactive.

Mortgage Electronic Registration Systems, Inc. (hereafter "MERS") is not named as the payee of the Note, but is named as acting solely as a "nominee" for lender as the beneficiary of the security interest Deed of Trust.

The role of MERS and the actions they took have been shown to be in violation of standard procedure and accepted practices, and have separated the Note and the Deed of Trust.

In 2005, MERS was trying to foreclose in South Carolina. The South Carolina Court, citing MERS v. Nebraska Dept. of Banking and Finance held that MERS does not have standing to foreclose.  In the Nebraska case, MERS put forth that they had no independent right to collect on any debt because MERS itself had not extended any credit, and none of the Mortgage debtors owed MERS any money.  This Nebraska ruling is an important ruling because of the assertions made wholly and specifically by MERS, which the South Carolina judge relied upon as to the truth of their actual role.

Regardless of whether or not MERS in involved in a nominal capacity, the Deed of Trust must follow the Note pursuant to the language of the contract between the lender and the borrower and well established law.

Irrespective of the role that MERS has established and played, and regardless of their actions to avoid the recording of Assignments in public records, the lender or the lender's successor and assigns are bound to do so under the terms of the Deed of Trust and all applicable laws including statutes of fraud.

Finally, it should be noted that whatever interest the original lender could claim in the subject Note was released shortly after the origination date of the Trust when it allegedly signed the Note in an attempt to deliver the Note to ACE Securities Corp. Home Equity Loan Trust 2006-HE3, thus MERS, even if it was to somehow be considered as a "duly empowered agent to the original lender would not have had any beneficial interest at the time if an Assignment were executed by it.

## COUNTY RECORDS

The Official Records of the Office of the Recorder of San Joaquin County, State of California were reviewed spanning the period of 2006-2014. The report records show the sale and finance of the subject property dated 02/01/2006, a Notice of Default and Election to Sell under Deed of Trust, an Assignment of Deed of Trust, a Notice of Trustee's Sale, a Substitution of Trustee and a Notice of Default and Election to Sell under Deed of Trust, all related to that Deed of Trust.

A Notice of Default and Election to Sell under Deed of Trust is recorded in the Official Records of the Office of the San Joaquin County Recorders, State of California on 08/08/2008 as Document 2008-130147. Said document states that the mortgage loan, recorded on February 1, 2006 as Instrument No. 2006-032215, is in default and if not the arrears are not cured that the property, securing the loan could proceed to public auction. Said document is signed by Taryn Dewar, as agent, Default Resolution Network a division of Fidelity National Title Company Agent for the Beneficiary, By: Fidelity National Default Solutions, with a typewritten affixed date of August 7, 2008. Said document is not notarized.

Findings: A total of three fatal defects was identified with this document from the Max Gardner guidelines. Said document is enacted by an entity that has no proven standing in which to request payment of the loan arrearage nor does it have the standing in which to pursue to foreclosure and auction said property. This document is potentially fraudulent.

An Assignment of Deed of Trust California is recorded in the Official Records of the Office of the San Joaquin County Recorders, State of California on 01/30/2009 as Document 2009-017779. Said document states that Mortgage Electronic Registration Systems, Inc., Its Successors and Assigns as nominee for Encore Credit Corp., Its Successors and Assigns ("Assignor") does so assign all its rights, title and interest in a certain mortgage dated February 1, 2006, recorded February 9, 2006 as Instrument Number 2006-032215 to HSBC Bank USA, N.A., as Trustee on behalf of Ace Securities Corp. Home Loan Trust and for the Registered Holders of Ace Securities Corp, Home Equity Loan Trust Series 2006-H3, Asset Backed Pass-through Certificates whose address in care of Ocwen Loan Servicing, LLC. This Assignment is made without recourse, representation or warranty and begins with the statement that this is entered into as of the 19th day of June 2006. Said document is signed by Scott Anderson, Vice President, Mortgage Electronic Registration Systems, Inc. Acting Solely as Nominee for Encore Credit Corp., with a typewritten date affixed of on September 05, 2008. Said document is notarized by Noemi

Morales, commissioned Notary Public, State of Florida, County of Palm Beach with a typewritten date affixed of on September 05, 2008.

Findings: A total of seven fatal defects was identified from the Max Gardner guidelines. Said document is enacted by an entity that is not the Holder in Due Course nor does it have the standing in which to enact anything. The signor of this document is a well-known robosigner is involved and sought in many legal cases for their participation in alleged wrongdoings of many lenders, servicers, and creditors. This document has no standing and is potentially fraudulent in nature.

A Notice of Trustee's Sale is recorded in the Official Records of the Office of the San Joaquin County Recorders, State of California on 01/30/2009. Said document states that the beneficiary, Mortgage Electronic Registration Systems, Inc., under said Deed of Trust, recorded February 9, 2006 as Instrument No. 2006-032215, will proceed to auction on a specified date, the property commonly known as, 736 North Golden Avenue, Lodi, California 95240, if the defaulted amount is not brought current. Said document is signed by Rozalyn Tudor, Authorized Signature, Fidelity National Title Insurance Company as Trustee, with a typewritten affixed date of January 22, 2009. Said document is not notarized.

Findings: A total of two fatal defects was identified from the Max Gardner guidelines. If taken at face value, this document appears to be prepared, filed and recorded accordingly.

A Substitution of Trustee is recorded in the Official Records of the Office of the San Joaquin County Recorders, State of California on 04/22/2014 as Document 2014-039007. Said document states that the undersigned, HSBC Bank USA, N.A., as Trustee on behalf of Ace Securities Corp. Home Equity Loan Trust and for the registered holders of Ace Securities Corp. Home Equity Loan Trust, Series 2006-HE3, Asset Backed Pass-Through Certificates, By Its Servicer Ocwen Loan servicing, LLC, is the present Beneficiary under that certain Deed of Trust dated 02/01/2006 and recorded on 02/09/2006 as Instrument No. 2006-032215 of official records of San Joaquin County, California, and does so substitute Western Progressive, LLC as Trustee. Said document is signed by Krystle D. Hernandez, Contract Management Coordinator, HSBC Bank USA, N.A., as Trustee on behalf of Ace Securities Corp. Home Equity Loan Trust and for the registered holders of Ace Securities Corp. Home Equity Loan Trust, Series 2006-HE3, Asset Backed Pass-Through Certificates, By Its Servicer Ocwen Loan servicing, LLC, with a handwritten date affixed of 4/16/2014. Said document is notarized by Kristin Frontera, commissioned Notary Public, State of Florida, County of Palm Beach, with a typewritten and handwritten date affixed of this 16th day of April, 2014.

Findings: A total of two fatal defects was identified from the Max Gardner guidelines. If this document is taken at face value, it is allegedly prepared, filed and recorded accordingly. One note though is that the entity claiming to be the beneficiary is not truly and has no proven standing nor has it proven to be the Holder in Due Course. This document would actually be allegedly fraudulent.

A Notice of Default and Election to sell under Deed of Trust is recorded in the Official Records of the Office of the San Joaquin County Recorders, State of California on 05/01/2014 as Document 2014-042513. Said document states that by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such Deed of Trust and all documents evidencing obligations secured thereby, and has declared and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby. Said document is signed by Tamika Y. Smith, Trustee Sale Assistant, Western Progressive, LLC, as agent for beneficiary, with a typewritten affixed date of April 29, 2014. Said document is not notarized.

Findings: A total of three fatal defects was identified from the Max Gardner guidelines. Said document reveals that the entity signing is signing on behalf of the Trust Fund's Trustee to which has no proven standing in which to do anything with this Deed of Trust. Said document is potentially fraudulent.

### SERVICER

The servicer is not the original lender and has no beneficial interest in the Note – should it attempt to foreclose in the future.

There is a practice where lenders now allow the servicer to "hold the documents" on behalf of this Trust. As a part of "holding" these documents, the servicer is also conducting foreclosure proceedings. In many cases to the untrained eye, this is perfectly "valid" because the servicer and original lender appear to be the same, which is not the case with this loan.

As has been shown *In Re Jacobson*, regardless of whether or not the name of the company has changed, their beneficial interest in the Note has changed.

With each sale and transfer of the Note, the Deed of Trust also had to be transferred. The recognized, accepted, and publicly verifiable transfers of land records in existence in the United States are those public records maintained at the county level.

A failure to transfer the Deed of Trust through properly recorded Assignments via this accepted medium for each sale would cause critical problems for the Trust Fund: The Trust itself did not achieve a true sale at each step of the process, which would prevent the Holder In Due Course Status and True Sale from being achieved.

Although the Note had been endorsed, the asset that was the collateral for that Trust was not transferred: this could mean that the placement of the Note within the Trust was a null and void act. The chain of title becomes broken and because the Trust had set a closing date, once that date and any grace periods had expired, it was not possible to repair the break in the chain of title.

The absence of Assignments in conjunction with the sale of the Note (Depositor, Sponsor, and Trustee) does not allow for independent verification that this Note was sold into this Trust within the time frames allowed. Thus, any failure to deliver the Deed of Trust or delivery of the Deed of Trust without its Assignments as regulated by these Trusts in general could be a void act for the reason that it violated the express terms of the Trust instrument.

Previously stated and supported in this report, generally, if the Deed of Trust and the Note are not together with the same entity, there can be no legal enforcement of the Note. The Deed of Trust enforces the Note and provides the capability for the lender to foreclose on the property. Thus, if the Deed of Trust and the Note are separated, foreclosure legally cannot occur: conversely, the Note cannot be enforced by the Deed of Trust if each contains a different Mortgagee/beneficiary; and, if the Deed of Trust is not itself a legally enforceable instrument, there can be no valid foreclosure on the homeowners' property.

No Entity can be a creditor if it does not hold/own the asset in question (i.e. the NOTE and/or the property); a Mortgage Pass Through Trust (i.e. R.E.M.I.C., as defined in Title 26, Subtitle A, Chapter 1, Subchapter M, Part II §§ 850-862) cannot hold assets, for if they do, their tax exempt status is violated and the Trust itself is void ab initio. Therefore, either the Trust has voided its intended Tax Free Status, or the asset is not in fact owned by it.

Since the loan was sold, pooled and turned into a security, the alleged holder can no longer claim that it is a real party of interest, as the original lender has been paid in full.

As has also been shown in the accompanying report, the language of the Trust did not allow for any one participant in the Trust to have actual ownership of the Note. Once the Note was converted into a stock, or stock equivalent, it is no longer a Note. If both the Note and the stock, or stock equivalent, exist at the same time, that is known as double dipping. Double dipping is a form of securities fraud. Once a loan has been securitized, it forever loses its security component (i.e., the Deed of Trust), and the right to foreclose through the Deed of Trust is forever lost.

The Promissory Note has been converted into a stock as a permanent fixture. It is now a stock and governed as a stock under the rules and regulations of the SEC; hence, the requirement for the filings of the registration statements, pooling and servicing agreements, form 424B-5, etc. There is no evidence on Record to indicate that the Deed of Trust was ever transferred concurrently with the purported legal transfer of the Note, such that the Deed of Trust and Note has been irrevocably separated, thus making a nullity out of the purported security in a property, as claimed (Federal Rules of Evidence Rules 901 & 902).

Investigation reveals that this was a securitized loan. But to be controlled by those SEC filings, the true original loan Note and Deed of Trust had to be provided by the Document Custodian certified to have been in possession of them by the closing date. Because it was not, the claim of ownership by the Trust cannot be substantiated and the loan servicing rights are not established at law by agreement.

I supply this report as written testimony and am available for oral testimony.

Dated this _2nd_ day of _August_ , 2014 by:

Selena Nieman
Mortgage Securitization Analyst

On this _2nd_ day of _August_ , 2014, _Selena Nieman_
has signed this document in my presence, and has subscribed and sworn to (or affirmed)
before me, proven to me on the basis of satisfactory evidence to be the person who
appears before me.

Signature _DeeAnn Guthrie_                    (Seal)

DEEANN GUTHRIE
Commission Expires
NOTARY
PUBLIC
12-19-2015
STATE OF WASHINGTON

# EXHIBIT "3"

**Western Progressive, LLC**
**2002 Summit Blvd, Suite 600**
**Atlanta, GA 30319**
**(866) 960-8299**

Date: May 9, 2014

T.S. Number: 2014-00817-CA
Loan Number: 80112733

## DEBT VALIDATION NOTICE

1.  The enclosed document relates to a debt owed to:
    **Ocwen Loan Servicing, LLC**

2.  You may send us a written request for the name and address of the original creditor, if different from the current creditor, and we will obtain and mail the information within thirty (30) days after we receive your written request.

3.  As of **04/25/2014** the total delinquency owed was 10,905.75, because of interest, late charges, and other charges that may vary from day to day this amount will increase until the delinquency has been fully paid. Before forwarding payment please contact the above at the address or phone number listed in order to receive the current amount owed.

4.  As of **05/09/2014**, the amount required to pay the entire debt in full was the unpaid principal balance of 361,000.00, plus interest from **08/01/2013**, late charges, negative escrow and attorney and/or trustee's fees and costs that may have been incurred. The amount will increase daily until the debt has been paid in full. For further information please write to the above listed address or call **(866) 960-8299**

5.  You may dispute the validity of this debt, or any portion thereof, by contacting our office within thirty (30) days after receiving this notice. In that event, we will obtain and mail to you written verification of the debt. Otherwise, we will assume that the debt is valid.

### WE ARE ATTEMPTING TO COLLECT A DEBT, AND ANY INFORMATION
### WE OBTAIN WILL BE USED FOR THAT PURPOSE.

"The state Rosenthal Fair Debt Collection Practices Act and the federal Fair Debt Collection Practices Act require that, except under unusual circumstances, collectors may not contact you before 8 a.m. or after 9 p.m. They may not harass you by using threats of violence or arrest or by using obscene language. Collectors may not use false or misleading statements or call you at work if they know or have reason to know that you may not receive personal calls at work. For the most part, collectors may not tell another person, other than your attorney or spouse, about your debt. Collectors may contact another person to confirm your location or enforce a judgment. For more information about debt collection activities, you may contact the Federal Trade Commission at 1/877/FTC-HELP or www.ftc.gov."



Loan No.: 80112733                                          TS No. 2014-00817-CA

**Dated: April 29, 2014**          Western Progressive, LLC, as agent for beneficiary
                                   C/O 30 Corporate Park Suite 450
                                   Irvine, CA 92606
                                   Beneficiary Phone: 877-596-8580

                                   Tamika Y. Smith, Trustee Sale Assistant

RECORDING REQUESTED BY:

Premium Title of California

WHEN RECORDED MAIL TO:

Western Progressive, LLC

2002 Summit Blvd, Suite 600

Atlanta, GA 30319

Doc #: 2014-042513
05/01/2014 08:00:45 AM
Page 1 of 5    Fee: $34.00
Kenneth W. Blakemore
San Joaquin County Recorder
Paid By: PREMIUM TITLE TSG

---

| Loan No.: 80112733 | TS No. 2014-00817-CA |
| | APN No.:041-260-12 |

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER
## DEED OF TRUST

**PURSUANT TO CIVIL CODE § 2923.3(a), THE SUMMARY OF INFORMATION REFERRED TO BELOW IS NOT ATTACHED TO THE RECORDED COPY OF THIS DOCUMENT BUT ONLY TO THE COPIES PROVIDED TO THE TRUSTOR.**

NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED
注：本文件包含一个信息摘要
참고사항: 본 첨부 문서에 정보 요약서가 있습니다
NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACION DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY

## IMPORTANT NOTICE
**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property.   No sale date may be set until approximately 90 days from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is **10,848.75** as of **04/25/2014** ,and will increase until your account becomes current.   While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage.   If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing.   In addition, the beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.



Loan No.: 80112733                                    TS No. 2014-00817-CA

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than three months after this notice of default is recorded) to, among other things. (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

**To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:**

**Ocwen Loan Servicing, LLC HSBC Bank USA, N.A., as Trustee on behalf of ACE Securities Corp. Home Equity Loan Trust and for the registered holders of ACE Securities Corp. Home Equity Loan Trust, Series 2006-HE3, Asset Backed Pass-Through Certificates By Ocwen Loan Servicing, LLC, its attorney in-fact**

C/O Western Progressive, LLC

30 Corporate Park, Suite 450

Irvine, California 92606

Beneficiary Phone: 877-596-8580

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure. **Remember, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.**

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

NOTICE IS HEREBY GIVEN: That Western Progressive, LLC is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary under a Deed of Trust dated 02/01/2006, executed by, **Thomas Benson And Marcella Benson, Husband And Wife, As Joint Tenants.,** as Trustor, to secure certain obligations in favor of ENCORE CREDIT CORP, A CALIFORNIA CORPORATION, A CORPORATION, AS LENDER, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS BENEFICIARY., recorded 02/09/2006 , as Instrument No. 2006-032215 , in Book ---, Page — , of Official Records in the Office of the Recorder of San Joaquin County, **California** describing land therein as: **As more particularly described on**

Loan No.: 80112733                                    TS No. 2014-00817-CA

said Deed of Trust.

Street Address or other common designation of real property:    **736 North Golden Avenue, Lodi, CA 95240**

The subject obligation includes **ONE NOTE(S) FOR THE ORIGINAL** sum of 361,000.00. A breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of the following:

**Installment of Principal and Interest plus impounds and/or advances which became due on 09/01/2013 plus late charges, and all subsequent installments of principal, interest, balloon payments, plus impounds and/or advances and late charges that become payable.**
**You are responsible to pay all payments and charges due under the terms and conditions of the loan documents which come due subsequent to the date of this notice, including, but not limited to, foreclosure trustee fees and costs, advances and late charges.**
**Furthermore, as a condition to bring your account in good standing, you must provide the undersigned with written proof that you are not in default on any senior encumbrance and provide proof of insurance.**
**Nothing in this notice of default should be construed as a waiver of any fees owing to the beneficiary under the deed of trust, pursuant to the terms and provisions of the loan documents.**

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

"See Attached Declaration"

WE ARE ASSISTING THE BENEFICIARY TO COLLECT A DEBT AND ANY INFORMATION WE OBTAIN WILL BE USED FOR THE PURPOSE BY EITHER OURSELVES OR THE BENEFICIARY, WHETHER RECEIVED ORALLY OR IN WRITING. YOU MAY DISPUTE THE DEBT OR A PORTION THEREOF WITHIN THIRTY (30) DAYS. THEREAFTER WE WILL OBTAIN AND FORWARD TO YOU WRITTEN VERIFICATION THEREOF. SHOULD YOU NOT DO
SO, THE DEBT WILL BE CONSIDERED VALID. IN ADDITION, YOU MAY REQUEST THE NAME AND ADDRESS OF THE ORIGINAL CREDITOR IF DIFFERENT FROM THE CURRENT ONE.

**2. The mortgage servicer has exercised due diligence to contact the borrower pursuant to California Civil Code § 2923.55(f) to "assess the borrower`s financial situation and explore options for the borrower to avoid foreclosure." Thirty (30) days, or more, have passed since these due diligence requirements were satisfied.**



## California Declaration of Compliance
### (Civ. Code § 2923.55(c))

Borrower(s):   Thomas Benson
                        Marcella Benson
Loan No.:      80112733

The undersigned declares as follows:

I am employed by the undersigned mortgage servicer, and I have reviewed its business records for the borrower's loan, including the borrower's loan status and loan information, to substantiate the borrower's present loan default and the right to foreclose. The information set forth herein is accurate, complete and supported by competent and reliable evidence that I have reviewed in the mortgage servicer's business records. Those records reflect *one* of the following.

☐   The mortgage servicer contacted the borrower to assess the borrower's financial situation and to explore options for the borrower to avoid foreclosure as required by California Civil Code § 2923.55. Thirty days, or more, have passed since the initial contact was made.

☑   The mortgage servicer has exercised due diligence to contact the borrower pursuant to California Civil Code § 2923.55(f) to "assess the borrower's financial situation and explore options for the borrower to avoid foreclosure." Thirty (30) days, or more, have passed since these due diligence requirements were satisfied.

☐   The mortgage servicer was not required to comply with California Civil Code § 2923.55 because the individual does not meet the definition of a "borrower" under Civil Code §2920.5(c).

☐   The mortgage servicer was not required to comply with California Civil Code § 2923.55 because the above-referenced loan is not secured by a first lien mortgage or deed of trust that secures a loan on "owner-occupied" residential real property as defined by California Civil Code § 2924.15(a)

Signed and Dated:

By: Ocwen Loan Servicing, LLC, as Servicer for HSBC Bank USA, N.A., as Trustee on behalf of ACE Securities Corp. Home Equity Loan Trust and for the registered holders of ACE Securities Corp. Home Equity Loan Trust, Series 2006-HE3, Asset Backed Pass-Through Certificates

**Matthew Owens**   Contract Management Coordinator        
Print Name                                                                Signature                            Date



Summary of Notice of Default

NOTICE OF DEFAULT

SUMMARY OF KEY INFORMATION

The attached notice of default was sent to , Thomas Benson And Marcella Benson, Husband And Wife, As Joint Tenants. ,in relation to 736 North Golden Avenue, Lodi, CA 95240.

This property may be sold to satisfy your obligation and any other obligation secured by the deed of trust or mortgage that is in default. Thomas Benson And Marcella Benson, Husband And Wife, As Joint Tenants. has, as described in the notice of default, breached the mortgage or deed of trust on the property described above.

IMPORTANT NOTICE: IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION, and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until approximately 90 days from the date the attached notice of default may be recorded (which date of recordation appears on the notice).

This amount is $ 361,000.00  as of 05/09/2014  and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than three months after this notice of default is recorded) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

Ocwen Loan Servicing, LLC HSBC Bank USA, N.A., as Trustee on behalf of ACE Securities Corp. Home Equity Loan Trust and for the registered holders of ACE Securities Corp. Home Equity Loan Trust, Series 2006-HE3, Asset Backed Pass-Through Certificates, By Ocwen Loan Servicing, LLC, its attorney-in-fact.

C/O Western Progressive, LLC
2002 Summit Blvd, Suite 600
Atlanta, GA 30319
Beneficiary Phone: 877-596-8580

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.



Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.

Remember, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

If you would like additional copies of this summary, you may obtain them by calling (866) 960-8299.